# 25-296(L)

**25-302(CON), 25-333(CON)**

*To Be Argued By*:
PAUL M. MONTELENI

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**Docket Nos. 25-296(L), 25-302(CON), 25-333(CON)**

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NADINE MENENDEZ, JOSE URIBE,

*Defendants,*

WAEL HANA, FRED DAIBES, ROBERT MENENDEZ,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA


JAY CLAYTON,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

PAUL M. MONTELEONI,
CATHERINE GHOSH,
ELI J. MARK,
LARA POMERANTZ,
DANIEL C. RICHENTHAL,
NATHAN REHN,
*Assistant United States Attorneys,*
CHRISTINA A. CLARK,
*Special Assistant United States Attorney, Of Counsel*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. The Government's Case . . . . . . . . . . . . . . . . 4

1. Acts to Benefit Egypt and Hana . . . . . . 5

a. Promises of Egyptian Aid and Promises of a Job for Nadine Menendez. . . . . . . . . . . . . . . . . . . . . 6

b. Menendez's Attempt to Protect Hana's Monopoly and Hana's Payments to Nadine Menendez from that Monopoly . . . . . . . . . . . . . . . . . 9

c. Additional Acts on Behalf of Egypt and Things of Value . . . . . . . . . . . 12

2. Acts to Benefit Uribe and Uribe's Associates . . . . . . . . . . . . . . . . . . . . . . . 13

a. Menendez's Intervention in the Elvis Parra Prosecution and Hana's Promise of the Convertible . . . . . . 14

b. Menendez's Intervention into the Peguero Investigation and Uribe's Provision of the Convertible . . . . . 15

3. Acts to Benefit Daibes and Qatar . . . . 18

PAGE

a. Menendez's Attempts to Influence Daibes's Prosecution by Recommending a U.S. Attorney Candidate . . . . . . . . . . . . . . . . . . . 18

b. Menendez's Attempts to Influence Daibes's Prosecution Following Sellinger's Confirmation. . . . . . . . 20

c. Menendez's Attempts to Induce a Qatari Firm to Invest with Daibes 23

4. Obstruction of the Grand Jury's Investigation . . . . . . . . . . . . . . . . . . . . 24

B. The Defense Cases . . . . . . . . . . . . . . . . . . 27

ARGUMENT:

POINT I—The Speech or Debate Clause Does Not Entitle any Defendant to a New Trial . . . . . . . 28

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 29

1. Protection for Legislative Acts . . . . . . 29

2. Legislative Factfinding . . . . . . . . . . . . 32

3. Determining Whether an Act is Legislative . . . . . . . . . . . . . . . . . . . . . 35

4. The Speech or Debate Privilege is Invocable Only by the Senator or the Senator's Aide . . . . . . . . . . . . . . . . . . . 37

PAGE

5. Legislative-Act Evidence is Subject to Harmless-Error Analysis . . . . . . . . . . 39

6. Plain Error . . . . . . . . . . . . . . . . . . . . . . 44

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 44

1. Menendez's Recommendation of Sellinger for Nomination Was Not a Legislative Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2. Menendez's Promise to Approve a Foreign Military Sale Was Not a Past Legislative Act . . . . . . . . . . . . . . . . . . . 55

3. Menendez's Discussions of Which Acts to Perform in Exchange for Bribes Were Not Legislative Factfinding . . . . . . . . . . . . 61

4. Daibes's Request that Menendez Advance a Senate Resolution Was Not a Legislative Act . . . . . . . . . . . . . . . . . . . 65

5. Evidence of Foreign Military Financing Did Not Show any Legislative Act . . . 67

6. Menendez Did Not Conduct "Diplomacy," Which Is Not a Legislative Act . . . . . . 69

7. Extra-Record Matter Accidentally Loaded on the Jury's Laptop Was Not Seen or Understood and Did Not Prejudice Any Defendant . . . . . . . . . . . . . . . . . . . . . . 71

a. Relevant Facts. . . . . . . . . . . . . . . . 71

PAGE

b. Applicable Law . . . . . . . . . . . . . . . 73

c. Discussion . . . . . . . . . . . . . . . . . . . 76

i. The District Court Did Not Err in Finding No Reasonable Possibility that Any Juror Saw Any Extra-Record Material . . 76

ii. The District Court Did Not Err in Finding No Reasonable Possibility that Any Extra-Record Material Caused Prejudice Even if Seen . . . . . . 81

iii. The Defendants Forfeited Their Objections to the Jury Laptop . . . . . . . . . . . . . . . . . . . 84

8. Any Error Related to the Speech or Debate Clause Would Have Been Harmless . . . . . . . . . . . . . . . . . . . . . . 86

POINT II—The Jury Was Properly Instructed . . . . 97

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 97

1. The Official Act Instruction . . . . . . . . 97

2. The *Quid Pro Quo* Instruction . . . . . . 98

B. Applicable Law . . . . . . . . . . . . . . . . . . . . 100

1. Review of Jury Instructions . . . . . . . 100

PAGE

2. The Official Act and *Quid Pro Quo* Requirements . . . . . . . . . . . . . . . . . . . 101

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 104

1. Menendez's Challenge to the Official Act Instruction is Meritless . . . . . . . . . . . 104

2. Hana's Challenge to the Quid Pro Quo Instruction is Meritless . . . . . . . . . . . 106

POINT III—The Evidence Was Sufficient . . . . . . . 109

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 109

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 111

1. The Evidence Proved the Counts Related to Egypt . . . . . . . . . . . . . . . . 111

a. The Evidence Showed Official Acts . . . . . . . . . . . . . . . . . 111

b. The Evidence Showed a *Quid Pro Quo* . . . . . . . . . . . . . . 116

2. The Evidence Proved the Counts Related to New Jersey State Criminal Matters . . . . . . . . . . . . . . . . 123

a. The Evidence Showed Official Acts . . . . . . . . . . . . . . . . . 123

b. The Evidence Showed a *Quid Pro Quo* . . . . . . . . . . . . . . 128

PAGE

3. The Evidence Proved the Counts Related to Daibes's Federal Prosecution and Qatar . . . . . . . . . . . . 130

    a. The Evidence Showed Official Acts . . . . . . . . . . . . . . . . . . 130

    b. The Evidence Showed a *Quid Pro Quo* . . . . . . . . . . . . . . 133

4. The Evidence Proved Obstruction of Justice . . . . . . . . . . . . . . . . . . . . . . . . . 136

    a. Applicable Law . . . . . . . . . . . . . . 136

    b. The Evidence Showed an Intent to Obstruct the Daibes Federal Prosecution . . . . 138

    c. The Evidence Showed an Endeavor to Obstruct the Grand Jury Investigation . . . . . . 138

5. The Evidence Proved Venue Was Proper . . . . . . . . . . . . . . . . . . . . . 141

    a. Applicable Law . . . . . . . . . . . . . . 141

    b. Discussion . . . . . . . . . . . . . . . . . . 143

        i. Substantive Counts Related to Egypt (Counts 5, 6, 7, 8, 16) . . . . . . 143

PAGE

ii. Substantive Counts Related to the New Jersey Attorney General's Office (Counts 9 and 10) . . . . . . . . . 152

iii. Substantive Counts Related to Daibes's Federal Prosecution and Qatar (Counts 11, 12, 13, 14) . . . . . 155

iv. Corruption Conspiracy Counts (Counts 1, 2, 3) . . . . . . . . . . . 158

v. Conspiracy Count Related to Daibes's Federal Prosecution (Count 4) . . . . . . . . . . . . . . . . 160

POINT IV—Section 219 Is Constitutional . . . . . . . 161

POINT V—The District Court Properly Admitted Summary Charts and Testimony . . . . . . . . . . 167

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 167

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 168

POINT VI—Hana's Forfeiture Order Was Proper . 171

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 171

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 172

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

PAGE

## TABLE OF AUTHORITIES

*Cases*:

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) . . . . . . . . . . . . . . . . 167

*Arizona v. Fulminante*,
499 U.S. 279 (1991). . . . . . . . . . . . . . 41, 42, 89, 90

*Att'y Gen. of U.S. v. Irish N. Aid Committee*,
668 F.2d 159 (2d Cir. 1982) . . . . . . . . . . . 165, 166

*Barton v. Barr*,
590 U.S. 222 (2020). . . . . . . . . . . . . . . . . . . . . . . . 49

*Bastien v. Office of Senator Ben Nighthorse Campbell*,
390 F.3d 1301 (10th Cir. 2004) . . . . . . . . . . . . . . . 34

*Bibbins v. Dalsheim*,
21 F.3d 13 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . 75

*Biden v. Texas*,
597 U.S. 785 (2022). . . . . . . . . . . . . . . . . . . . . . . 113

*Blackburn v. State of Ala.*,
361 U.S. 199 (1960). . . . . . . . . . . . . . . . . . . . . . . . 42

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973). . . . . . . . . . . . . . . . . . . . . . . 167

*Carroll v. Trump*,
No. 24-644, 2025 WL 2585964
(2d Cir. Sep. 8, 2025) . . . . . . . . . . . . . . . . . . . . . . 91

*Chambers v. Maroney*,
399 U.S. 42 (1970). . . . . . . . . . . . . . . . . . 42, 55, 89

PAGE

*City of Columbia v. Omni Outdoor Advert.*,
499 U.S. 365 (1991) . . . . . . . . . . . . . . . . . . . . . . . 115

*Doe v. McMillan*,
412 U.S. 306 (1973) . . . . . . . . . . . . . . . . . . . . *passim*

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975) . . . . . . . . . . . . . . . . . 32, 52, 67

*Edmond v. United States*,
520 U.S. 651 (1997) . . . . . . . . . . . . . . . . . 46, 47, 51

*Evans v. United States*,
504 U.S. 255 (1992) . . . . . . . . . . . . . . . . . . . . *passim*

*Fagiola v. Nat'l Gypsum Co.*,
906 F.2d 53 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 168

*Favors v. Cuomo*,
No. 11 Civ. 5632 (DLI)(RR)(GEL), 2013 WL
11319831 (E.D.N.Y. Feb. 8, 2013) . . . . . . . . . 38, 54

*Fields v. Office of Eddie Bernice Johnson*,
459 F.3d 1 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . 37

*Forrester v. White*,
484 U.S. 219 (1988) . . . . . . . . . . . . . . . . . . . 31, 164

*Fulton County Special Purpose Grand Jury v. Graham*,
No. 22-12696-DD, 2022 WL 13682659
(11th Cir. Oct. 20, 2022) . . . . . . . . . . . . . . . . . . . . 37

*Gov't of Virgin Islands v. Lee*,
775 F.2d 514 (3d Cir. 1985) . . . . . . . . . . . . . . . . . 36

PAGE

*Gravel v. United States*,
408 U.S. 606 (1972). . . . . . . . . . . . . . . . . . . . *passim*

*Greer v. United States*,
593 U.S. 503 (2021). . . . . . . . . . . . . . . . . 40, 41, 44

*Hamer v. Neighborhood Housing Services of Chicago*,
583 U.S. 17 (2017). . . . . . . . . . . . . . . . . . . . . . 74, 85

*Hoffer v. Tellone*,
128 F.4th 433 (2d Cir. 2025) . . . . . . . . . . . . . . . . 80

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979). . . . . . . . . . . . . . . . . . . . *passim*

*In re Sealed Case*,
80 F.4th 355 (D.C. Cir. 2023). . . . . . . . . . . . . 34, 51

*INS v. Chadha*,
462 U.S. 919 (1983). . . . . . . . . . . . . . . . . . . . . . . . 58

*Johnson v. United States*,
520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . 41, 89

*Jud. Watch, Inc. v. Schiff*,
998 F.3d 989 (D.C. Cir. 2021). . . . . . . . . . . . . . . . 61

*Jud. Watch, Inc. v. U.S. Secret Serv.*,
726 F.3d 208 (D.C. Cir. 2013). . . . . . . . . . . . . . . 162

*Kastigar v. United States*,
406 U.S. 441 (1972). . . . . . . . . . . . . . . . . . . . . . . . 37

*Loughrin v. United States*,
573 U.S. 351 (2014). . . . . . . . . . . . . . . . . . . . . . . . 76

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013). . . . . . . . . . . . . . . . . . . . . . . . 48

PAGE

*McDonnell v. United States*,
579 U.S. 550 (2016). . . . . . . . . . . . . . . . . . . . . *passim*

*McSurely v. McClellan*,
553 F.2d 1277 (D.C. Cir. 1976). . . . . . . . . . . . 30, 35

*Miranda v. Arizona*,
384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . 42

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012). . . . . . . . . . . . . . . . . . . . . . . 163

*New York v. United States*,
505 U.S. 144 (1992). . . . . . . . . . . . . . . . . . . . . . . 163

*Nunes v. NBCUniversal Media, LLC*,
No. 22 Civ. 1633 (PKC) (SN), 2024 WL 1500945
(S.D.N.Y. Mar. 19, 2024) . . . . . . . . . . . . 38, 54, 66

*Parker v. Levy*,
417 U.S. 733 (1974). . . . . . . . . . . . . . . . . . . . . . . 167

*Percoco v. United States*,
598 U.S. 319 (2023). . . . . . . . . . . . . . . . . . . . . . . 122

*Pope v. Illinois*,
481 U.S. 497 (1987). . . . . . . . . . . . . . . . . . . . . 42, 89

*Puckett v. United States*,
556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . 44, 86

*Ramirez v. United States*,
898 F. Supp. 2d 659 (S.D.N.Y. 2012). . . . . . . . . 151

*Schlup v. Delo*,
513 U.S. 298 (1995). . . . . . . . . . . . . . . . . . . . . . . . 78

PAGE

*SEC v. Alpine Secs. Corp.*,
354 F. Supp. 3d 396 (S.D.N.Y. 2018) . . . . 168, 169

*Snyder v. United States*,
603 U.S. 1 (2024) . . . . . . . . . . . . . . . . 117, 118, 119

*Texas v. Holder*,
No. 12 Civ. 128 (DST, RMC, RLW), 2012 WL 13070060 (D.D.C. June 5, 2012) . . . . . . . . . . . . . 67

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) . . . . . . . . . . . . . . . . . . . . . . . . 52

*Trump v. United States*,
603 U.S. 593 (2024) . . . . . . . . . . . . . . . . . . . . . . . . 91

*U.S. Football League v. NFL*,
842 F.2d 1335 (2d Cir. 1988) . . . . . . . . . . . . . 38, 54

*United States v. Abbas*,
100 F.4th 267 (1st Cir. 2024) . . . . . . . . . . . . . . . 157

*United States v. Abou-Khatwa*,
40 F.4th 666 (D.C. Cir. 2022) . . . . . . . . . . . . . . . 170

*United States v. Aguilar*,
515 U.S. 593 (1995) . . . . . . . . . . . . . . 137, 138, 139

*United States v. Aiello*,
118 F.4th 291 (2d Cir. 2024) . . . . . . . . . . . . . . . . 96

*United States v. Allocco*,
305 F.2d 704 (2d Cir. 1962) . . . . . . . . . . . . . . . . . 50

*United States v. Al-Sadawi*,
432 F.3d 419 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 94

PAGE

*United States v. Anderson*,
509 F.2d 312 (D.C. Cir. 1974). . . . . . . . . . . . . . . . . 65

*United States v. Archer*,
977 F.3d 181 (2d Cir. 2020) . . . . . . . 169, 171, 172

*United States v. Bailey*,
743 F.3d 322 (2d Cir. 2014) . . . . . . . . . . . . . . . 92, 94

*United States v. Baker*,
923 F.3d 390 (5th Cir. 2019) . . . . . . . . . . . . . . . . 170

*United States v. Basciano*,
No. 03 Cr. 929 (NGG), 2007 WL 29439
(E.D.N.Y. Jan. 4, 2007). . . . . . . . . . . . . . . . . . . . . 174

*United States v. Benally*,
187 F.3d 649 (Table), 1999 WL 451013
(9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States v. Benjamin*,
95 F.4th 60 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . 120

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988) . . . . . . . . . . . . . . *passim*

*United States v. Blackwood*,
366 F. App'x 207 (2d Cir. 2010) . . . . . . . . . . . . . 167

*United States v. Boruch*,
550 F. App'x 30 (2d Cir. 2013) . . . . . . . . . 151, 154

*United States v. Bouchard*,
828 F.3d 116 (2d Cir. 2016) . . . . . . . . . . . . . . . . 156

*United States v. Boyland*,
862 F.3d 279 (2d Cir. 2017) . . . . . . . 103, 126, 127

PAGE

*United States v. Bray*,
139 F.3d 1104 (6th Cir. 1998) . . . . . . . . . . . . . . 169

*United States v. Brewster*,
408 U.S. 501 (1972). . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Bruno*,
661 F.3d 733 (2d Cir. 2011) . . . 120, 123, 134, 136

*United States v. Burke*,
No. 19 Cr. 322, 2024 WL 3090277
(N.D. Ill. June 21, 2024) . . . . . . . . . . . . . . . . . . 115

*United States v. Calk,*
No. 19 Cr. 366 (LGS), 2022 WL 101908
(S.D.N.Y. Jan. 11, 2022) . . . . . . . . . . 121, 133, 145

*United States v. Calk*,
87 F.4th 164 (2d Cir. 2023) . . . . . . . 121, 148, 149

*United States v. Camporeale*,
515 F.2d 184 (2d Cir. 1975) . . . . . . . . . . 74, 84, 85

*United States v. Carr*,
880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . . . . 100

*United States v. Carson*,
464 F.2d 424 (2d Cir. 1972) . . . . . . . . . . . . . . . . 114

*United States v. Cesiro*,
No. 23-6649, 2024 WL 4647667
(2d Cir. Nov. 1, 2024) . . . . . . . . . . . . . . . . . . . 79, 80

*United States v. Cioffi*,
493 F.2d 1111 (2d Cir. 1974) . . . . . . . . . . . . . . . 137

PAGE

*United States v. Citron*,
783 F.2d 307 (2d Cir. 1986) . . . . . . . . . . . 168, 169

*United States v. Collymore*,
61 F.4th 295 (2d Cir. 2023) . . . . . . . . . . . . . . . . 165

*United States v. Colon-Munoz*,
192 F.3d 210 (1st Cir. 1999) . . . . . . . . . . . . . . 42, 90

*United States v. Coney*,
76 F.4th 602 (7th Cir. 2024) . . . . . . . . . . . . . . 76, 79

*United States v. Conlin*,
551 F.2d 534 (2d Cir. 1977) . . . . . . . . . . . . . . . . 170

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . 110, 127

*United States v. Corrado*,
227 F.3d 543 (6th Cir. 2000) . . . . . . . . . . . . . . . 174

*United States v. Cuti*,
720 F.3d 453 (2d Cir. 2013) . . . . . . . . . . . . . . . . 110

*United States v. Davis*,
689 F.3d 179 (2d Cir. 2012) . . . . . . . . . . . . . *passim*

*United States v. Desinor*,
525 F.3d 193 (2d Cir. 2008) . . . . . . . . . . . . . . . . 106

*United States v. Dowdy*,
479 F.2d 213 (4th Cir. 1973) . . . . . . . . . . . . *passim*

*United States v. Espaillet*,
380 F.3d 713 (2d Cir. 2004) . . . . . . . . . . . . . . . . 110

*United States v. Estes*,
793 F.2d 465 (2d Cir. 1986) . . . . . . . . . . . . . . . . . 88

PAGE

*United States v. Facen*,
812 F.3d 280 (2d Cir. 2016) . . . . . . . . . . . . . . . . 110

*United States v. Falcón-Nieves*,
79 F.4th 116 (1st Cir. 2023) . . . . . . . . . . . . . . . . 144

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 75

*United States v. Fassnacht*,
332 F.3d 440 (7th Cir. 2003) . . . . . . . . . . . . . . . 140

*United States v. Freidel*,
124 F.2d 515 (2d Cir. 1941) . . . . . . . . . . . 137, 138

*United States v. Friedman*,
854 F.2d 535 (2d Cir. 1988) . . . . . . . . . . . . . . . . 120

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007) . . . . . . . 144, 155, 156

*United States v. Gansman*,
657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 101

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . . . . 172

*United States v. Gentile*,
No. 21 Cr. 54 (RPK) (PK), 2024 WL 3046193
(E.D.N.Y. June 18, 2024) . . . . . . . . . . . . . 168, 169

*United States v. Georgiton*,
No. 23-6807, 2025 WL 1091253
(2d Cir. Apr. 8, 2025) . . . . . . . . . . . . . . . . . . . . . 158

PAGE

*United States v. Gilbert*,
No. 17 Cr. 419 (AKK) (TMP), 2018 WL 2095853
(N.D. Ala. May 4, 2018) . . . . . . . . . . . . . . . . . . . 115

*United States v. Greenberg*,
835 F.3d 295 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 80

*United States v. Gross*,
No. 15 Cr. 769 (AJN), 2017 WL 4685111
(S.D.N.Y. Oct. 18, 2017) . . . . . . 144, 145, 154, 157

*United States v. Guldi*,
141 F.4th 435 (2d Cir. 2025) . . . . . . . . . . . . . . . . 100

*United States v. Hansen*,
369 F. App'x 215 (2d Cir. 2011) . . . . . . . . . . . . . . . 78

*United States v. Helstoski*,
442 U.S. 477 (1979). . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Hillard*,
701 F.2d 1052 (2d Cir. 1983) . . . . . . . . . . . . . 82, 83

*United States v. Hills*,
27 F.4th 1155 (6th Cir. 2022). . . . . . . . . . . . . . . 136

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020) . . . . . . . 167, 168, 169

*United States v. Hood*,
343 U.S. 148 (1952). . . . . . . . . . . . . . . . . . . . . . . 126

*United States v. Hutcher*,
622 F.2d 1083 (2d Cir. 1980) . . . . . . . . . . . . . . . . 45

PAGE

*United States v. Hwa*,
No. 18-CR-538 (MKB), 2021 WL 11723583
(E.D.N.Y. Sept. 3, 2021) . . . . . . . . . . . . . . . . . . . 153

*United States v. Ianniello*,
866 F.2d 540 (2d Cir. 1989) . . . . . . . . . . . . . . . . . 78

*United States v. Jackson*,
335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . 111

*United States v. James*,
No. 24-849, 2025 WL 2486539
(2d Cir. Aug. 29, 2025) . . . . . . . . . . . . . . . . . . . . . 83

*United States v. Jass*,
569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . 91

*United States v. Jefferson*,
289 F. Supp. 3d 717 (E.D. Va. 2017) . . . . . . . . . 114

*United States v. Jefferys*,
No. 20-3630, 2022 WL 9627085
(2d Cir. Oct. 17, 2022). . . . . . . . . . . . . . . . . . . 74, 78

*United States v. Johnson*,
383 U.S. 169 (1966). . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001) . . . . . . . . . . . . . . . . 154

*United States v. Kimbrew*,
944 F.3d 810 (9th Cir. 2019) . . . . . . . . . . 103, 126

*United States v. Koskerides*,
877 F.2d 1129 (2d Cir. 1989) . . . . . . . . . . . . . . . 171

Case: 25-296, 09/09/2025, DktEntry: 210.1, Page 20 of 202



PAGE

*United States v. Kozeny*,
667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . 109, 138

*United States v. Lasko*,
146 F. App'x 530 (2d Cir. 2005) . . . . . . . . . . . . . 167

*United States v. Lee*,
833 F.3d 56 (2d Cir. 2016) . . . . . . . . . . . . . . *passim*

*United States v. Lee*,
919 F.3d 340 (6th Cir. 2019) . . . . . . . . . . . . *passim*

*United States v. Lee*,
818 F.2d 1052 (2d Cir. 1987) . . . . . . . . . . . . . . . 173

*United States v. Lemire*,
720 F.2d 1327 (D.C. Cir. 1983). . . . . 168, 170, 171

*United States v. Lombardozzi*,
491 F.3d 61 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . 94

*United States v. Mangano*,
128 F.4th 442 (2d Cir. 2025) . . . . . . . . . . . . *passim*

*United States v. Marcus*,
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Masotto*,
73 F.3d 1233 (2d Cir. 1996) . . . . . . . . . . . . . . . . 100

*United States v. McKeon*,
738 F.2d 26 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 140

*United States v. Melgen*,
967 F.3d 1250 (11th Cir. 2020) . . . . . . . . . . . . . 171

*United States v. Menendez*,
720 F. Supp. 3d 301 (S.D.N.Y. 2024) . . . . . . . . . . 45

PAGE

*United States v. Menendez*,
759 F. Supp. 3d 460 (S.D.N.Y. 2024) . . . . . . . . . . . 8

*United States v. Menendez*,
763 F. Supp. 3d 538 (S.D.N.Y. 2025) . . . . . . . . . . 71

*United States v. Menendez*,
831 F.3d 155 (3d Cir. 2016) . . . . . . . . . 37, 60, 162

*United States v. Miller*,
954 F.3d 551 (2d Cir. 2020) . . . . . . . . . . . 167, 168

*United States v. Moran*,
493 F.3d 1002 (9th Cir. 2007) . . . . . . . . . . . . . . 108

*United States v. Murphy*,
642 F.2d 699 (2d Cir. 1980) . . . . . . . . . . . . . . 43, 88

*United States v. Myers*,
635 F.2d 932 (2d Cir. 1980) . . . . . . . . . . . . . *passim*

*United States v. Myers*,
692 F.2d 823 (2d Cir. 1982) . . . . . . . 33, 36, 62, 64

*United States v. Ng Lap Seng*,
934 F.3d 110 (2d Cir. 2019) . . . . . . . . . . . . . . . . 105

*United States v. Nkansah*,
699 F.3d 743 (2d Cir. 2012) . . . . . . . . . . . . . *passim*

*United States v. Olano*,
507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . 74, 85

*United States v. Parnas*,
No. 19 Cr. 725 (JPO), 2022 WL 669869
(S.D.N.Y. Mar. 7, 2022) . . . . . . . . . . . . . . . . . . . 168

PAGE

*United States v. Percoco*,
13 F.4th 180 (2d Cir. 2021) . . . . . . . . . . . . . . . . 121

*United States v. Percoco*,
80 F.4th 393 (2d Cir. 2023) . . . . . . . . . . . . . . . . 122

*United States v. Persico*,
645 F.3d 85 (2d Cir. 2011) . . . . 109, 110, 119, 120

*United States v. Polakoff*,
121 F.2d 333 (2d Cir. 1941) . . . . . . . . . . . 137, 138

*United States v. Raniere*,
55 F.4th 354 (2d Cir. 2022) . . . . . . . . . . . 100, 108

*United States v. Reed*,
773 F.2d 477 (2d Cir. 1985) . . . . . . . . . . . . . . . . 161

*United States v. Reichberg*,
5 F.4th 233 (2d Cir. 2021) . . . . . . . . . . . . . . *passim*

*United States v. Reifler*,
446 F.3d 65 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 94

*United States v. Renzi*,
651 F.3d 1012 (9th Cir. 2011) . . . . . 33, 34, 43, 62

*United States v. Renzi*,
769 F.3d 731 (9th Cir. 2014) . . . . . . . . . . . . . . . . . 30

*United States v. Riggi*,
541 F.3d 94 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 110

*United States v. Rom*,
528 F. App'x 24 (2d Cir. 2013) . . . . . . . . . . . . . . 172

*United States v. Rose*,
28 F.3d 181 (D.C. Cir. 1994). . . . . . . . . . . 162, 164

PAGE

*United States v. Rosen*,
716 F.3d 691 (2d Cir. 2013) . . . . . . . . . . . . . . . . 120

*United States v. Rostenkowski*,
59 F.3d 1291 (D.C. Cir. 1995). . . . . . . . . . . . . . . . 35

*United States v. Rutigliano*,
790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . 110, 142

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 108

*United States v. Salmonese*,
352 F.3d 608 (2d Cir. 2003) . . . . . . . . . . . 158, 159

*United States v. Scarfo*,
41 F.4th 136 (3d Cir. 2022) . . . . . . . . . . . . . . 42, 90

*United States v. Schwarz*,
283 F.3d 76 (2d Cir. 2002) . . . . . . . . . . 74, 78, 137

*United States v. Shepard*,
500 F. App'x 20 (2d Cir. 2012) . . . . . . . . . . . . . . 154

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017) . . . . . . . . . . . . . *passim*

*United States v. Silver*,
948 F.3d 538 (2d Cir. 2020) . . . . . . . . . . . . . *passim*

*United States v. Skelos*,
707 F. App'x 733 (2d Cir. 2017) . . . . . . . . 102, 126

*United States v. Smith*,
198 F.3d 377 (2d Cir. 1999) . . . . . . . . . . . . . . . . 142

PAGE

*United States v. Stasiv*,
No. 19-4286, 2021 WL 4888865
(2d Cir. Oct. 20, 2021). . . . . . . . . . . . . . . . . . . . . . 73

*United States v. Stephenson*,
895 F.2d 867 (2d Cir. 1990) . . . . . . . . . . . . . *passim*

*United States v. Stevenson*,
834 F.3d 80 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 172

*United States v. Suescun*,
237 F.3d 1284 (11th Cir. 2001) . . . . . . . . . . . . . . . 42

*United States v. Sullivan*,
118 F.4th 170 (2d Cir. 2024) . . . . . . . . . . . . . . . . . 95

*United States v. Sutherland*,
921 F.3d 421 (4th Cir. 2019) . . . . . . . . . . . . . . . 140

*United States v. Swindall*,
971 F.2d 1531 (11th Cir. 1992) . . . . . . . . . . . 43, 88

*United States v. Terabelian*,
105 F.4th 1207 (9th Cir. 2024). . . . . . . . . . . . 37, 54

*United States v. Tompkins*,
No. 23-6525, 2024 WL 4645689
(2d Cir. 2024). . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*United States v. Treacy*,
639 F.3d 32 (2d Cir. 2011) . . . . . . . . . . . . . 94, 172

*United States v. Triumph Cap. Grp.*,
544 F.3d 149 (2d Cir. 2008) . . . . . . . . . . . . 95, 139

*United States v. Tropeano*,
252 F.3d 653 (2d Cir. 2001) . . . . . . . . . . . . . . 41, 89

PAGE

*United States v. Tzolov*,
642 F.3d 314 (2d Cir. 2011) . . . . . . . . . . . . . *passim*

*United States v. Urciuoli*,
513 F.3d 290 (1st Cir. 2008) . . . . . . . . . . . . . . . . 116

*United States v. Vasquez*,
267 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . 101, 109

*United States v. Villafuerte*,
502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 44

*United States v. Weiss*,
752 F.2d 777 (2d Cir. 1985) . . . . . . . . . . . . . . . . . 75

*United States v. Wey*,
No. 15 Cr. 611 (AJN), 2017 WL 237651
(S.D.N.Y. Jan. 18, 2017) . . . . . . . . . . . . . . . . . . . 150

*United States v. White*,
552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 100

*United States v. Williams*,
644 F.2d 950 (2d Cir. 1981) . . . . . . . . . . . . . *passim*

*United States v. Williams*,
504 U.S. 36 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) . . . . . . . . 167, 168, 170

*United States v. Yu-Leung*,
51 F.3d 1116 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 45

*United States v. Zheng*,
113 F.4th 280 (2d Cir. 2024) . . . . . . . . . . 123, 134

PAGE

*Vasquez v. Hillery*,
474 U.S. 254 (1986) . . . . . . . . . . . . . . . . . 44, 88, 89

*Victor v. Nebraska*,
511 U.S. 1 (1994) . . . . . . . . . . . . . . . . . . . . . . . . 108

*Weaver v. Massachusetts*,
582 U.S. 286 (2017) . . . . . . . . . . . . . . . . . . . . . 41, 90

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) . . . . . . . . . . . . . . . . . . . . 69, 113

*Statutes, Rules & Other Authorities:*

U.S. Const. art. I, § 6, cl. 1 . . . . . . . . . . . . . . . . . *passim*

U.S. Const. art. II, § 2, cl. 2 . . . . . . . . . . . . . . . . . . . . 46

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . 89

18 U.S.C. § 1503(a) . . . . . . . . . . . . . . . . . . . . . . . . . 136

18 U.S.C. §§ 219 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 161

22 U.S.C. § 611(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . 145

28 U.S.C. § 2461(c) . . . . . . . . . . . . . . . . . . . . . . . . . 172

Fed. R. Crim. P. 30(d) . . . . . . . . . . . . . . . . . . . . . . . 100

Fed. R. Crim. P. 32.2(b)(1)(A) . . . . . . . . . . . . . . . . . 172

Fed. R. Crim. P. 32.2(b)(1)(B) . . . . . . . . . . . . . . . . . 172

Fed. R. Crim. P. 51(b) . . . . . . . . . . . . . . . . . . . . . 44, 86

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . . 101

Fed. R. Evid. 606(b) . . . . . . . . . . . . . . . . . . . . . . 75, 78

PAGE

Daryl J. Levinson & Richard H. Pildes, *Separation of Parties, Not Powers*, 119 Harv. L. Rev. 2311 (2006) . . . . . . . . . . . . 47, 48

Leonard D. White, *The Federalists: A Study in Administrative History* (1948) . . . . . . . . . . . . . . . 49

Letter from George Mason to James Monroe ("Mason Letter") (Jan. 30, 1792), *available at* https://www.consource.org/document/george-mason-to-james-monroe-1792-1-30/ . . . . . . . . . . . . . . . . 47, 48

Senate Historical Office, *Senate Stories: Origins of Senatorial Courtesy* (July 5, 2022), https://www.senate.gov/artandhistory/senate-stories/origins-of-senatorial-courtesy.htm. . . . . . . . . . . . 47

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**Docket Nos. 25-296(L), 25-302(CON), 25-333(CON)**

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NADINE MENENDEZ, JOSE URIBE,

*Defendants,*

WAEL HANA, FRED DAIBES, ROBERT MENENDEZ,

*Defendants-Appellants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Robert Menendez, Wael Hana, and Fred Daibes appeal from judgments of conviction entered on January 31, 2025 in the United States District Court for the Southern District of New York, following a nine-week trial before the Honorable Sidney H. Stein, United States District Judge, and a jury.

Indictment S4 23 Cr. 490 (SHS) (the "Indictment") was filed on March 5, 2024, in eighteen counts. Count

One charged Menendez, Hana, and Daibes with conspiracy to commit bribery, in violation of 18 U.S.C. § 371. Count Two charged Menendez, Hana, and Daibes with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349. Count Three charged Menendez with conspiracy to commit extortion under color of official right, in violation of 18 U.S.C. § 1951. Count Four charged Menendez with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371. Counts Five and Eleven charged Menendez with bribery, in violation of 18 U.S.C. §§ 201(b)(2)(A) and (C), and 2. Count Six charged Hana and Daibes with bribery, in violation of 18 U.S.C. §§ 201(b)(1)(A) and (C), and 2. Count Seven charged Menendez, Hana, and Daibes with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2. Counts Eight, Ten, and Fourteen charged Menendez with extortion under color of official right, in violation of 18 U.S.C. §§ 1951 and 2. Count Nine charged Menendez and Hana with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2. Count Twelve charged Daibes with bribery, in violation of 18 U.S.C. §§ 201(b)(1)(A) and (C), and 2. Count Thirteen charged Menendez and Daibes with honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2. Count Fifteen charged Menendez and Hana with conspiracy for a public official to act as a foreign agent, in violation of 18 U.S.C. § 371. Count Sixteen charged Menendez with being a public official acting as a foreign agent, in violation of 18 U.S.C. §§ 219 and 2. Count Seventeen charged Menendez with conspiracy to obstruct justice, in violation of 18 U.S.C. § 371. Count Eighteen charged

Menendez with obstruction of justice, in violation of 18 U.S.C. §§ 1503 and 2.[1]

Trial commenced on May 13, 2024 and ended on July 16, 2024, when Menendez, Hana, and Daibes were each convicted on all counts in which they were charged.

On January 29, 2025, Judge Stein sentenced Menendez to a term of 60 months' imprisonment on Counts One, Four, and Seventeen; 132 months' imprisonment on Counts Two, Three, Five, Seven through Eleven, Thirteen, and Fourteen; 24 months' imprisonment on Count Sixteen; and 120 months' imprisonment on Count Eighteen, all to run concurrently, 3 years' supervised release, imposed a $1500 special assessment, and ordered forfeiture in the amount of $922,188.10.[2]

On the same date, Judge Stein sentenced Hana to 60 months' imprisonment on Count One and 97 months' imprisonment on Counts Two, Six, Seven and Nine, all to run concurrently, 3 years' supervised release, imposed a $500 special assessment and $1,250,000 fine, and ordered forfeiture in the amount of $125,000.

---

[1] Counts One, Two, Six, Seven, Twelve, and Thirteen included a sentence enhancement, pursuant to 18 U.S.C. § 3147(1), as to Daibes for committing the offenses while on federal bail.

[2] Judge Stein dismissed Count Fifteen, concluding that it was multiplicitous with Count One.

On the same date, Judge Stein sentenced Daibes to 60 months' imprisonment on Count One with a consecutive term of 24 months pursuant to the 18 U.S.C. § 3147(1) enhancement for committing the offense while on bail, as well as 84 months' imprisonment on Counts Two, Six, Seven, Twelve, and Thirteen, and 60 months' imprisonment on Count Four, with all counts to run concurrently, 3 years' supervised release, and imposed a $700 special assessment and $1,750,000 fine.

The District Court and this Court denied all three defendants' motions for bail pending appeal, and the defendants are currently serving their sentences.

## Statement of Facts

### A. The Government's Case

The evidence proved that the defendants engaged in a corrupt scheme with one another and with Menendez's girlfriend and later wife Nadine Menendez, as well as with New Jersey businessman Jose Uribe, to exchange things of value, including money, gold, and a luxury Mercedes-Benz convertible (the "Convertible"), for promised and attempted official acts by Menendez to protect and enrich the bribe-payors and their associates.[3] The Government presented testimony from thirty witnesses, including one of Menendez's Senate staffers; employees of Hana and Daibes; officials

---

[3] Nadine Menendez was also charged in the Indictment, and was separately tried and convicted on April 21, 2025 on all counts in which she was charged.

Menendez attempted to influence; experts in fingerprint, DNA, and cell site location analysis; and Uribe, who testified pursuant to a cooperation agreement.[4] The Government also introduced over 2,500 exhibits, including numerous text messages between the co-conspirators; gold bars and envelopes of cash seized from Menendez's residence; and forensic evidence showing that these valuables originated from Daibes and Hana.

### 1. Acts to Benefit Egypt and Hana

The first major component of the scheme concerned Menendez's promises and actions to benefit Hana and the Government of the Arab Republic of Egypt.[5] The Government of Egypt, during the course of the scheme and after receiving information and promises from Menendez passed through Hana, awarded Hana a lucrative monopoly to certify meat as halal for export from the U.S. to Egypt, and Menendez thereafter intervened with the U.S. Department of Agriculture ("USDA") to protect that monopoly.

---

[4] The Senate by resolution authorized its members and employees to testify and produce evidence in this prosecution. S. Res. 662, 118th Cong. (2024).

[5] This conduct resulted in Menendez's convictions on Counts Five, Eight, and Sixteen, Hana's and Daibes's convictions on Count Six, and all defendants' convictions on Count Seven, and formed one basis for all defendants' convictions on Counts One and Two and Menendez's conviction on Count Three.

### a. Promises of Egyptian Aid and Promises of a Job for Nadine Menendez

The scheme began in early 2018, when Menendez commenced a romantic relationship with Nadine Menendez, who was at the time named Nadine Arslanian. Shortly after her first date with Menendez, Nadine Menendez met with Hana (an Egyptian-American businessman with well-placed Egyptian government contacts) and Andy Aslanian (an attorney representing Egypt) to discuss how her relationship with Menendez could, in Aslanian's words, "result to a good job for" her. (GX-1302 row 30).[6]

Menendez, who at the time held a leadership position on the Senate Foreign Relations Committee ("SFRC"), was influential over matters important to Egypt, such as the large amounts of military aid the U.S. provided to Egypt, including cash grants and arms sales. Menendez's SFRC leadership position gave him the power, under longstanding interbranch practice, to cause the State Department to delay transferring grant money to Egypt through the foreign

---

[6] "Tr." refers to the trial transcript; "GX" and "DX" refer to Government and defense exhibits, respectively; "Br." refers to the brief of the corresponding defendant on appeal; and "A" and "SPA" refer to the appendix and special appendix, respectively, filed with the corresponding defendant's brief. Unless otherwise indicated, quotations omit internal quotation marks, citations, footnotes, and previous alterations.

military financing ("FMF") program. (Tr. 877-78). Specifically, if an SFRC leader such as Menendez communicated to the State Department that he wished to "place a hold" on such grant money—after the money had been appropriated by Congress and was in the State Department's hands to transfer—the State Department would typically not transfer the funds to Egypt until the "hold" was resolved. (Tr. 878-79). With respect to U.S. arms sales to the Egyptian government through the foreign military sales ("FMS") program, Menendez's influence was, if anything, even greater. (Tr. 947). The State Department would generally not proceed with a sale through the FMS program unless the SFRC leaders affirmatively signed off on the sale. (Tr. 890). Hana made sure to highlight Menendez's leadership position, sending Egyptian defense attaché Khalid Shawky information about Menendez's committee assignments shortly after Menendez's first date with Nadine Menendez. (GX-1302 row 34; GX-10G-6).

Over the next several months, Nadine Menendez and Hana arranged a series of meetings between Menendez and Egyptian officials, in which Menendez, in exchange for Hana's promises to pay Nadine Menendez in the form of a job, offered the Egyptian government various forms of assistance, including providing information and promising to approve military aid. Menendez typically texted this information and these promises to Nadine Menendez, who passed it along to Hana, who in turn communicated it to Egyptian officials. On May 7, 2018—the day after meeting with Hana and Nadine Menendez—Menendez sent Hana (through Nadine Menendez) information on the number of Americans and Egyptian local employees

currently stationed at the U.S. Embassy in Cairo. (GX-1302 rows 102-05). Hana then passed this "highly sensitive, nonpublic" information to an Egyptian official named Ahmed Essam. (Menendez SPA-55 (reported as *United States v. Menendez*, 759 F. Supp. 3d 460 (S.D.N.Y. 2024)); *see also* GX-1302 row 127). That same day, Menendez provided Hana, again through Nadine Menendez, information on another Senator's human rights objections to U.S. military aid to Egypt. (GX-1302 row 107). Later in May 2018, Nadine Menendez asked Menendez to adapt a series of bullet points that Hana had sent her, responding to those same objections, into a polished letter. To motivate Menendez, Nadine Menendez explained, "I want to prove a point to the General. He and Will [Hana] just got me clearance for a project." (GX-1302 row 184). Later that day, Menendez sent Nadine Menendez a letter, written in the voice of the Egyptian government, responding to those human rights concerns and advocating for the release of grant money to Egypt. (GX-A403).

Several months later, in July 2018, Menendez attended a meeting and dinner with Shawky—again arranged by Hana and Nadine Menendez—and the next day sent Hana, through Nadine Menendez, a promise to approve a $99 million sale of tank ammunition. (GX-1302 rows 314-23). Hana passed this promise on to Essam and Shawky, and discussed with Shawky who should get credit for it. (GX-1302 rows 324-31).

Throughout this period, Hana was promising Nadine Menendez a paycheck for a no-show-or-low-show job, but was failing to deliver. (*See, e.g.*, GX-1302 row 520 (March 26, 2019 text from Nadine Menendez: "It

has been a year of broken promises by Will to me"); *see also, e.g.*, GX-1302 rows 81, 184, 527, 533).

### b. Menendez's Attempt to Protect Hana's Monopoly and Hana's Payments to Nadine Menendez from that Monopoly

In the spring of 2019, after months of Menendez, through Hana, providing Egypt information and promises, the Government of Egypt awarded Hana a monopoly on the certification of U.S. beef exports to Egypt as halal. After conducting a supposed audit of the existing halal certifiers, the Government of Egypt awarded this monopoly to IS EG Halal Certified Inc., a new company owned by Hana with no experience in halal certification, while withdrawing recognition of multiple existing U.S. halal certifiers. (*See, e.g.*, Tr. 387-89). Because Egypt would not accept imported beef not certified as halal, Hana gained significant monopoly power, which he immediately exploited, increasing certification prices to U.S. exporters more than tenfold. (Tr. 386-88, 408, 500-01).

Both the U.S. Embassy in Cairo and the USDA objected to this monopoly and began a diplomatic campaign to influence Egypt to change course. (Tr. 474-76, 485-86, 1778-80, 1788-91). After formulating a policy position through interagency consultation, the Executive Branch articulated that position in coordinated diplomatic communications to Egypt by the acting U.S. ambassador to Egypt and the USDA Under Secretary for Trade and Foreign Agricultural Affairs Ted

McKinney. (Tr. 390, 470-71, 485-86, 1778-80, 1788-91).

The evidence showed that the defendants believed that Egypt had granted Hana the monopoly as a reward for Menendez's acts and promises during the scheme, which Menendez had performed in exchange for Hana's promise of a well-paying job for Nadine Menendez. In preparation for the audit that led to Egypt's grant of the monopoly, Hana corresponded about the audit with Essam—to whom he had sent Menendez's information about U.S. Embassy staffing and Menendez's promise to approve the tank ammunition sale. (GX-1302 rows 127, 325, 504-07). Nadine Menendez, whom Hana had promised to pay since she began arranging meetings between Menendez and Egyptian officials in early 2018 (*id.* rows 71-72, 520), and whom he had specifically promised to pay through a six-figure job with IS EG Halal (*id.* row 520), texted Menendez on April 8, 2019, which was the day after Egypt had given Hana inside information that he would receive the monopoly, but weeks before it notified the U.S. Government. Her message confirmed their expectation that the promised payments from Hana would now be forthcoming. (*Id.* row 588 ("Seems like halal went through. It might be a fantastic 2019 all the way around."); *see also id.* row 569).

In May 2019, as the USDA's opposition to the monopoly became publicly reported in Egypt, Menendez, at Hana's request, intervened by calling Under Secretary McKinney and admonishing him to stand down. On May 21, 2019, Menendez and Nadine Menendez met with Hana and Egyptian official Ahmed Helmy at

a steakhouse, during which an FBI surveillance team heard Nadine Menendez ask, "What else can the love of my life do for you." (Tr. 2126). The following day, Hana sent Nadine Menendez information about the USDA's opposition to Hana's monopoly. (GX-1302 rows 701, 704). Nadine Menendez passed that information on to Menendez (*id.* rows 722-23), and Menendez called McKinney and told him bluntly, "Stop interfering with my constituent." (Tr. 1799). The call so alarmed McKinney that he directed his staff to reassure Embassy personnel that he had "their back," the only time he had ever done so after a call from a Member of Congress (Tr. 1819-21; *see also* GX-1302 row 743).

Following Menendez's intervention, Hana (with the assistance of Daibes, a business associate of Hana who would go on to share in Hana's monopoly profits through multimillion dollar joint ventures) provided Menendez and Nadine Menendez with a series of things of value. Beginning shortly after Menendez's call, Hana and Menendez prepared for IS EG Halal to pay Nadine Menendez as a supposed consultant, ultimately resulting in Hana issuing three $10,000 checks in the fall of 2019, which Daibes helped deliver. (GX-1302 rows 759, 786, 862, 903, 994-95, 998, 1010, 1099, 1117, 1128). In addition, Hana (urged on by Daibes, whom Nadine Menendez, at Menendez's advice, repeatedly followed up with seeking payment) paid approximately $23,568 to a mortgage company in July 2019 to bring Nadine Menendez's home mortgage payments up to date and help her avoid foreclosure. (*Id.* rows 969-70, 974, 981, 986-87).

### c. Additional Acts on Behalf of Egypt and Things of Value

Menendez continued to provide the Egyptian government various forms of assistance, and continued to receive things of value from Hana, including an elliptical exercise machine, an air purifier, and one-ounce gold bars worth more than $12,000. (GX-1302 rows 1197-98, 1221; GX-7N-2; GX-1F-1087; Tr. 5595). Additionally, several of the envelopes of cash found in Menendez's house bore fingerprints of Hana's associates. (Hana/Daibes A-1837).

Starting in the spring of 2019—around the time Hana received his monopoly—Menendez informed a staffer that he wished to be less publicly critical of Egypt. (Tr. 4511-14). In the spring of 2020, Menendez wrote a letter to the U.S. Secretaries of State and Treasury supporting Egypt's position in international negotiations regarding a dam Ethiopia had built on the Nile River. (*See, e.g.*, Tr. 4535-37). In mid-2021, Menendez met secretly with Abbas Kamel, the head of Egyptian intelligence, and passed the Egyptian government—both directly and through Nadine Menendez—information on questions that his fellow U.S. Senators planned to ask Kamel about reports that Egypt had participated in a human rights abuse (GX-1302 rows 1209-15), so that, in the words of Nadine Menendez, the Egyptian side could "prepare" their "rebuttals" (*id.* row 1220).

In late 2021, Menendez and Nadine Menendez sought to arrange a trip to Egypt directly with Egyptian official Mai Abdelmaguid, whom his staff understood worked for Egyptian intelligence. (Tr. 4543).

This was so irregular that when the State Department found out about the trip, Abdelmaguid told Nadine Menendez "SOS" and feared that Abdelmaguid would "loose [her] job". (GX-1302 row 1233). When Nadine Menendez forwarded this panicked message to Menendez, instead of expressing any confusion at this reaction, he told Nadine Menendez, "Taken care of" (*id.* rows 1234-35) and, several days later, disinvited from the trip the staffer who had alerted the State Department about it. (Tr. 4585). In response, Menendez's SFRC staff director remarked, "All of this Egypt stuff is very weird. I've never seen anything like it." (GX-8F-22; Tr. 4827).

### 2. Acts to Benefit Uribe and Uribe's Associates

The second major component of the scheme was a corrupt *quid pro quo* in which, in exchange for Hana and Uribe giving Nadine Menendez the Convertible, Menendez promised and attempted to disrupt two New Jersey state criminal matters, including by trying to pressure then-New Jersey Attorney General Gurbir Grewal to change how his office was handling the cases.[7]

---

[7] This conduct resulted in Menendez's convictions on Counts Nine and Ten, and Hana's conviction on Count Nine, and formed one basis for their convictions on Count Two and Menendez's conviction on Count Three.

#### a. Menendez's Intervention in the Elvis Parra Prosecution and Hana's Promise of the Convertible

In the spring of 2018, Hana sought to use his connection to Menendez to enrich himself and the Menendezes by brokering a scheme to corruptly influence two New Jersey state criminal proceedings involving associates of his friend Uribe. Hana promised Uribe and others that, in exchange for $200,000 to $250,000 in cash, Menendez would favorably resolve both the criminal prosecution of Elvis Parra, a trucker who had been charged with insurance fraud, and a related investigation of another Parra company that could implicate Parra's insurance broker Phoenix Risk Management LLC ("Phoenix"). (Tr. 2962-69). Phoenix was nominally owned by Ana Peguero, but in fact run by Uribe, who was barred from the insurance industry due to a prior conviction. (Tr. 2937-40). Hana, Uribe, Parra, and Parra's business partner Bienvenido Hernandez agreed to this exchange, with the cash to come from Parra and Hernandez. (Tr. 2969; *see also* GX-1303 row 22 (Uribe to Hana: "The deal is to kill and stop all investigation.")).

In January 2019—after Parra's motions to dismiss his case were denied (GX-1303 rows 78, 88)—Menendez intervened in Parra's case by calling Grewal, the ultimate supervisor of the prosecution team. In preparation for the call, Menendez, through Nadine Menendez, invited Hana and Uribe to a planning meeting, and then, two days later, called Nadine Menendez to request basic identifying details about Parra's case, which Nadine Menendez in turn requested from Hana.

(*Id.* rows 254, 302, 354-73). Following this briefing, Menendez called Grewal and raised Parra's case (identifying it by the name of Parra's defense attorney Michael Critchley), claiming to be concerned that Parra was being treated differently because he was Hispanic. (*Id.* row 379; Tr. 2715-16). Grewal refused to discuss the case with Menendez. (Tr. 2716-17).

Menendez's January call to Grewal was made in exchange for Hana's promises of the Convertible for Nadine Menendez, who had totaled her previous car in an accident. (GX-1303 rows 79-85, 132, 149, 174, 387). Hana—who at this point had not yet obtained his lucrative monopoly—attempted without success to get Daibes to provide the car. (*Id.* rows 386, 390).

**b. Menendez's Intervention into the Peguero Investigation and Uribe's Provision of the Convertible**

Nadine Menendez contacted Uribe on March 12, 2019 and complained about Hana's failure to deliver the promised Convertible. (Tr. 3000-01). On this call and in a follow-up meeting, Uribe learned that Nadine Menendez was aware only of Parra's case and not the related investigation involving Peguero, and he offered to provide the Convertible if Menendez influenced the Peguero investigation as well. (Tr. 3001-03, 3018-19). Later in March, Uribe—while on the phone with Hana—texted Nadine Menendez the contact information for a Mercedes-Benz dealer and then arranged for her to purchase the Convertible there. (*See, e.g.*, GX-1303 rows 521-23, 536-38, 554-64, 576).

Uribe provided Nadine Menendez the down payment for the Convertible by meeting her briefly in a parking lot and handing her $15,000 in cash. (Tr. 3021-22). He then made monthly car payments for Nadine Menendez until the FBI approached him, Menendez, and Nadine Menendez in June 2022. (*See* GX-1303 rows 761-71, 804-16, 1143, 1145; GX-7F-7).

Hana reimbursed a part of Uribe's payments for the Convertible. Uribe learned that Parra and Hernandez had negotiated Hana's initially requested sum down to $150,000, of which they had delivered $125,000. (*See* Tr. 3075-76). After Parra's case was resolved with a noncustodial sentence, Parra and Hernandez met Uribe and Hana in Hana's car and gave Hana $25,000 cash. (Tr. 3077-80). After Parra and Hernandez left, Uribe told Hana that Uribe would take the cash because he was paying for the Convertible, and Hana allowed him to do so. (Tr. 3079-80).

In late July 2019, the New Jersey investigators renewed their attempts to interview Peguero, and Uribe became more urgent in his demands that Menendez disrupt the investigation. After meeting and texting with Nadine Menendez about the need to "move fast" and "stop this" investigation (GX-1303 rows 931-40), Uribe met in August with Nadine Menendez and Menendez, who acknowledged having been asked by Hana to get a better resolution for Parra's case but not the Peguero investigation (Tr. 3100-04; *see also* GX-1303 row 963 (Nadine Menendez to Uribe: "[Menendez] said it would've been so so easy if we had wrapped both together.")). On September 3, 2019, Uribe texted Nadine Menendez, "Please don't forget about me. I will

never forget about you." (GX-1303 row 1017). Menendez called Grewal the next day, summoning Grewal to a meeting in Menendez's New Jersey Senate office. (*Id.* rows 1021, 1042). The night before the meeting, Menendez again met with Uribe, who requested that Menendez do "anything in his power to stop this investigation." (Tr. 3105). At the meeting with Grewal, Menendez reiterated his supposed concern that the defendants represented by Critchley were being treated differently because they were Hispanic. (Tr. 2727-30). Although Grewal again rebuffed him, Menendez met with Uribe later that day and told Uribe that the meeting was positive, although not final. (Tr. 3137-38, 3140-41).

Seeking finality, Uribe followed up repeatedly with Nadine Menendez in September and October 2019, sending texts requesting "peace," code for the termination of the investigation. (GX-1303 rows 1107-08, 1111). After several weeks of such messages, Nadine Menendez spoke to Menendez, who called Uribe and told him "I give you your peace." (Tr. 3144).

The next summer, Menendez went out to dinner with Uribe, Nadine Menendez, and her adult daughter. During the dinner, Menendez secretly texted Nadine Menendez telling her to "go to [the] bathroom," giving Menendez an opportunity—once she and her daughter had left the table—to boast to Uribe, "I saved your ass twice. Not once, but twice," referring to Menendez's interventions with Grewal. (Tr. 3151-52; GX-A101-103).

### 3. Acts to Benefit Daibes and Qatar

The third major component of the scheme was a corrupt *quid pro quo* in which Menendez accepted cash and gold bars from Daibes in exchange for (a) Menendez's promises and attempts to disrupt a pending federal prosecution of Daibes in the District of New Jersey; and (b) Menendez's promise to advance a Senate resolution supporting Qatar, to try to induce a firm with ties to Qatar's government to invest with Daibes.[8]

#### a. Menendez's Attempts to Influence Daibes's Prosecution by Recommending a U.S. Attorney Candidate

In October 2018, Daibes was charged with financial crimes by the U.S. Attorney's Office for the District of New Jersey, and in late 2020, Menendez saw an opportunity to influence that prosecution. With the election of a president of his own political party in 2020, Menendez, as the senior U.S. Senator from New Jersey, sought to use his influence to recommend a U.S. Attorney for the District of New Jersey that he thought he could sway regarding Daibes's case. (Tr. 3873-74, 3878).

---

[8] This conduct resulted in Menendez's convictions on Counts Eleven, Thirteen, and Fourteen, and Daibes's convictions on Counts Twelve and Thirteen, and formed one basis for Menendez's convictions on Counts One through Three and Daibes's convictions on Counts One and Two.

In December 2020, Menendez met with Philip Sellinger, a potential candidate for the U.S. Attorney position. (Tr. 3605-09). During that meeting, Menendez brought up Daibes's case, stating that Daibes was being treated unfairly and that Menendez hoped Sellinger would "look at it carefully" if he became U.S. Attorney. (Tr. 3611-12). This was the only individual case Menendez raised during the meeting. (Tr. 3612).

Following this meeting, Sellinger realized he might have to be recused from Daibes's prosecution because of an unrelated case from Sellinger's private practice, and told Menendez that he would have to disclose the potential conflict to the Justice Department. (Tr. 3623-24). Several hours later, Menendez initiated consideration of Esther Suarez, a different candidate for U.S. Attorney, and one Daibes believed would be favorable to him. (GX-1304 rows 34-40; Menendez A-1676).

In the spring of 2021, after Suarez—who was suffering negative publicity—appeared unlikely to be nominated by the President, Menendez renewed his potential consideration of Sellinger. Menendez's outside political advisor Michael Soliman spoke with Sellinger about the position. (Tr. 3934). Soliman, who was not a lawyer, understood from this conversation that the Justice Department had advised Sellinger that he did not have to be recused from the Daibes prosecution after all, and reported that understanding to Menendez. (Tr. 3935-36).[9] After hearing that, Menendez

---

[9] Although Sellinger testified that he remembered the conversation differently, Sellinger did not communicate directly with Menendez about it, so

recommended that the President nominate Sellinger. (Tr. 3945).

On October 18, 2021, while Sellinger's candidacy for U.S. Attorney was pending, Daibes met with Menendez and Nadine Menendez after their return from a trip to Egypt and Qatar, and gave them at least one one-kilogram gold bar. (GX-1304 rows 166, 171, 176-80).

#### b. Menendez's Attempts to Influence Daibes's Prosecution Following Sellinger's Confirmation

In December 2021, Sellinger was confirmed as U.S. Attorney and recused from Daibes's prosecution, but Menendez nevertheless attempted and promised to influence the prosecution.

Despite knowing Sellinger was recused from Daibes's prosecution, Menendez twice directed Soliman to speak to Sellinger about it. In January 2022, Menendez asked Soliman to ask Sellinger why he had been recused from the case despite having previously stated he would not need to be. (Tr. 3943-44). Instead of carrying out this request, Soliman (for the first time in his over 15-year relationship with Menendez) falsely told Menendez that he had done what Menendez had asked. (Tr. 3945-46). Then in March 2022, Menendez asked Soliman to ask Sellinger to give

---

Soliman's report that Sellinger would not need to be recused was all Menendez heard. (Tr. 3634-35).

Daibes "all due process." (Tr. 3946-47). Soliman did not do so. (Tr. 3949).

Menendez also contacted Sellinger's deputy Vikas Khanna, who, as a result of the recusal, had ultimate supervision over Daibes's prosecution. Menendez first attempted to contact Khanna on January 24, 2022, the same day on which Daibes's driver contacted Nadine Menendez, who then thanked Daibes for "Christmas in January." (GX-1304 rows 233-38). One week later, Menendez again called Khanna, and praised Daibes's counsel. (Tr. 4997). Immediately after this call, Menendez called Daibes to report on it. (GX-1304 rows 242-43). During the same period, Menendez and Daibes jointly called Daibes's counsel—*i.e.*, the attorney Menendez had praised to Khanna—and Menendez admonished that attorney to aggressively lobby Khanna to have the case dismissed. (Menendez A-1678-79).

On March 31, 2022—by which point Daibes's counsel had met with Khanna, was in plea negotiations with the prosecution team, and was optimistic about reaching a disposition—Daibes met Nadine Menendez for lunch. (GX-1304 rows 244, 253, 264-67). Around this time, Daibes provided Nadine Menendez with two one-kilogram gold bars. Following the lunch, Nadine Menendez thanked Daibes profusely and then, the next day, met with jeweler Vasken Khorozian to sell the two one-kilogram gold bars. (GX-1304 rows 269-72; Tr. 5089). Although Nadine Menendez told Khorozian these bars came from her family, the serial numbers of the two one-kilogram gold bars she had photographed right before meeting Khorozian (and after meeting

with Daibes) matched Daibes's gold inventory. (Tr. 5090; GX-B201-1A; GX-3D-6). The purpose of the gold sale, as Daibes was aware, was to pay down Nadine Menendez's existing mortgages in anticipation of purchasing expensive new real estate, which Daibes was also helping Nadine Menendez obtain. (GX-8K-1; GX-1304 rows 256-59, 261-63, 270-72, 280-81, 294-97, 302).

Throughout the same period, Daibes also provided Menendez and Nadine Menendez with numerous envelopes of cash. A June 16, 2022 search of the residence of Menendez and Nadine Menendez, and the safe deposit box of Nadine Menendez, revealed ten envelopes of cash, containing a total of $82,500, which bore Daibes's fingerprints or DNA. (GX-1338).[10] Most of these envelopes were bank envelopes with the annotation "$10,000" handwritten over the flap, which was shut with tape that bore, on its sticky side, Daibes's fingerprints. (Hana/Daibes A-1837; GX-1338; Tr. 2876). At least seven of those envelopes contained at least one bill that was first placed into circulation in or after late 2020. (GX-1338).[11]

Although Daibes reached a plea agreement in the New Jersey prosecution, Menendez nevertheless retaliated against Sellinger for his recusal, refusing to

---

[10] The envelope with Daibes's DNA also bore the fingerprints of Daibes's driver. (Hana/Daibes A-1837).

[11] For the other three envelopes, from the safe deposit box, the FBI's records did not track which bills came from which envelopes. (Tr. 5574).

attend his investiture and stating, "The only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship with the United States Attorney, and you don't." (Tr. 3653).

#### c. Menendez's Attempts to Induce a Qatari Firm to Invest with Daibes

Daibes provided Menendez the cash and gold in exchange for Menendez's promises and attempts not just to influence Daibes's federal prosecution, but also to induce a firm to invest with Daibes. While he was promising and attempting to influence Daibes's federal prosecution, Menendez sought to assist Daibes in obtaining a multimillion-dollar investment from Heritage Advisors Ltd. ("Heritage"), a firm that was run by a member of the Qatari royal family and that boasted of close ties to the Government of Qatar. (*See, e.g.*, GX-1304 rows 60, 91-92).

In exchange for the cash and gold, Menendez promised and attempted a series of steps to induce Heritage to invest with Daibes. Beginning in mid-2021, Menendez made the initial introduction between Heritage's principals and Daibes (GX-1304 rows 90-92, 106-09); urged Heritage to engage in the transaction (*id.* row 219); attended a Manhattan meeting with Daibes and the Emir of Qatar (a relative of one of Heritage's principals) (*id.* rows 141, 144-51, 155, 165; Menendez A-1484); and gave Daibes advance copies of his press releases lauding Qatar, encouraging Daibes to share them with Heritage's principals before their public release (GX-1304 rows 120-27, 133-39). In addition,

Daibes requested that Menendez use his position on the SFRC to advance a formal Senate resolution praising Qatar. Shortly after offering Menendez luxury wristwatches (*id.* rows 160-62) and shortly before delivering him gold bars (*id.* rows 176-80), Daibes sent Menendez a link to a website showing that the resolution had been introduced and was pending before Menendez (*id.* row 164), and several weeks later sent him a screenshot of a website showing that the resolution had attracted an additional cosponsor (*id.* row 189).[12]

In May 2022, Daibes ultimately signed a letter of intent for Heritage to make a multimillion-dollar investment in his business (GX-1304 row 331), and just days later met Menendez and delivered another one-kilogram gold bar (*id.* rows 332-42).

### 4. Obstruction of the Grand Jury's Investigation

Menendez also obstructed the grand jury investigation of his conduct. After receiving subpoenas, he and Nadine Menendez created, and produced in response to a Southern District of New York grand jury subpoena, checks and other documents falsely characterizing Hana's payment of Nadine Menendez's

---

[12] No evidence was introduced regarding whether or not Menendez took any action regarding this resolution, and the identities of the resolution's sponsors and cosponsors were redacted.

mortgage, and Uribe's payments toward the Convertible, as loans.

On June 16, 2022, the FBI seized the cellphones of Menendez, Nadine Menendez, and Uribe pursuant to search warrants, and served each of them with subpoenas issued by a Southern District of New York grand jury. Nadine Menendez then had an associate travel to Uribe's workplace and summon him to her car so that she could arrange an in-person meeting with Uribe. At that meeting, Nadine Menendez said that the subpoenas made her "sick" and asked Uribe what he would say if asked about his payments for the Convertible. (Tr. 3164-65). Uribe responded that he would say the payments were a loan, to which Nadine Menendez said that that "sounds good." (Tr. 3165). In fact, this was a false story Uribe fabricated to "cover up" his "wrongdoings," as he and Nadine Menendez both understood those payments were never intended to be a loan. (Tr. 3165-66).

In December 2022, less than a month after Menendez's Senate office received a subpoena that asked about Nadine Menendez's payments received from Uribe and Hana, Menendez and Nadine Menendez generated a series of checks and documents containing false and misleading statements intended to support the agreed cover story. Menendez wrote Nadine Menendez a check for $23,000, bearing the memo line "for car payment," and she then wrote Uribe a check for $21,000, bearing the memo line "personal loan." (Menendez A-1407-10). This $21,000 was less than the over $33,000 that Uribe had made in monthly payments for the Convertible (GX-1303 row 1143; GX-7F-

7), let alone the approximately $48,000 total amount considering Uribe's $15,000 cash down payment. (Tr. 3021).

Also in December 2022, Menendez and Nadine Menendez generated a similar series of checks and other documents to falsely characterize Hana's payment towards Nadine Menendez's mortgage as a loan. Menendez wrote Nadine Menendez a check for $23,569, bearing the memo line "To Liquidate loan," and she then wrote a check to Hana's attorneys for $23,568.54, bearing the memo line "Full payment of Wael Hana loan." (Menendez A-1402, 1406). Nadine Menendez also handwrote a cover letter to Hana's attorneys, stating that she was enclosing a check in trust for Hana "in full payment of a personal loan he gave me." (Menendez A-1405).

Nadine Menendez produced these checks and other documents to the grand jury pursuant to a subpoena in 2023, and Menendez later dispatched his attorneys to make a presentation to the Southern District of New York prosecutors reinforcing the false statements that had been produced pursuant to the grand jury subpoena. (GX-1409; Menendez A-1416-19). This presentation characterized these checks as repayments of loans from Uribe and Hana, and also: (a) falsely denied that Menendez had been aware of Hana's mortgage payment before June 2022, (b) falsely denied that Menendez had been aware of Uribe's car payment before June 2022, (c) falsely claimed that Uribe had paid only the monthly payments, not the cash down payment, for the Convertible (presumably because Menendez did not believe that the investigators would

find out about Uribe's provision of the cash to Nadine Menendez at the parking-lot meeting), and (d) falsely denied that Menendez had been aware of Hana's $10,000 checks to Nadine Menendez before June 2022. (Menendez A-1416-19).

## B. The Defense Cases

Menendez called five witnesses. His sister and Nadine Menendez's sister both testified about prior occasions on which Menendez and Nadine Menendez had cash or gold, although both admitted that these incidents had been long ago, in the 1970s and 1980s. (Tr. 5777-80, 5822, 5838-40, 5888-90). Menendez also called a forensic accountant who summarized actual and "hypothetical" cash withdrawals from Menendez's accounts (Tr. 5919, 5963-65), although the accountant admitted on cross-examination that his chart contained incorrect figures (Tr. 5971-77), and that the total amounts he calculated were substantially less than the amount of cash found in Menendez's and Nadine Menendez's residence. (Tr. 5982-83). Michael Critchley, who was Parra's criminal defense lawyer, testified about a call he had with Menendez about the case (Tr. 6072), but acknowledged on cross-examination that Menendez did not discuss the facts of the case in the approximately two-minute phone call.

Menendez and Hana jointly called a summary witness to introduce a series of summary charts, which were similar to the Government's principal summary charts, but with additional rows listing defense exhibits. (Tr. 6081-83, 6126-28). On cross-examination, the

witness admitted that the defense charts contained a number of inaccurate entries. (Tr. 6139-43, 6150-54).

Hana called two additional witnesses. The first was an IS EG Halal employee who testified about certain work Nadine Menendez performed (Tr. 6177-84), but admitted that Nadine Menendez's performance was insufficient and yet she had continued to be paid (Tr. 6201-02). The second was an Egyptian government official who testified about the monopoly grant to IS EG Halal (Tr. 6272-77), but admitted on cross-examination that he was not involved in the decision (Tr. 6285).

Daibes did not call any witnesses.

After approximately twelve hours of deliberations over three days, the jury found Menendez, Hana, and Daibes guilty on all counts. (Tr. 7199-208).

# A R G U M E N T

## POINT I

### The Speech or Debate Clause Does Not Entitle any Defendant to a New Trial

The trial complied with the Constitution's Speech or Debate Clause, which does not immunize Members of Congress (much less their co-defendants) for any act they take in or related to their official capacity, but only for "legislative acts." Under settled law, none of the trial evidence referenced a legislative act, and the defendants' claims are contrary to constitutional text, historical practice, and clear precedent. Indeed, this

Court can affirm on the ground that the District Court actually *overprotected* Menendez by precluding evidence of Menendez's attempts to influence the Executive Branch about military aid to Egypt, which are not "legislative acts" for purposes of the Speech or Debate Clause.

Tacitly acknowledging the weakness of their other Speech or Debate claims, the defendants rely heavily on a redaction error the Government discovered and brought to their attention after trial, which caused a handful of the over 3,000 exhibits on the jury laptop to contain a few scattered phrases the District Court had excluded on Speech or Debate grounds. But even if Judge Stein had been correct to exclude this material, his fact-bound findings that it was almost certainly never seen by the jury, would not have been understood if seen, and could not have caused any prejudice even if seen and understood, are entitled to deference by this Court and are manifestly correct.

## A. Applicable Law

### 1. Protection for Legislative Acts

The Speech or Debate Clause (the "Clause"), U.S. Const. art. I, § 6, cl. 1, provides that, "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." The Clause was intended to protect the independence of the legislative branch by limiting inquiry into certain aspects of the legislative process. *See United States v. Helstoski*, 442 U.S. 477, 491 (1979); *United States v. Johnson* ("*Johnson I*"), 383 U.S. 169, 178-79 (1966).

The Supreme Court has given "the Clause a practical rather than a strictly literal reading." *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979). As relevant here, the Clause gives a form of immunity including, where it applies, the protection that "evidence of a legislative act of a Member may not be introduced by the Government" in that Member's prosecution. *Helstoski*, 442 U.S. at 487. Precisely because this immunity is so powerful, it has long been the law that "everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause." *Doe v. McMillan*, 412 U.S. 306, 313 (1973). Rather, consistent with its important—but discrete—purpose, the Clause covers only those acts that are an "integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972).

Such a limitation is critical, lest "Members of Congress" become "super-citizens, immune from criminal responsibility." *United States v. Brewster*, 408 U.S. 501, 516 (1972); *see also, e.g.*, *United States v. Renzi* ("*Renzi II*"), 769 F.3d 731, 736 (9th Cir. 2014) ("Congressmen may write the law, but they are not above the law."). Accordingly, the Supreme Court "has repeatedly insisted that the [ ] Clause is subject to finite limits, refusing to stretch its protective umbrella beyond the legislative sphere to conduct not essential to legislating." *McSurely v. McClellan*, 553 F.2d 1277, 1285 (D.C. Cir. 1976). In short, the Clause "does not

prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions." *Brewster*, 408 U.S. at 528; *see also id.* at 517 (the Clause's "shield does not extend beyond what is necessary to preserve the integrity of the legislative process"); *Forrester v. White*, 484 U.S. 219, 224 (1988) ("the Court has been careful not to extend the scope of [the Clause] further than its purposes require").

That an act is within a Member of Congress's official duties, or could bear on legislation, is not, without more, sufficient. *See, e.g.*, *Brewster*, 408 U.S. at 524 ("[M]any non-legislative activities are an established and accepted part of the role of a Member, and are indeed 'related' to the legislative process."). That is particularly true with respect to a Member of Congress seeking to "influence the Executive Branch." *McMillan*, 412 U.S. at 313; *see also, e.g.*, *Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature. Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity."); *Johnson I*, 383 U.S. at 172 (rejecting contention "that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process").

Only a legislative act *itself*—if it has occurred—is protected, not a promise or agreement to perform such

an act. "Promises by a Member [of Congress] to perform an act in the future are not legislative acts." *Helstoski*, 442 U.S. at 489; *see also id.* at 490 ("[P]rotection extends only to an act that has already been performed. A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.' Likewise, a *promise* to introduce a bill is not a legislative act." (emphasis in original)); *Brewster*, 408 U.S. at 526 (the Clause is not implicated when "the Government need not show any act of [the defendant] subsequent to the corrupt promise for payment," which it need not do to prove bribery, "for it is taking the bribe, not performance of the illicit compact, that is a criminal act").

### 2. Legislative Factfinding

Courts have recognized that the protections of the Clause extend to certain acts of legislative factfinding tied to official congressional business, such as through a legislative subpoena, *see, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505-06 (1975), or a committee-authorized investigation, *e.g.*, *United States v. Dowdy*, 479 F.2d 213, 218, 224-25 (4th Cir. 1973). Similarly, this Court has recognized that "legislative factfinding" on committee-funded trips was protected by the Clause. *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988).

The scope of this protection is limited, however, as the Clause does not cover activities that simply "relate" to the legislative process. *See Brewster*, 408 U.S. at 516 ("Given such a sweeping reading, we have no doubt that there are few activities in which a legislator

engages that he would be unable somehow to 'relate' to the legislative process."). The Supreme Court has noted that "congressional efforts to inform itself through committee hearings are part of the legislative function," but has drawn a clear distinction between this "narrower" sense of fact-finding and one that would include "wide-ranging inquiries by individual Members on subjects of their choice," which are not part of the legislative process. *Hutchinson*, 443 U.S. at 132-33.

Applying these principles, this Court has held that an individual Senator's discussion with third parties of "the possible future performance of legislative functions" is not a legislative act. *United States v. Williams* ("*Williams I*"), 644 F.2d 950, 952 (2d Cir. 1981). Consistent with *Williams I*, the federal courts have uniformly held that Congressmen's conversations with interested parties about what legislative acts they wish to be performed in exchange for bribes are unprotected. *See, e.g.*, *United States v. Myers* ("*Myers I*"), 635 F.2d 932, 937 (2d Cir. 1980) (Clause not violated by indictment for demanding money "for a promise to take . . . official action, including the enactment of private immigration bills"); *United States v. Myers* ("*Myers II*"), 692 F.2d 823, 834, 860 (2d Cir. 1982) (affirming when Congressman testified that Congressman-defendant "told him, in a discussion on the floor of the House of Representatives, about the wealthy Arabs who might need assistance on immigration matters"); *Dowdy*, 479 F.2d at 218, 224 (Congressman's conversations and arrangements with bribe-payors were unprotected, even when the bribe-payors requested particular Congressional actions); *see also, e.g.*, *United*

*States v. Renzi* (“*Renzi I*”), 651 F.3d 1012, 1022-26 (9th Cir. 2011) (rejecting argument that Congressman’s pre-legislative act negotiations were either protected legislative acts or protected fact-finding); *Bastien v. Office of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1316 (10th Cir. 2004) (refusing “to stretch the meaning of ‘Speech or Debate in either House’ to include the everyday task of gathering views and information from constituents and others through informal contacts”); *In re Sealed Case*, 80 F.4th 355, 370 (D.C. Cir. 2023) (rejecting Congressman’s argument that “all communications that may influence a vote are privileged; rather, the proper test is whether such communications are ‘integral’ or ‘essential’ to deliberations or otherwise satisfy the requirements of *Gravel*”).

This rule follows from the Supreme Court’s holding that “an inquiry into the purpose of a bribe does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them.” *Brewster*, 408 U.S. at 526. Instead, “[t]he question is whether it is necessary to inquire into how appellee spoke, how he debated, how he voted, or anything he did *in the chamber or in committee*,” *Brewster*, 408 U.S. at 526 (emphasis added); *see also id.* at 528 (noting that so long as evidence of speech on the House floor was excluded, Member “could not have obtained immunity from prosecution” for related conspiracy “by asserting that the matter being inquired into was related to the motivation for his House speech”); *Renzi I*, 651 F.3d at 1023 (*Brewster* rejected argument “that the prosecution was simply a veiled attempt to inquire as to the motivation for those later ‘legislative acts’ actually performed”).

Put differently, to avoid "render[ing] Members of Congress virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office," *Brewster*, 408 U.S. at 520, activity that is not itself legislative is unprotected, even if its motive for being performed may be to inform or influence legislative acts. *See, e.g.*, *Hutchinson*, 443 U.S. at 130-31 (holding press statements unprotected, even while assuming they "exert some influence on other votes in the Congress and therefore have a relationship to the legislative and deliberative process"). Indeed, while the Clause "recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Gravel*, 408 U.S. at 626; *McSurely*, 553 F.2d at 1288 ("The employment of unlawful means to implement an otherwise proper legislative objective is simply not essential to legislating. As with taking a bribe, resort to criminal or unconstitutional methods of investigative inquiry is no part of the legislative process or function; it is not a legislative act.").

### 3. Determining Whether an Act is Legislative

As the party invoking the privilege, the legislator has the "burden of establishing the applicability of legislative immunity, by a preponderance of the evidence." *United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir. 1995). The test is objective, and the mere fact that a legislator claims the privilege is not determinative. Rather, in determining whether the

privilege applies, courts consider the content and context of the communication to determine whether it was made "in the course of the legislative process." *Myers II*, 692 F.2d at 860. Even remarks made on the floor of Congress may not be protected by the Clause if they do not meet this standard. *Id.* (affirming "introduction into evidence of [Congressman's] private conversations with Congressman Murtha on the floor of the House of Representatives, in which he invited Murtha to join the ranks of those accepting bribes" and noting that "the Speech or Debate Clause accords immunity to what is said on the House floor in the course of the legislative process, not to whispered solicitations to commit a crime"). Thus, when a Congressman claims that a particular act had an "asserted legislative function," this Court examines the act to determine whether it was a legislative act or merely a discussion of the "possible future performance of legislative functions." *Williams I*, 644 F.2d at 952; *see also Myers I*, 635 F.2d at 937.

The purpose of this inquiry is to distinguish between those acts that are necessarily legislative (as to which no further inquiry is appropriate), *see, e.g.*, *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985) (listing examples such as "introducing proposed legislation," "subpoenaing records for committee hearing," "introducing evidence during committee hearings," or "delivering a speech on the floor of the House"), and those acts which may or may not be legislative depending on the particular context and details (as to which courts must determine if the actual conduct is legislative). *See, e.g.*, *id.* (holding that "[p]rivate conversations—even between officials of

governments" must be scrutinized to determine if they are legislative); *United States v. Menendez*, 831 F.3d 155, 168 (3d Cir. 2016) ("We therefore reject Senator Menendez's first argument that the Speech or Debate Clause necessarily protects apparently legislative activity. Courts may dig down to discern if it should be deemed legislative or non-legislative."); *Fulton County Special Purpose Grand Jury v. Graham*, No. 22-12696-DD, 2022 WL 13682659, at *1 (11th Cir. Oct. 20, 2022) ("[E]ven assuming that such informal investigations are covered by the Speech and Debate Clause, courts still must determine whether a legislator's conversation was a protected investigation or an unprotected non-legislative discussion."); *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 17 (D.C. Cir. 2006) (district court must "determine whether the asserted activity is in fact protected by the Speech or Debate Clause").

#### 4. The Speech or Debate Privilege is Invocable Only by the Senator or the Senator's Aide

The Supreme Court held in *Gravel* that the privilege established by the Speech or Debate Clause is "the privilege of the Senator, invocable only by the Senator or by the aide on the Senator's behalf." 408 U.S. at 622. This rule mirrors the rule for other constitutional privileges. For example, evidence derived from a compelled statement is, under *Kastigar v. United States*, 406 U.S. 441, 453 (1972), inadmissible against the speaker but not against others. *See, e.g.*, *United States v. Terabelian*, 105 F.4th 1207, 1221-22 (9th Cir. 2024).

This rule is widely accepted by courts interpreting Speech or Debate Clause and the substantively similar state legislative privilege. *See, e.g.*, *Nunes v. NBCUniversal Media, LLC*, No. 22 Civ. 1633 (PKC) (SN), 2024 WL 1500945, at *2 (S.D.N.Y. Mar. 19, 2024) ("The privilege is invocable only by the Senator or by the aide on the Senator's behalf. . . . Relatedly, a Member may assert only his own privilege; *he may not assert the privilege of others*." (emphasis added)); *Favors v. Cuomo*, No. 11 Civ. 5632 (DLI)(RR)(GEL), 2013 WL 11319831, at *9 (E.D.N.Y. Feb. 8, 2013) ("[T]he [state] legislative privilege is a personal one, which must be asserted by each individual legislator. A legislator is *not permitted to assert the privilege on behalf of another legislator*," citing cases (emphasis added)).

This Court has once, in considering legislative act evidence that was excluded from a trial between private parties on multiple other grounds, opined—without any consideration of *Gravel*—that the evidence would also have been excludable on Speech or Debate grounds. *See U.S. Football League v. NFL*, 842 F.2d 1335, 1374-75 (2d Cir. 1988). This Court, however, has never applied the Speech or Debate Clause as the sole ground for excluding evidence for the benefit of a non-legislator, let alone held that the *remedy* for introducing such evidence is vacating the conviction of anyone other than the legislator in question, which would do precisely what *Gravel* forbids—"relieve others from the operation of otherwise valid . . . criminal laws." 408 U.S. at 621.

### 5. Legislative-Act Evidence is Subject to Harmless-Error Analysis

The introduction of evidence barred by the Speech or Debate Clause is, like most constitutional errors, not a structural error but instead subject to harmless error review. In *Johnson I*, the Supreme Court considered a trial including evidence of a Congressman's speech on the floor of the House of Representatives, and—though the majority and the dissent divided over whether the legislative-act evidence was in fact harmless on certain counts—unanimously endorsed a harmlessness analysis. 383 U.S. at 185. The legislative-act evidence in that case necessitated a new trial on a conspiracy count, *id.*, but the Congressman was also convicted of other counts relating to a conflict of interest, which the Fourth Circuit had ruled were also prejudiced by the evidence of the speech. *See id.* Since the government did not argue before the Supreme Court that the legislative-act evidence was harmless as to those counts, the *Johnson I* majority declined to disturb the Fourth Circuit's "assessment of the record" that the evidence prejudiced the other counts, while accepting that such assessment was appropriate. *Id.* at 185-86 ("In these circumstances we find no occasion to review the Court of Appeals' assessment of the record in this respect."). The *Johnson I* dissenters did assess the record and concluded that the legislative act evidence was harmless, and would have affirmed the conviction on the remaining counts. *Id.* at 188-89. The Supreme Court subsequently confirmed that the *Johnson I* court was unanimous as to the legal standard. *See Brewster*, 408 U.S. at 510-12 (summarizing and quoting majority and dissent, concluding "*Johnson* [*I*]

thus stands as a unanimous holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts."); *see also Helstoski*, 442 U.S. at 487-88 (quoting *Brewster*).

In *United States v. Dowdy*, following *Johnson I*, the Fourth Circuit again considered the introduction of legislative-act evidence at trial, and confirmed that such error could be harmless. *See* 479 F.2d at 227-28 & n.21.[13] The Fourth Circuit relied on the non-structural nature of this error in *Dowdy*, affirming the Congressman's conviction on three counts despite the introduction of legislative-act evidence. *See* 479 F.2d at 228 ("[W]hile we conclude that it might have been preferable for defendant to have been tried on perjury counts six-eight under laboratory conditions which excluded any disclosure of legislative acts, we cannot say that there was sufficient prejudice to defendant by their disclosure to warrant overturning these convictions.").

These holdings are consistent with the ordinary principles of structural error. Most constitutional errors are not structural. *See, e.g.*, *Greer v. United States*, 593 U.S. 503, 513 (2021). That term is reserved for

---

[13] In fact, in *Dowdy*, the Fourth Circuit remarked that the Supreme Court's opinion in *Johnson I* had "severely shaken" its confidence that it had correctly held that Representative Johnson had been prejudiced on all counts in that case. *Id.* at 227 n.21.

error that "affect[s] the entire conduct of the proceeding from beginning to end." *Id.* The "highly exceptional category of structural errors includes, for example, the denial of counsel of choice, denial of self-representation, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." *Id.* "[T]he defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017). By contrast, "discrete defects in the criminal process," *Greer*, 593 U.S. at 513, even highly significant ones such as "the omission of a single element from jury instructions," *id.*, are not structural error.

The erroneous introduction of evidence, "a classic trial error," *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991), is—regardless of whether the error is constitutional, statutory, or rule-based—not structural under well-settled law. *See, e.g.*, *United States v. Tropeano*, 252 F.3d 653, 659 (2d Cir. 2001) ("'[H]armless error analysis applies to evidentiary errors[.]"); *see also, e.g.*, *Johnson v. United States* ("*Johnson II*"), 520 U.S. 461, 468-69 (1997) ("We have found structural errors only in a very limited class of cases," listing cases, none of which involved erroneous introduction of evidence).

A "discrete defect[ ] in the criminal process," *Greer*, 593 U.S. at 513, is not structural error even if it implicates a constitutional provision protecting some interest separate from avoiding erroneous conviction. Only where an error goes to the "framework" of the trial, and the harm of conviction is truly "*irrelevant to* the basis underlying the right," *Weaver*, 582 U.S. at 295

(emphasis added), is an error structural. For example, introduction of an involuntary confession may be harmless error, *Fulminante*, 499 U.S. at 310, even though the underlying Fifth Amendment right involves "considerations which transcend the question of guilt or innocence," including "important human values." *Blackburn v. State of Ala.*, 361 U.S. 199, 206 (1960); *see also Miranda v. Arizona*, 384 U.S. 436, 460 (1966). Likewise, trial errors implicating the First Amendment, *e.g.*, *Pope v. Illinois*, 481 U.S. 497, 501-02 (1987), and the Fourth Amendment, *e.g.*, *Chambers v. Maroney*, 399 U.S. 42, 53 (1970), may also be harmless even though each of those provisions protects interests beyond avoiding erroneous conviction.

Similarly, errors implicating the separation of powers—*i.e.*, those that "involve[ ] the structure of the federal government rather than the structure of the criminal trial process as a reliable means of determining guilt or innocence," *United States v. Colon-Munoz*, 192 F.3d 210, 217 n.9 (1st Cir. 1999)—are not, without more, structural errors. *See, e.g.*, *United States v. Lee* ("*Lee I*"), 833 F.3d 56, 69 (2d Cir. 2016) ("we infer that *the role of the grand jury as an independent check on prosecutors and courts* likewise does not provide a basis for considering the grand jury's failure to allege an element that changes a misdemeanor to a felony to be a structural error that is impervious to harmless-error analysis." (emphasis added)); *United States v. Scarfo*, 41 F.4th 136, 174 (3d Cir. 2022) (holding alleged separation-of-powers violation subject to harmless-error review and not structural); *United States v. Suescun*, 237 F.3d 1284, 1288 n.12 (11th Cir. 2001).

This Court has thus repeatedly held that the erroneous presentation of evidence of legislative acts to a grand jury does not require dismissal of the indictment where there was "no substantial question of whether the grand jury had sufficient competent evidence to establish probable cause." *Myers I*, 635 F.2d at 941 n.10; *see also id.* at 941; *accord Williams I*, 644 F.2d at 952; *United States v. Murphy*, 642 F.2d 699, 700 (2d Cir. 1980). Other circuits are in accord, including the Eleventh Circuit in *United States v. Swindall*, which reasoned that where "reference to a legislative act is irrelevant to the decision to indict, the improper reference has not subjected the member to criminal liability," and thus does not violate the Clause. 971 F.2d 1531, 1548 (11th Cir. 1992); *see also, e.g.*, *Renzi I*, 651 F.3d at 1029.[14] These holdings further demonstrate that the erroneous introduction of legislative-act evidence cannot be structural error, since structural error in the grand jury requires dismissal of the indictment even

---

[14] The *Swindall* court's statement, in dicta and without analysis, that harmless error was not the appropriate framework for Speech or Debate Clause violations, *id.* at 1548 n.21, does not somehow overrule the Supreme Court's analysis in *Johnson I*, but in any event appears to have been focused merely on verbiage, because *Swindall* actually *approved* certain counts despite presentation of legislative-act evidence to the grand jury, reasoning that where "reference to a legislative act is irrelevant to the decision to indict" there was no violation at all. *Id.* at 1548.

after a trial conviction. *See, e.g.*, *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986).

### 6. Plain Error

An evidentiary or other objection not timely raised under Federal Rule of Criminal Procedure 51(b) is reviewed only for plain error under Rule 52(b). Plain error requires that "the appellant demonstrate[ ] that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "[T]he defendant has the burden of establishing each of the four requirements for plain-error relief." *Greer*, 593 U.S. at 508. "Meeting all four prongs" of the plain error standard "is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

## B. Discussion

Contrary to Menendez's extravagant claims, not everything he did as a Senator was a legislative act protected by the Clause. (*Compare* Menendez Br. 24-25 (asserting that Speech or Debate Clause forbids showing how Menendez "did his job" or "used" his "office"), *with Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity

as Senators does not necessarily make all such acts legislative in nature."), *and Brewster*, 408 U.S. at 524 ("[M]any non-legislative activities are an established and accepted part of the role of a Member, and are indeed 'related' to the legislative process.")). Under settled law, Menendez has not identified any legislative act that was admitted into evidence.

### 1. Menendez's Recommendation of Sellinger for Nomination Was Not a Legislative Act

Judge Stein correctly ruled that Menendez's pre-nomination recommendation of a U.S. Attorney candidate to the Executive Branch was not a legislative act, because the Senate's "Advice and Consent" function applies *after*, not before, the President nominates a candidate. (Menendez SPA-5-6 (reported as *United States v. Menendez*, 720 F. Supp. 3d 301 (S.D.N.Y. 2024))).[15] As Judge Stein recognized, the

[15] Although Menendez objected to the subject matter in his motion to dismiss (Hana/Daibes A-291-94), following the denial of that motion he did not challenge all of the evidence regarding his U.S. Attorney recommendation as violative of the Clause. His current claim that all such evidence is barred by the Clause is thus unpreserved in part. *See, e.g.*, *United States v. Hutcher*, 622 F.2d 1083, 1087 (2d Cir. 1980) ("a general objection, if overruled, cannot avail the objector on appeal"). Indeed, certain of the evidence Menendez now appears to challenge was not described in the Indictment (or even necessarily known at the time). *Cf. United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir.

Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2, makes plain that "Advice and Consent" refers to post-nomination action by the Senate. (Menendez SPA-6 ("The Constitution reads that the President 'shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States'—not that the President 'with the advice of the Senate shall nominate, and with the Consent of the Senate shall appoint . . . Officers of the United States.' ")).

Supreme Court precedent, likewise, confirms that the Constitution commits nomination to the President alone. *See Edmond v. United States*, 520 U.S. 651, 659 (1997) ("By vesting the President with *the exclusive power to select* the principal (noninferior) officers of the United States, the Appointments Clause *prevents congressional encroachment* upon the Executive and Judicial Branches." (emphasis added)); *see also id.* at 660 (quoting Alexander Hamilton's observation that "[t]he blame of a bad nomination would fall upon the president singly and absolutely"). Menendez's claims of a constitutional role in the President's nomination are

---

1995) (a pretrial motion to exclude evidence may preserve an objection where, among other things, it "is ruled upon without equivocation by the trial judge"). But this Court need not determine whether all of Menendez's Speech or Debate claims are fully preserved, or only reviewable for plain error, because they fail under either standard.

just the sort of "congressional encroachment" the Supreme Court rejected. *Edmond*, 520 U.S. at 659.

The historical record confirms that a President's pre-nomination consultation with Senators, when it happens (and it does not always), is a "courtesy" that "was not envisioned by the framers." Senate Historical Office, *Senate Stories: Origins of Senatorial Courtesy* ("*Origins of Senatorial Courtesy*") (July 5, 2022), https://www.senate.gov/artandhistory/senate-stories/origins-of-senatorial-courtesy.htm ("Senatorial courtesy also has been interpreted to mean that a president should consult with senators of his or her party when nominating individuals to serve in positions in their home states. *Such a practice was not envisioned by the framers*. In fact, in *The Federalist*, No. 66, Alexander Hamilton wrote: 'There will, of course, be *no exertion of choice* [in executive appointments] on the part of Senators.' " (emphasis added)).[16] That this "courtesy" only applies, if at all, to "senators of [the President's] party," *id.*, underscores that it is neither constitutionally mandated nor integral to the process. *See, e.g.*, Daryl J. Levinson & Richard H. Pildes, *Separation of Parties, Not Powers*, 119 Harv. L. Rev. 2311, 2320

---

[16] Daibes's citation to one of Alexander Hamilton's writings in the Federalist Papers (Daibes Br. 38) fails to acknowledge Hamilton's actual views, which were that " '[t]here will, of course, be no exertion of choice [in executive appointments] on the part of Senators,' " *Origins of Senatorial Courtesy*, and that " '[t]he blame of a bad nomination would fall upon the president singly and absolutely,' " *Edmond*, 520 U.S. at 659.

(2006) ("The idea of political parties, representing institutionalized divisions of interest, was famously anathema to the Framers . . . .").

Menendez's only primary source is a 1792 letter (Menendez Br. 30), which actually refutes his claim. *See* Letter from George Mason to James Monroe ("Mason Letter") (Jan. 30, 1792), *available at* https://www.consource.org/document/george-mason-to-james-monroe-1792-1-30/. Far from giving the Senate a pre-nomination role, the letter states that the Constitution "gives to the President *alone* the Right of *Nomination*"; that the nomination is what "brings the Subject fully under the Consideration of the Senate"; and that officers "shall not be *appointed*, but with the Advice" of the Senate, rather than that the Senate's "Advice" is a condition of their being *nominated*. *Id.* (first and second emphases in original). Indeed, this letter answers Menendez's and Daibes's specious argument (Menendez Br. 30; Daibes Br. 37-38) that the word "Advice" must apply pre-nomination to avoid surplusage. *See* Mason Letter ("The Word '*Advice*' here clearly relates in the Judgment of the Senate on the Expediency or Inexpediency of the Measure, or Appointment; and the Word '*Consent*' to their Approbation or Disapprobation of the Person nominated; otherwise the word *Advice* has no Meaning at all").[17]

---

[17] As this demonstrates, there is no surplusage. But the canon against surplusage, in any case, is not an absolute rule, *see, e.g.*, *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013), and has no application where the only competing interpretation requires rewriting

Similarly, Menendez and Daibes cite a history involving the Executive Branch's consultation with Congressmen on appointments (Menendez Br. 30 (citing Leonard D. White, *The Federalists: A Study in Administrative History* ("*Federalists*") (1948)); Daibes Br. 38 (same)), but that source describes a non-constitutional practice, as it discusses consultation not only with Senators but also with members of the House of Representatives, who of course have no "Advice and Consent" power whatsoever. *See Federalists* 83 ("Senators *and to a lesser extent Representatives* promptly began to interest themselves in appointments." (emphasis added)); *id.* at 87 ("Members of *both Houses* carried on correspondence with the President and the heads of departments in favor of their friends and constituents." (emphasis added)).

The District Court's ruling is also consistent with the uniform precedent that an attempt to influence an *Executive Branch* decision is not *legislative* activity under the Speech or Debate Clause, at least—as here—outside formal constitutional processes. *See, e.g.*, *McMillan*, 412 U.S. at 313 (no protection for attempts to "influence the Executive Branch of Government"); *Gravel*, 408 U.S. at 625; *Johnson I*, 383 U.S. at 172. Menendez's examples of the Senate holding courtesy hearings before a nomination, or Senators communicating their views before a formal nomination, clearly

---

the entire sentence structure. *See, e.g.*, *Barton v. Barr*, 590 U.S. 222, 239 (2020) ("Redundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text[.]").

describe the same interbranch dialogue that, "though generally done, is not protected activity." *Gravel*, 408 U.S. at 625.[18]

Against this authority, Menendez's and Daibes's sole case support for their claim that "Advice" precedes nomination (Menendez Br. 31; Daibes Br. 36) is an obvious misreading of this Court's description of the typical "practice followed" in judicial nominations. *See United States v. Allocco*, 305 F.2d 704, 711 (2d Cir. 1962) (describing President receiving "various sources of information" in selection, including that "since the appointment must have the advice and consent of the Senate[,] the recommendations of the candidate's Senators must be obtained and weighed by the President before a final decision is possible"). But *Allocco* simply recognizes that because a *nominee* will ultimately need Senate approval, the President has a prudential reason to consult before nomination. Indeed—since "consent" undisputedly comes after nomination—this Court, in describing an appointment needing "the advice *and consent* of the Senate," *Allocco*, 305 F.2d at 711 (emphasis added), was necessarily referencing the steps that *follow* nomination.

Lacking any cogent textual or case support, Menendez and Daibes instead cite a handful of law review

---

[18] A courtesy pre-nomination hearing would likely be a legislative act because it is a hearing, *see, e.g.*, *Gravel*, 408 U.S. at 624, but that would not make it constitutional "Advice." In any event, no such hearings are at issue here.

articles, including a student Comment, that generally seek to *change* settled constitutional interpretation (Menendez Br. 30; Daibes Br. 35-36), and fail to rebut the District Court's citation of other articles grounding the opposite conclusion in constitutional text and history (Menendez SPA-6). This scattering of commentary cannot upset the text of the Constitution or the Supreme Court's holding that the President's nomination power is exclusive. *See Edmond*, 520 U.S. at 659.

Since Menendez's pre-nomination recommendation is not a legislative act, Menendez and Daibes cannot manufacture a Speech or Debate violation by claiming it would influence a future legislative act such as Sellinger's potential confirmation vote, much less characterize Menendez's *preparation* for that non-legislative recommendation as a legislative act. (Menendez Br. 32-34; Daibes Br. 36-37). Where an act is not itself legislative, it does not become so just because it may *also* eventually play a role in potentially influencing or informing a legislative act. *See, e.g.*, *Hutchinson*, 443 U.S. at 130-31 (rejecting argument that press statements are protected, even while assuming they "exert some influence on other votes in the Congress and therefore have a relationship to the legislative and deliberative process"); *In re Sealed Case*, 80 F.4th 355, 370 (D.C. Cir. 2023) ("Not all communications that may influence a vote are privileged[.]"); *Biaggi*, 853 F.2d at 104 ("The fact that one of the purposes of the travel may have been the conduct of legislative activity does not preclude a conviction[.]"); *see Brewster*, 408 U.S. at 524 ("[M]any non-legislative activities are an established and accepted part of the role of a Member, and are indeed 'related' to the legislative process."); *id.*

at 528 (while the Clause barred evidence of a Congressman's speech on the House floor, inquiry into matters related to the "motivation for his House speech" was permissible).

More fundamentally, Menendez and Daibes cannot transmute an unprotected act to a protected one by moving back in time to a *preparatory* step even farther removed from constitutional functions. *See Brewster*, 408 U.S. at 516 ("Given such a sweeping reading, we have no doubt that there are few activities in which a legislator engages that he would be unable somehow to 'relate' to the legislative process."). Menendez's and Daibes's attempt to liken a nonlegislative recommendation (let alone preparation for one) to a legislative subpoena (Menendez Br. 32-33; Daibes Br. 36 (citing *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020)), just because it might later influence Menendez's legislative acts approving the nominee, is inapposite. A legislative subpoena is itself an exercise of formal power that is "an indispensable ingredient of lawmaking," *Eastland*, 421 U.S. at 505, and does not remotely imply that every discussion of "the possible future performance of legislative functions," *Williams I*, 644 F.2d at 952, becomes itself legislative. The opposite is true. *See, e.g.*, *Hutchinson*, 443 U.S. at 130-31; *Biaggi*, 853 F.2d at 104; *see Brewster*, 408 U.S. at 524.

Instead of resembling a subpoena, Menendez's pre-recommendation conversations are at most the sort of "wide-ranging inquiries by individual Members on subjects of their choice," *Hutchinson*, 443 U.S. at 132, that are *not* protected. Indeed, Menendez's discussions with Sellinger are even farther removed from

legislative acts than the discussion of "the potential future performance of legislative functions" that this Court held unprotected in *Williams I*, which at least concerned a bill, rather than a recommendation that *might* lead to a nomination that could provide an opportunity to perform a legislative function. *Williams I*, 644 F.2d at 952.[19]

Moreover, Daibes lacks rights under the Speech or Debate Clause, as is apparent from the contortions he undertakes to rewrite the Supreme Court's language in *Gravel*. (Daibes Br. 20-23). Daibes claims that *Gravel* "simply described the universe of legislative actors whose own 'conduct' could generate speech-or-debate protection in the first instance" (Daibes Br. 23), but the text of *Gravel* says nothing of the kind. Instead, it states that in order to avoid "the abuses that history reveals have occurred when legislators are invested with the power to *relieve others* from the operation of otherwise valid civil and criminal laws," the privilege applicable to an aide "must be" viewed as "the privilege *of the Senator*, and *invocable only by the Senator* or by the aide on the Senator's behalf." *Gravel*, 408 U.S. at 621-22 (emphasis added).

Contrary to Daibes's strained reinterpretation, courts apply *Gravel* according to its plain terms, whether interpreting the Speech or Debate Clause or

---

[19] Indeed, Menendez's recommendation of Suarez for U.S. Attorney did *not* result in her nomination, underscoring that a recommendation need not lead to a legislative act. (*See, e.g.*, Tr. 3934).

analogous state legislative privilege. *See, e.g.*, *Nunes*, 2024 WL 1500945, at *2; *Favors*, 2013 WL 11319831, at *9. Cases addressing the Tenth Amendment or the Appointments Clause (Daibes Br. 23-24; *see also* Hana Br. 26-27), do not displace the Supreme Court's binding interpretation of the Speech or Debate Clause simply because each of those provisions involve (in very different ways) the separation of powers. Daibes cannot be "relieve[d]" from "the operation of otherwise valid . . . criminal laws" by Menendez's privilege, *Gravel*, 408 U.S. at 621, any more than any defendant can be relieved from a conviction by the fact that trial evidence was derived from *someone else's* compelled statement. *See, e.g.*, *Terabelian*, 105 F.4th at 1221 ("Terabelian is therefore not the witness that *Kastigar* protects.").[20]

---

[20] This Court's dictum in *U.S. Football League*, opining that evidence excluded from trial on other grounds would also have been excludable on the grounds of the Speech or Debate Clause, did not consider and cannot overrule *Gravel*, but in any event never considered whether a private party could obtain *reversal* if the evidence was admitted, *see U.S. Football League*, 842 F.2d at 1374-75, which is the relief Daibes seeks and which would "relieve" an "other[ ]" from the operation of criminal laws, *Gravel*, 408 U.S. at 621.

### 2. Menendez's Promise to Approve a Foreign Military Sale Was Not a Past Legislative Act

Menendez's text to Nadine Menendez—then passed to Hana and, through him, to Egyptian officials—stating that he would approve an arms sale *in the future* is manifestly not a *past* legislative act. (*See* GX-B201-10 ("Tell Will I am going to sign off this sale to Egypt today", followed by sale details)).[21]

As Judge Stein recognized, this statement is plainly in the future tense and covered by the Supreme Court's clear holding that "[p]romises by a Member [of Congress] to perform an act in the future are not legislative acts." ***Helstoski***, 442 U.S. at 489; (*see* Hana/Daibes A-2861 ("That this text message constituted such a promise is not a close question; it manifestly is a promise to perform an act in the future.")). In a thinly-disguised sufficiency challenge, Menendez and Daibes claim the message does not show a "compact" (Menendez Br. 41-42; Daibes Br. 33), but even though

---

[21] As with Daibes (*see supra* at 53-54), Hana is not entitled to be "relieve[d]" of his convictions, *Gravel*, 408 U.S. at 621, because of Menendez's Speech or Debate privilege, on this or any of the remaining grounds. Indeed, contrary to his position here (Hana Br. 26-27), Hana previously conceded he could not benefit from Menendez's Speech or Debate rights. (Hana/Daibes A-2677 n.2 ("Mr. Hana does not contend that he has standing to challenge the improper exhibits as violative of the Speech or Debate Clause.")).

unnecessary to Speech or Debate analysis, the evidence is overwhelming that the message shows just that. (*See* Menendez SPA-29-33).[22]

The defendants' argument that there should be no conceptual difference between evidence of a past and a future act (Menendez Br. 40-42; Hana Br. 47-48; Daibes Br. 33-34) was specifically rejected by the Supreme Court. (*Compare* Menendez Br. 42 (complaining about supposed "inference that such an action was in fact taken") *with Helstoski*, 442 U.S. at 488 ("[T]he Government argues the exclusion of references to past acts is not logically consistent. In its view, *if jurors are told of promises to perform legislative acts they will infer that the acts were performed*, thereby calling the acts into question. *We do not accept the Government's arguments*." (emphasis added))).

Seeking to evade *Helstoski*'s holding, the defendants try to recharacterize this obvious forward-looking statement as a report on what Menendez allegedly "decided" in the past. (Menendez Br. 41-42; Hana Br. 46-48; Daibes Br. 32-33). This reimagining, of course, would eviscerate the rule that "[p]romises" to "perform an act in the future" are unprotected, *Helstoski*, 442 U.S. at 489, since every statement of intent to perform a future act is necessarily made after the speaker

---

[22] Menendez's claim that his promise of a future act is somehow legislative if it is "facially legitimate" (Menendez Br. 40-41), has no support in the law (and would all but render legislators "super-citizens," *Brewster*, 408 U.S. at 516).

"decided" to form that intent. Moreover, the defendants' entire argument, which proceeds as though this message is indistinguishable from an actual act (Menendez Br. 41; Hana Br. 47-48; Daibes Br. 32-33), neglects that there is no evidence in the record whether Menendez in fact acted to approve the arms sale that day, as he promised to.[23]

The defendants' claim that this message should be considered as if Menendez had made a statement to the media that he was planning to take a legislative act (Menendez Br. 41; Daibes Br. 34) is irrelevant. A statement to the media—even assuming it can be relevantly compared with a private message to a bribe-payor—is not protected. *See, e.g.*, *Hutchinson*, 443 U.S. at 130-31. More fundamentally, no counterfactual hypothetical can wish away the Supreme Court's clear holding that "protection extends *only to an act that has already been performed*," *Helstoski*, 442 U.S. at 490 (emphasis added); *see also id.* ("[A] *promise* to introduce a bill is not a legislative act." (emphasis in

---

[23] Since the jury never learned whether Menendez approved this sale (or if so, when), there is no need to supplement the record. It suffices to observe that the defendants' arguments (*see, e.g.*, Daibes Br. 33 (describing Menendez's message as sent "on the morning of his actions")) assume facts beyond the record. The Government notes for completeness, however, that the information available to the Government does not indicate that Menendez carried out his promise to communicate approval of the sale to the State Department on that day.

original)).[24] It simply does not matter whether the message was to the media, a private person, or no one at all—it was forward-looking, and thus unprotected under settled law.

Although this statement is straightforwardly unprotected under *Helstoski*'s binding holding, this Court can also affirm on the alternative ground that, contrary to the District Court's overprotective ruling, Menendez's communications to the State Department concerning arms sales were not legislative acts at all. Congress cannot constitutionally exercise legislative power other than through the Constitution's bicameralism and presentment procedures. *INS v. Chadha*, 462 U.S. 919, 955-58 (1983). Accordingly, Menendez's communications with the Executive Branch were not and could not be an exercise of *legislative* power (and were obviously not "other matters" constitutionally committed to the Senate such as the trial of impeachments), and are thus not protected. *Gravel*, 408 U.S. at 625 ("Insofar as the Clause is construed to reach other matters, *they must be* an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of *proposed legislation* or with respect to *other matters which the Constitution places within the jurisdiction of either House*." (emphasis added)).

---

[24] Hana is thus simply incorrect to claim that the Supreme Court has "never held that *only* references to past legislative acts are prohibited." (Hana Br. 47).

Instead of any constitutional process protected by the Clause, Menendez's communications with the State Department were unprotected attempts to "influence the Executive Branch" on a matter committed to the Executive Branch by statute. *McMillan*, 412 U.S. at 313. The State Department, in transacting arms sales, was administering the Arms Export Control Act of 1976 (Tr. 880-91), and Menendez's communications with the State Department were thus "cajol[ing] and exhort[ing] with respect to the administration of a federal statute," not "protected legislative activity" at all. *See, e.g.*, *Gravel*, 408 U.S. at 625.

Rather than any constitutional process, the communications constituting these holds were done under longstanding interbranch practice. Indeed, the testimony about this practice provides a textbook example of how legislators can leverage their official powers to "cajole, and exhort with respect to the administration of a federal statute." *Gravel*, 408 U.S. at 625; (*see* Tr. 877-78, 891). This interbranch realpolitik, "though generally done, is not protected legislative activity." *Gravel*, 408 U.S. at 625.[25]

---

[25] The possibility of legislative reprisal, either through such tools or through a joint resolution of disapproval of a particular arms sale (*see* Menendez SPA-8), is of course present every time a legislator "exhort[s]" the Executive Branch, and does not make the *exhortation itself* "protected legislative activity." *Gravel*, 408 U.S. at 625. But in any event, the views of

The District Court erred in concluding otherwise based on the Third Circuit's dicta from Menendez's prior prosecution that " 'informal attempts to influence the Executive Branch on policy, for actual legislative purposes, may qualify as 'true legislative oversight' and merit Speech or Debate immunity.' " (Menendez SPA-8 (quoting *United States v. Menendez*, 831 F.3d at 169). Neither the District Court nor the Third Circuit provided any authority holding any comparable form of "informal oversight" (as distinct from formal committee investigations, hearings, or subpoenas, all of which are necessary incidents to future legislation) to be legislative activity. The only basis on which the Third Circuit distinguished so-called "informal oversight" from simply "cajol[ing] and exhort[ing] with respect to the administration of a federal statute," *Gravel*, 408 U.S. at 625, was by deeming communications "oversight" if they affected more than one party. *Menendez*, 831 F.3d at 168-69. But that distinction makes no difference, as legislative status does not turn on the number of parties affected. *See, e.g.*, *Helstoski*, 442 U.S. at 481-82, 486 (private immigration bills protected). Rather, the question is whether such a communication is an "integral part" of the process of "consideration and passage or rejection of proposed legislation" or "other matters which the Constitution places within the jurisdiction of the Senate," *Gravel*, 408 U.S. at 625, which these were not. Since they had nothing to do with proposed legislation but were instead

---

Congress in this area were not even always followed by the Executive Branch. (*See* Tr. 922-23, 930-31).

attempts to "influence the Executive Branch," *McMillan*, 412 U.S. at 313, with respect to its "administration of" an *already-passed* statute, *Gravel*, 408 U.S. at 625, Menendez had no Constitutional role.

Menendez's claim of Speech or Debate protection for this non-legislative act (Menendez Br. 37) fails. Unlike the legislative subpoenas at issue in the sole case he cites, which are formal exercises of power incident to the Constitutional powers to legislate and try impeachments, *Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 992 (D.C. Cir. 2021), these interbranch communications involve no Constitutional power at all. Whether they could be characterized as in some way a "duty of office" (Menendez Br. 37) is not the test. *See, e.g.*, *Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature."). This Court can thus affirm on the ground that the District Court—in apparently the first-ever extension of Speech or Debate protection to such non-binding interbranch communications—*overprotected* Menendez.

### 3. Menendez's Discussions of Which Acts to Perform in Exchange for Bribes Were Not Legislative Factfinding

Similarly, Menendez's meetings with Egyptian officials to learn what acts they wished him to perform, in exchange for bribes from Hana, were not protected legislative information-gathering. Indeed, Menendez failed to object to certain of this evidence, rendering aspects of his challenge reviewable at most for plain

error. (*See* Tr. 1017-19, 1046 (no Speech or Debate challenge to documents showing meetings); *see also* Hana/Daibes A-2296-98 & n.19). But on any standard, Menendez's challenge fails, as such meetings are paradigmatic instances of unprotected "wide-ranging inquiries by individual Members on subjects of their choice," *Hutchinson*, 443 U.S. at 132, and fall within a category that this Court and others have squarely held unprotected.

Neither Menendez nor Daibes cites any precedent supporting their outlandish suggestion that an individual legislator's communications regarding *which acts a third party requests in exchange for bribes* are protected "information-gathering." (Menendez Br. 43-45; Daibes Br. 34-35).[26] To the contrary, this is precisely the sort of discussion of "the possible future performance of legislative functions" that this Court, and every court to consider them, has repeatedly held unprotected. *Williams I*, 644 F.2d at 952; *see also Myers I*, 635 F.2d at 937; *Myers II*, 692 F.2d at 834, 860; *Renzi I*, 651 F.3d at 1022-26; *Dowdy*, 479 F.2d at 218, 224; *Brewster*, 408 U.S. at 526 ("[A]n inquiry into the purpose of a bribe does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them."); *id.* ("Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act.").

---

[26] *Biaggi*, cited by Daibes, involved committee-funded factfinding trips, obviously not at issue here. 853 F.2d at 102.

Menendez's sweeping assertions of immunity fly directly in the face of binding precedent. He claims, for example that any "discussions of legislative acts" are "immune" (Menendez Br. 44), but this Court has held that "Speech or Debate Clause protection *does not extend to discussions of this sort*, which involve only the possible future performance of legislative functions." *Williams I*, 644 F.2d at 952 (emphasis added)).[27] He next asserts that any "information-gathering" that is "related to legislative activity" is "immune from judicial inquiry" (Menendez Br. 45), but the Supreme Court has held that the Clause "*does not prohibit inquiry* into activities that are casually or incidentally *related to legislative affairs* but not a part of the

[27] Indeed, this Court in *Williams I* rejected arguments substantively indistinguishable from Menendez's here, underscoring that his position is foreclosed by settled law. (*Compare* Menendez Br. 44 (arguing that meetings were protected because "Senator was learning from Egyptian officials what legislative acts they wanted from him on their behalf"), *with* Br. for Appellant ("*Williams* Br.") at 10 (arguing that meeting with undercover agent posing as bribe-payor was protected because Senator was obtaining "background information" relating to bribe-payor's request for a private immigration bill); *see Williams I*, 644 F.2d at 953 (rejecting argument that Clause's protections extended to this "discussion of a proposed immigration bill"); *see also Williams* Br. App. C (transcript of private meeting showing Senator's questions to undercover agent related to requested legislation).

legislative process itself." *Brewster*, 408 U.S. at 528; *see also id.* at 524 ("many *non-legislative activities* are an established and accepted part of the role of a Member, and *are indeed 'related'* to the legislative process" (emphasis added)).[28] To accept Menendez's arguments would necessarily be to overrule the Supreme Court's holding that corrupt promises to perform legislative acts—which obviously are "discussions of legislative acts" and "related to legislative activity" (Menendez Br. 44-45)—may be prosecuted. *See, e.g.*, *Helstoski*, 442 U.S. at 490 ("[A] *promise* to introduce a bill is not a legislative act." (emphasis in original)); *Brewster*, 408 U.S. at 526 ("When a bribe is taken, it does not matter whether the promise for which the bribe was given was for the performance of a legislative act[.]").[29]

---

[28] Menendez and Daibes suggest that this Court's decision in *Biaggi*, 853 F.2d at 102, renders their characterization of Menendez's meetings unreviewable. But *Biaggi* stands only for the uncontroversial principle that the question whether something is a legislative act is an objective one that does not depend on the legislator's motive, as both seem to acknowledge. (Menendez Br. 44-45; Daibes Br. 34-35). This Court has never let a legislator's self-serving claims preclude a court from analyzing particular communications to determine whether they should be characterized as legislative acts. *See Williams I*, 644 F.2d at 952; *Myers II*, 692 F.2d at 834, 860.

[29] In addition, as with the other Speech or Debate Clause claims based on military aid to Egypt, this Court can affirm on the ground that the

Case: 25-296, 09/09/2025, DktEntry: 210.1, Page 92 of 202



#### 4. Daibes's Request that Menendez Advance a Senate Resolution Was Not a Legislative Act

Menendez's claim that his Speech or Debate rights were infringed by evidence of Daibes sending him two excerpts of a *public* website showing that *other* Senators had sponsored a resolution pending before him (Menendez Br. 35-36) is specious. Evidence of what bills were or might be "pending" before a lawmaker does not violate the Speech or Debate Clause. *See, e.g.*, *Brewster*, 408 U.S. at 525-26 (permitting prosecution for bribery with respect to "pending" legislation); *United States v. Anderson*, 509 F.2d 312, 318 (D.C. Cir. 1974) (affirming co-defendant's conviction following Supreme Court decision in *Brewster*: "*There was discussion of the pending bill*, during which Morris Speigel handed an envelope to Brewster." (emphasis added)).

Menendez's argument—that evidence of a pending bill implies that he has decided not to support it (Menendez Br. 35)—proves too much. Every discussion of "the possible future performance of legislative functions," *Williams I*, 644 F.2d at 952, implies that those functions have not yet been performed. If this violated the Clause, there would be nothing left of *Helstoski*'s holding that promises "to perform an act in the future are not legislative acts," 442 U.S. at 489, since

---

communications with the Executive Branch to which these meetings relate are not legislative acts. (*See supra* at 58-61).

each such promise would carry the supposedly improper implication. This too-clever-by-half argument ignores that simply not yet having acted in any way (in support or opposition) does not imply having reached a decision to support or to withhold support from a proposal. *See, e.g.*, *id.* at 490 ("[P]rotection extends only to an act that has already been performed.").[30]

Nor can Menendez (much less Daibes) benefit from the Speech or Debate privilege of the Senators who sponsored the resolution. (Menendez Br. 35-36; Daibes Br. 38-39). Reversing these convictions because *other* Senators, who were never identified, sponsored a Senate resolution, would result in the very "abuses" of absent lawmakers gaining "the power to relieve others from the operation of otherwise valid civil and criminal laws" which led the Supreme Court to construe the privilege as "the privilege of the Senator [*i.e.*, the Senator taking the legislative act], and invocable only by the Senator or by the aide on the Senator's behalf." *Gravel*, 408 U.S. at 621-22; *see also, e.g.*, *Nunes*, 2024 WL 1500945, at *2 ("[A] Member may assert only his own privilege; he may not assert the privilege of others."). In any event, the Speech or Debate rights of the absent Senators were not infringed by the introduction, in a case to which they were not parties, of public documents from which their identities were redacted, thereby in no way threatening "the independence of"

[30] Menendez's citation to a case holding a decision not to open an investigation protected (Menendez Br. 35) is thus entirely inapposite, as the evidence here did not show any decision one way or the other.

these "individual lawmakers." *See Eastland*, 421 U.S. at 502; *see also, e.g.*, *Texas v. Holder*, No. 12 Civ. 128 (DST, RMC, RLW), 2012 WL 13070060, at *4 (D.D.C. June 5, 2012) (compelling disclosure of state legislator requests for information regarding pending legislation "with redactions where necessary to shield any reference to the individual legislator or staff who received or requested the information.").[31]

#### 5. Evidence of Foreign Military Financing Did Not Show any Legislative Act

Contrary to Menendez's claim (Menendez Br. 42-43), there was no evidence at trial that Menendez approved military aid to Egypt. The jury heard that FMF grants to Egypt were routinely appropriated by Congress (Tr. 867-68), following which the State Department had authority over the funds and could take steps to make the funds available to Egypt. (Tr. 871-72). The jury did not hear that Egypt always received the full amount of those grants, and indeed, due to State Department actions (*i.e.*, not legislative acts), it did not always do so. (Tr. 876). But in any event, to

---

[31] *Helstoski*'s approval of redactions to the legislative acts of an *identified defendant* Congressman is not, as Menendez and Daibes suggest (Menendez Br. 36; Daibes Br. 39), a prohibition on redacting the identities of *non-party* Senators. Both types of redactions equally "protect the integrity of the legislative process by insuring the independence of individual lawmakers," *Eastland*, 421 U.S. at 502; *Holder*, 2012 WL 13070060, at *4.

place a hold on an FMF grant, an SFRC leader would have to take an affirmative act to hold it, and then the hold could be lifted. (Tr. 872-73, 877-79). Even if the jury had heard that Egypt received its grant money during any relevant period, it would have literally no understanding whether any SFRC leader (let alone Menendez, who did *not* have the ability to place holds during the entire period testified about (Tr. 863)) did or did not place or lift a hold prior to the receipt of the grant money.

For FMS—unlike for FMF—the jury heard that the State Department would typically not transact the sale absent an affirmative act of approval by the SFRC leaders. (Tr. 890). But this did not allow the inference that Menendez gave any such approvals. First, the jury heard that in some circumstances the State Department would override a hold or bypass Congress altogether. (Tr. 930-31). More fundamentally, there was no trial evidence that *any* FMS to Egypt was transacted during the relevant period, and so the jury could not infer that Menendez did or did not play a role in any such transaction. Each of the examples Menendez cites of aid to Egypt that "in fact went through" (Menendez Br. 42 (citing Menendez A-1881, 1884-87, 1964)), refers not to FMS but to FMF, which does not require, even as a general matter, any affirmative act by Menendez (or any other legislator).

Menendez's attempt to cobble together legislative-act evidence is thus wrongheaded. Far from using a "two-step argument" to create an inference of aid approvals (Menendez Br. 42), the Government made clear it was *not* doing so, repeatedly cautioning that it

was just asking about the "process," not about any actual transactions. (Tr. 869, 889, 900-01, 905). Likewise, Menendez's complaint about the evidence that he changed his stance on Egypt (Menendez Br. 36-37, 42-43) is a non sequitur. The cited evidence and argument relate to Menendez's public statements, secret meetings, corrupt promises, and other unprotected acts. As noted, Menendez fails to identify any possible inference of approvals of FMF or FMS. And he does not even try to identify any inference of a *change* in such approvals.[32]

### 6. Menendez Did Not Conduct "Diplomacy," Which Is Not a Legislative Act

Contrary to Menendez's unprecedented claims (Menendez Br. 45-46), he had no authority—much less *legislative* authority—to represent the United States in "diplomacy" with Egypt or any other foreign nation. Far from it. Diplomacy is a quintessentially *executive* function. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) ("Congress . . . has no constitutional power that would enable it to initiate diplomatic relations with a foreign nation."). Menendez's attempt to wrap all his dealings with Egypt in the Speech or Debate Clause—a position so extreme he disclaimed it at trial (Tr. 4475 (counsel agreeing that "all

---

[32] The Court can also affirm on the alternative ground that Menendez's communications with the Executive Branch regarding the administration of already-passed appropriations were not legislative acts. (*See supra* at 58-61).

discussions that this staffer had concerning Egypt are not, do not implicate speech or debate"))—is a form of legislative aggrandizement alien to the Constitutional separation of powers. *Hutchinson*, 443 U.S. at 126 ("Our speech or debate privilege was designed to preserve legislative independence, not supremacy."). Moreover, given his failure to preserve this extreme argument, it is reviewable, if at all, at most for plain error.

Consistent with long-settled Constitutional law, the trial testimony showed that foreign policy was an Executive Branch function (Tr. 575, 914-16), and did not rely on contacts between Members of Congress and foreign officials (*see, e.g.*, Tr. 913 ("I don't know that the State Department sees it as vital to the implementing of U.S. foreign policy."); *id.* ("I can't speak exactly for what they might think is important. But certainly members of Congress enjoy going overseas.")). More fundamentally, the fact that Menendez regularly met with foreign officials does not make such meetings *legislative*. *See Gravel*, 408 U.S. at 625 ("That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature."). They plainly are not. *See, e.g.*, *Hutchinson*, 443 U.S. at 131; *Brewster*, 408 U.S. at 524.

### 7. Extra-Record Matter Accidentally Loaded on the Jury's Laptop Was Not Seen or Understood and Did Not Prejudice Any Defendant

#### a. Relevant Facts

The over nine-week trial of the defendants featured "more than 3,000 exhibits, containing tens of thousands—or more likely, hundreds of thousands of pages of evidence." (Menendez SPA-99 (reported as *United States v. Menendez*, 763 F. Supp. 3d 538 (S.D.N.Y. 2025))). For deliberations, the jury was provided a Government laptop containing copies of the exhibits, which was inspected by all counsel. (Menendez SPA-100-01). One jury note during the approximately twelve-hour deliberations requested a cable to connect the laptop to a television, but no note indicated any focus on any exhibit, or on any count related to Egypt. (Menendez SPA-101). Consistent with its standard practice, the Government later wiped the laptop to reuse it in other trials. (Menendez SPA-101 n.4).

Following trial, the Government discovered, and promptly alerted the Court and defense counsel, that a handful of exhibits loaded onto the jury's laptop were insufficiently redacted and contained several phrases that Judge Stein had excluded on Speech or Debate grounds. (Menendez SPA-101-02). These phrases referenced certain arms sales to Egypt that the speakers believed Menendez had either put a hold on or

approved.[33] At trial, the Government had introduced and relied on summary exhibits that had removed these references, pursuant to the District Court's rulings. The correct versions of those redacted summary exhibits were loaded onto the laptop. Certain of the voluminous underlying exhibits, however, were loaded onto the laptop with incomplete redactions. (SPA-102-03).

After being notified of the extra-record matter, defense counsel conducted a "document by document" review for multiple weeks to find other errors, but failed to notice several additional instances of these unredacted phrases, which the Government later discovered and again reported to the Court and defense counsel. (Menendez SPA-107-08). Ultimately, the errors consisted of several short unredacted phrases in nine exhibits (the "Exhibits"), which were mostly lengthy logs of text messages and call histories ranging into hundreds of pages. (Menendez SPA-101-04). None of the parties discussed the extra-record matter (of which they were unaware) in summation. (Menendez SPA-108). And in discussing the counts related to Egypt,

---

[33] The Government had argued that these messages were admissible because Menendez's communications with the Executive Branch were not legislative acts (Dkt. 180 at 37-40), and because they only evidenced third parties' beliefs about Menendez's interbranch communications, not the communications themselves (Hana/Daibes A-1917-18). To the Government's knowledge, the District Court was the first-ever court to preclude such evidence.

the Government urged that the jury could convict based solely on Menendez's attempts to pressure the USDA regarding Hana's halal monopoly, without reaching any conduct related to military aid. (*See, e.g.*, Tr. 6395-96). The Government briefly in summation referenced a summary chart containing properly admitted portions of some of the Exhibits, a reference to which no defendant responded in summation and to which the Government did not return in rebuttal. (Menendez SPA-108 n.11).

The defendants each moved for a new trial based on the Exhibits, which the District Court denied, concluding that (a) the defendants had "waived any objection to the inadvertent loading of the improperly redacted exhibits onto the jury's laptop"; (b) it was "extraordinarily unlikely that the jury was even aware of the miniscule amount of extra-record material on the laptop"; (c) "[e]ven in the infinitesimal chance that the jury happened upon this evidence, there is similarly a miniscule likelihood that the jury would have understood it"; and (d) the material was cumulative with "abundant properly admitted evidence." (Menendez SPA-106-09).

### b. Applicable Law

" '[D]efense counsel is as responsible as the prosecutor for seeing to it that only proper exhibits are sent to the jury room, and normally the failure of counsel to register a timely objection to the submission of improper evidence to the jury will be deemed a waiver, unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial.' " *United*

*States v. Stasiv*, No. 19-4286, 2021 WL 4888865, at *2 (2d Cir. Oct. 20, 2021) (quoting *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975)); *see also, e.g.*, *United States v. Jefferys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct. 17, 2022).

Although these cases use the language of "waiver," the analysis they employ is that governing the distinct concept of "forfeiture." *See Hamer v. Neighborhood Housing Services of Chicago*, 583 U.S. 17, 20 n.1 (2017) (noting terms are "often used interchangeably by jurists and litigants"). "Whereas forfeiture is the failure to make the timely assertion of a right," such as through the failure to object to exhibits being provided to the jury, true "waiver is the intentional relinquishment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). Since "[m]ere forfeiture, as opposed to waiver, does not extinguish an 'error' under Rule 52(b)," *Olano*, 507 U.S. at 733, this Court's cases regarding extra-record material—allowing relief in cases of extreme prejudice, *see, e.g.*, *Camporeale*, 515 F.2d at 188—effectively require review for plain error where defendants forfeit their objections.

Even leaving aside forfeiture, "[a]lthough a defendant's Sixth Amendment rights are implicated and prejudice is presumed when a jury is exposed to extra-record evidence, that presumption may be rebutted by a showing that the extra-record information was harmless." *Jefferys*, 2022 WL 9627085, at *3; *see also United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002) ("[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial."). "The touchstone of decision is thus not

the mere fact of infiltration of some molecules of extra-record matter but the nature of what has been infiltrated and the probability of prejudice." *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994).

To determine if the presumption is rebutted, a court considers "(1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury." *United States v. Farhane*, 634 F.3d 127, 169 (2d Cir. 2011). The "trial court should assess the possibility of prejudice by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985). A court "may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." *Id.*

A trial court has "broad discretion in reviewing the issue of the prejudicial effect of the infiltration of extra-record evidence into the deliberations of the jury," *id.*, and may inquire into the "circumstances surrounding the jurors' exposure to the information," *Farhane*, 634 F.3d at 169, but "may not reach further to inquire into the subjective effect of the information on jurors' mental processes or on the jury's deliberations," *id.*; *see also* Fed. R. Evid. 606(b). A trial court may find, based on circumstantial evidence, the presumption of prejudice rebutted by the low likelihood that jurors became aware of the extra-record material, and such a conclusion is entitled to "substantial weight." *United States v. Nkansah*, 699 F.3d 743, 751 (2d Cir. 2012) (no plain

error in denying mistrial where the district court concluded that it "was highly likely that the jury did not view" an extra-record document and its "contents were either immaterial or already on the record and therefore harmless"), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351, 366 & n.9 (2014).

### c. Discussion

#### i. The District Court Did Not Err in Finding No Reasonable Possibility that Any Juror Saw Any Extra-Record Material

The District Court's fact-bound finding that it was "extraordinarily unlikely that the jury was even aware of the miniscule amount of extra-record material on the laptop," which consisted of "a few phrases buried in thousands of exhibits and many thousands of pages of evidence" (Menendez SPA-107), is entitled to "substantial weight," *Nkansah*, 699 F.3d at 751, and is in any event manifestly correct.

The District Court did not err, much less clearly err, in its factual finding of an "infinitesimal" chance that the jurors saw the extra-record matter—based on the volume of the exhibits, the nature of the trial and arguments made by the parties, the jury's time to deliberate and notes, and the inability of defense counsel to find much of the extra-record matter even after conducting a document-by-document review for *weeks*. (Menendez SPA-107-08); *see United States v. Coney*, 76 F.4th 602, 608-09 (7th Cir. 2024) (affirming conclusion that it was unlikely jurors saw allegedly prejudicial

messages that "were contained among a massive number of pages given to the jury for a short period of time").

The defendants advance no persuasive reason to believe that any juror actually looked at any extra-record matter, let alone that Judge Stein clearly erred in finding otherwise. Contrary to Menendez's distorted account of the trial (Menendez Br. 38-39), Judge Stein rightly rejected Menendez's implausible suggestion that the jury "would naturally have investigated further" a fleeting reference in summation to a summary exhibit containing properly admitted portions of the Exhibits, to which no defendant even bothered to respond. (Menendez SPA-108 n.11). And that the jury requested a cable to access the laptop—the sole fact on which Hana and Daibes rely (Hana Br. 33-34; Daibes Br. 31)—does not remotely mean that the jurors reviewed each of the tens of thousands of pages of underlying exhibits and (without being aware of what to look for) found within hours what defense counsel failed to discover over weeks of focused searching after being put on notice of this precise issue. (*See* Menendez SPA-108 ("At bottom, defendants posit that the jury was a team of super sleuths, determined to uncover a few bits of information—that it had no reason to know existed—sprinkled on a few of pages within tens of thousands of pages of evidence.")).

Unable to show any error—let alone clear error—in Judge Stein's factual findings, Hana and Daibes retreat to a futile challenge to the District Court's authority to make them. (Hana Br. 33-34; Daibes

Br. 31).[34] But this Court has repeatedly upheld similar determinations that the presumption of prejudice was rebutted by the high likelihood that the jury did not see extra-record matter. *See Nkansah*, 699 F.3d at 751; *Jefferys*, 2022 WL 9627085, at *3; *United States v. Hansen*, 369 F. App'x 215, 216 (2d Cir. 2011).[35] As this Court's decision in *Nkansah* makes clear, certainty is not required. This Court upheld the *Nkansah* district court's finding that because the extra-record document was found within its folder after the day's

---

[34] Menendez, tellingly, ignores this finding altogether, though it is fatal to his claim. (Menendez Br. 38-40). Daibes acknowledges the finding but ignores the relevant cases, instead plucking out of context a quote from *Schlup v. Delo*, 513 U.S. 298, 329 (1995), involving the habeas standard for newly discovered evidence of innocence, which has nothing to do with this case. (Daibes Br. 31). Only Hana even attempts to address *Nkansah*, and, as set forth below, does so unconvincingly.

[35] Examining whether jurors saw the extra-record material is consistent with Rule 606(b)'s objective standard for what *effect* that material would have had on the jurors if seen. *See, e.g.*, *Schwarz*, 283 F.3d at 98 (Federal Rules "expressly permit testimony concerning 'whether extraneous prejudicial information was improperly brought to the jury's attention'" (quoting Fed. R. Evid. 606(b)); *see also, e.g.*, *United States v. Ianniello*, 866 F.2d 540, 544 (2d Cir. 1989) (directing hearing into "whether the judge or marshal made ex parte statements to the jury" and related facts).

deliberations, it was "highly likely" that the jurors did not view it. *See* 699 F.3d at 747. Although it was *theoretically possible* that those jurors examined the extra-record document and then placed it back in its folder before retiring for the evening, that bare possibility did not justify upsetting the verdict. Judge Stein's finding here fits comfortably within the discretion recognized in *Nkansah*, as the circumstances which could conceivably have led to the discovery of any excluded matter in this case are far more remote. The defendants—who, unlike the jury had the benefit of multiple computers, teams of professionals, awareness of what to look for, and *weeks* of time—did not find the remaining Exhibits even on a "document by document review" after the Government alerted them to the issue.[36] (Menendez SPA-107-08); *see also Coney*, 76 F.4th at 608-09 (relying on similar factors). It is thus far more than "highly likely that the jury did not view" the excluded matter, *Nkansah*, 699 F.3d at 751.

The Government's reuse of the laptop does not remotely justify an inference that the jury reviewed this material, as the defendants suggest. Such an inference is a form of spoliation sanction, and is available only upon a stringent showing that is utterly absent here. *See, e.g.*, *United States v. Cesiro*, No. 23-6649, 2024 WL 4647667, at *1 (2d Cir. Nov. 1, 2024). While an adverse inference requires an "obligation to preserve" evidence, *United States v. Tompkins*, No. 23-6525, 2024

---

[36] These factors fully answer Hana's demand for some "concrete indication" that the jurors did not find the Exhibits. (Hana Br. 34).

WL 4645689, at *3 (2d Cir. 2024), the defendants do not even try to show that the Government had a duty to maintain not just copies of the exhibits, but the actual jury laptop in a forensically pristine state, just in case. Similarly, the lack of a showing of bad faith is "fatal" to any spoliation claim, *Cesiro*, 2024 WL 4647667, at *1, and the Government—which discovered the issue and alerted defense counsel and the Court promptly—obviously did not act in bad faith.[37] And while spoliation requires "exculpatory value that was apparent" before evidence was destroyed, *Cesiro*, 2024 WL 4647667, at *1, there is no likelihood that the examination of the laptop would have even supported the defendants' claim that the jurors opened any of the Exhibits. *See, e.g.*, *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (agreeing with district court's observation that missing data likely "would show evidence contrary [to] the interests of the defendant").

The "infinitesimal" likelihood that the jury ever saw any extra-record matter (Menendez SPA-108) rebuts the presumption of prejudice and thus alone refutes this appellate claim, even disregarding *each* of

---

[37] Indeed, under the Federal Rules of Civil Procedure, an adverse inference based on the deletion of electronically stored information is *prohibited* without a showing of "intent to deprive another party of the information's use in the litigation." *Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025); *see also, e.g.*, *Tompkins*, 2024 WL 4645689, at *3 n.4 (noting this Court has applied civil spoliation rules in criminal cases).

Judge Stein's other findings, and even if legislative-act evidence errors were (unlike every other evidentiary error recognized in law, *see infra* at 86-91) structural. No rule of law entitles a defendant to a new trial just because jurors were *near* some documents without seeing them.

#### ii. The District Court Did Not Err in Finding No Reasonable Possibility that Any Extra-Record Material Caused Prejudice Even if Seen

In addition to finding that the jury almost certainly never saw the extra-record matter, Judge Stein made two additional independently sufficient findings, each equally compelling, and equally entitled to "substantial weight," *Nkansah*, 699 F.3d at 751.

First, Judge Stein correctly found that "[e]ven in the infinitesimal chance that the jury happened upon this evidence, there is similarly a miniscule likelihood that the jury would have understood it." (Menendez SPA-108). The extra-record portions of the Exhibits were snippets of messages scattered in mostly lengthy exhibits of thousands of text messages on numerous topics, including matters not otherwise referenced in the evidence. Not all of the Exhibits identify the senders and recipients in a readily comprehensible way, and not all use the same time zone, requiring the jury to perform laborious and technical cross-referencing to even discern the message sequence, senders, and

recipients.[38] As a result, a jury would encounter significant difficulty comprehending lengthy chains of messages spanning years, without any guidance from summary testimony, contextualizing evidence, argument, or explanation.

Because the extra-record matter was not presented with any such testimony or explanation, it would not, if the jury had somehow chanced to see it, remotely have had the powerful effect that the Government anticipated when arguing for its admission. (Tr. 1019-46). The Government's arguments—which defendants cite as if they applied to the evidence in the raw form the jury could have seen it (Menendez Br. 19, 38-39; Hana Br. 35; Daibes Br. 25-26)—were based not on the effect those phrases would have if stumbled upon unexplained, but rather on the effect the evidence would have had if the Government was able to present it in context and comprehensibly, and to make arguments based on it, none of which happened with the extra-record matter.

Moreover, Judge Stein found that the extra-record matter, even if seen and understood, was cumulative with "abundant properly admitted evidence," a well-recognized basis for rebutting the presumption of prejudice. *United States v. Hillard*, 701 F.2d 1052, 1064

---

[38] The Government's summary witnesses did this for the documents they summarized. (Tr. 1176, 1179-80, 1366). But this work, which was highly time-consuming (Tr. 1577), was *not* performed for any of the extra-record matter.

(2d Cir. 1983); *United States v. James*, No. 24-849, 2025 WL 2486539, at *5 (2d Cir. Aug. 29, 2025) (affirming finding of no prejudice where jury was exposed to un-admitted exhibits that "largely duplicated evidence that was properly admitted"). This finding too is amply supported by the record, which included extensive evidence of Menendez's corrupt promises on military aid. (Menendez SPA-109-10). Moreover, the Government encouraged the jury to convict without even relying on military aid to Egypt at all. (Tr. 6395-400). As this Court has affirmed denial of a new trial over cumulative extra-record information about a fact "critical to the government's case," *Hillard*, 701 F.2d at 1064, Judge Stein did not clearly err in doing likewise where the cumulative information concerned matters so far from "critical" that the Government urged the jury to convict without relying on them.

The conduct of the defendants at trial confirmed the lack of prejudice. The defendants did not bother to respond to the Government's brief summation reference to summaries of admitted portions of the Exhibits at all. It is only now, after learning in hindsight that non-admitted portions were included on the laptop, that these previously unmentioned exhibits loom so large in the defendants' account. The defendants' contemporaneous assessment—that the documents were not worth mentioning to the jury—is more reliable and should be weighed far more heavily than their *post hoc* protestations of prejudice.[39]

---

[39] As an additional indication of harmlessness, Nadine Menendez—in a trial with substantially the

That extra-record portions of the Exhibits had been excluded under the Speech or Debate Clause does not change this analysis. As set forth *infra* at 86-91, the erroneous introduction of evidence of legislative acts is not structural error but is subject to an "assessment of the record," *Johnson I*, 383 U.S. at 186, for harmlessness, which is amply shown here. *See Dowdy*, 479 F.2d at 228. And this Court can also affirm on the ground that the excluded evidence did not involve legislative acts at all, but rather Executive Branch communications. *See supra* at 58-61.[40]

#### iii. The Defendants Forfeited Their Objections to the Jury Laptop

Although this Court could affirm without reaching the issue, Judge Stein also correctly applied this Court's well-established law that the defendants forfeited their objections to the contents of the laptop, which they had an opportunity to inspect over multiple days. *Camporeale*, 515 F.2d at 188 ("Defense counsel

---

same evidence but without the extra-record matter—was convicted of five aiding and abetting counts in which the jury necessarily found that Menendez was guilty as a principal. But the Court need not rely on that fact to determine that Judge Stein did not clearly err.

[40] As the Government pressed this argument below (Dkt. 180 at 37-40), the defendants are wrong to claim the laptop involved a "conceded" violation of the Speech or Debate Clause (Menendez Br. 2).

is as responsible as the prosecutor for seeing to it that only proper exhibits are sent to the jury room.").

The defendants' objections to this finding (Menendez Br. 39-40; Hana Br. 27-30; Daibes Br. 28-30) rely on obfuscating that Judge Stein's finding of "waiver" merely tracked the language of this Court's cases, which use it "interchangeably," *Hamer*, 583 U.S. at 20 n.1, with the more accurate term "forfeiture." Despite sometimes using the language of "waiver," *see Camporeale*, 515 F.2d at 188, this Court's cases describe ways in which defendants *forfeit* their objections by not timely raising them, and effectively require review for plain error, *see Olano*, 507 U.S. at 733, of which, as set forth above, there was none.

Contrary to the defendants' claims, Judge Stein never found that Menendez *waived* the substantive protections of the Clause, such that the Government could rely on legislative acts in prosecuting him and be insulated from all review, as opposed to merely forfeiting exhibit objections, rendering them reviewable only for plain error.[41] That type of true waiver, which the Supreme Court considered in *Helstoski*, requires an "explicit and unequivocal renunciation of the protection," 442 U.S. at 491, which did not occur as to the Exhibits here. But the *Helstoski* court, which considered an appeal from the grant of a pretrial motion, had

---

[41] In finding forfeiture, Judge Stein noted that the defendants were not "denied a fair trial" (Menendez SPA-106), an unnecessary finding if he had found true waiver.

no occasion to consider preservation at all, let alone relieve a Senator from Federal Rule of Criminal Procedure 51(b)'s requirement to preserve exhibit objections.[42] Nor, as the Supreme Court has cautioned, should this Court do so itself. *See, e.g.*, *Puckett*, 556 U.S. at 135-36 (adhering to plain-error rule and criticizing judicial creation of exceptions).

### 8. Any Error Related to the Speech or Debate Clause Would Have Been Harmless

Because none of the defendants' Speech or Debate claims establish error, there is no need to consider harmlessness. But even had there been any such error, it would have been harmless, or at most would relate only to either the counts concerning Egypt, or the counts concerning Daibes's federal prosecution and Qatar.

Contrary to the defendants' arguments (Menendez Br. 49; Hana Br. 31-32; Daibes Br. 26-28), errors introducing legislative-act evidence are not structural, but instead are subject to harmless-error analysis, as the Supreme Court has held in *Johnson I*. 383 U.S. at 185-86. Rather than engage with *Johnson I*, Daibes selectively quotes the Supreme Court's clear language in a

---

[42] Similarly, Speech or Debate claims can be procedurally defaulted on collateral review, further confirming that *Helstoski* concerned only the waiver of the Clause's substantive protections and left intact the generally applicable rules for timely raising objections. *See United States v. Benally*, 187 F.3d 649 (Table), 1999 WL 451013, at *1 (9th Cir. 1999).

manner that obscures the Court's holding. (*Compare Johnson I*, 383 U.S. at 185-86 ("The Court of Appeals held that Johnson was entitled to a new trial on the conflict of interest counts because the admission of evidence concerning the speech aspect of the conspiracy count *was prejudicial on these other counts* as well. . . . [W]e find no occasion to review the Court of Appeals' *assessment of the record* in this respect." (emphasis added)) *with* Daibes Br. 28 ("Instead, for the Court, the 'prejudice[e]' (*i.e.*, the jury's inquiry into a member's legislative actions) *by its very nature* infected the 'other counts as well.'" (emphasis added))).

The Fourth Circuit's decision in *Dowdy* confirms that the introduction of legislative-act evidence is subject to harmless-error review. *See Dowdy*, 479 F.2d at 227-28 & n.21. Far from endorsing Daibes's reimagining of *Johnson I*, the Fourth Circuit *relied on* the non-structural nature of this error, affirming a Congressman's conviction on three counts despite the introduction of legislative-act evidence. *See* 479 F.2d at 228 ("[W]hile we conclude that it might have been preferable for defendant to have been tried on perjury counts six-eight under laboratory conditions which excluded any disclosure of legislative acts, we cannot say that there was sufficient prejudice to defendant by their disclosure to warrant overturning these convictions."). None of the defendants addresses this holding, even though *Dowdy* would have to be wrongly decided for them to be correct.

The defendants, similarly, cannot escape the decisions of this Court repeatedly declining to dismiss indictments where legislative-act evidence was

presented to the grand jury, *see, e.g.*, *Myers I*, 635 F.2d at 941 & n.10; *accord Williams I*, 644 F.2d at 952; *Murphy*, 642 F.2d at 700, even though structural errors before the grand jury result in dismissal, *Vasquez*, 474 U.S. at 263-64. Hana's argument that the standards for sufficiency of the evidence before the grand jury differ from those at trial (Hana Br. 32) is a non sequitur, as sufficiency is not the issue. Similarly, his citation to *United States v. Estes*, where the error was *not* structural, *see* 793 F.2d 465, 466 (2d Cir. 1986), does nothing to rebut the fact that *structural* errors before the grand jury require dismissal. Moreover, this Court has, in an alternative holding, endorsed harmless-error review even when allegedly legislative-act evidence is introduced at trial. After rejecting a Congressman's claim that evidence of his travel was Speech or Debate privileged, this Court held the trial evidence sufficient "even if there had been no travel"—*i.e.*, alternatively held any error harmless. *Biaggi*, 853 F.2d at 104.

Whereas the Supreme Court and Fourth Circuit have held that introduction of legislative-act evidence at trial is *not* structural error, and this Court's decisions similarly confirm it cannot be structural error, no court has held that it *is* structural error. The defendants rely heavily on the Eleventh Circuit's decision in *Swindall*, but while *Swindall* stated that harmless-error analysis was not the appropriate framework, it actually refused to dismiss counts of an indictment despite presentation of legislative-act evidence to the grand jury. 971 F.2d at 1534. Instead, the Eleventh Circuit reasoned that where "reference to a legislative act is irrelevant to the decision to indict," there was no violation at all. *Id.* at 1548. Since

structural errors before the grand jury result in dismissal, *Vasquez*, 474 U.S. at 263-64, *Swindall* necessarily did not treat the introduction of non-dispositive legislative-act evidence as structural error.

Indeed, the erroneous introduction of evidence, a "classic trial error," *Fulminante*, 499 U.S. at 309, is *never* structural error. *See, e.g.*, *Johnson II*, 520 U.S. at 468-69 ("We have found structural errors only in a very limited class of cases," listing cases, none involving erroneous introduction of evidence). Even if this Court were permitted to break from its own precedent, *see, e.g.*, *Tropeano*, 252 F.3d at 659, to make this the first and only evidentiary error that is somehow structural, it should not do so. *See Johnson II*, 520 U.S. at 470 ("Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.").

Contrary to Menendez's and Daibes's arguments (Menendez Br. 49; Daibes Br. 26-27), the fact that the Speech or Debate Clause serves interests beyond avoiding erroneous conviction does not create structural error, any more than do the Fifth Amendment privilege, *Fulminante*, 499 U.S. at 310, the First Amendment, *Pope*, 481 U.S. at 501-02, or the Fourth Amendment, *Chambers*, 399 U.S. at 53, all of which serve such interests. Indeed, the Fifth Amendment privilege not only serves numerous such interests, but has a strikingly similar formulation to the Speech or Debate Clause. In both cases, the Constitutional violation occurs during the evidentiary presentation, whether because the defendant is "compelled" to "be a witness" against himself, U.S. Const. amend. V, or

because a legislator is "questioned" as to legislative acts, U.S. Const. art. I, § 6, cl. 1. The fact that the Fifth Amendment privilege is nevertheless not structural, *Fulminante*, 499 U.S. at 310, refutes Daibes's imaginative claim that this phrasing means "the prejudice caused by violating the Clause *is* the jury's exposure to privileged evidence." (Daibes Br. 30).

The introduction of legislative-act evidence thus differs fundamentally from errors where "harm is irrelevant to the basis underlying the right," such as denial of self-representation or a public trial. *Weaver*, 582 U.S. at 295. Such errors are structural both because they clearly "affect[ ] the framework in which the trial proceeds," rather than being "error[s] in the trial process itself," and also because the right is truly "irrelevant to" the harm of conviction, *id.*—indeed, self-representation and, in some cases, a public trial, may make conviction *more* likely, unlike the Speech or Debate privilege, which obviously "make[s] prosecutions more difficult." *Helstoski*, 442 U.S. at 488.

Nor does the fact that the Speech or Debate Clause involves the separation of powers render any error structural. *See Lee I*, 833 F.3d at 69 ("the role of the grand jury as an independent check on prosecutors and courts" did not render error structural); *see also United States v. Williams* ("*Williams II*"), 504 U.S. 36, 47-50 (1992) (separation-of-powers principles governing grand jury); *Scarfo*, 41 F.4th at 174 (alleged separation-of-powers violation not structural); *Colon-Munoz*, 192 F.3d at 217 n.9 (separation-of-powers errors that "involve[ ] the structure of the federal government rather than the structure of the criminal trial

process as a reliable means of determining guilt or innocence" are not structural).[43]

Even if any of the challenged evidence was protected by the Clause, its introduction would have been harmless beyond a reasonable doubt. On the Egypt counts, the subject of Egyptian military aid was not necessary for conviction—indeed, the Government urged the jury to convict based solely on Menendez's attempts to pressure the USDA. (Tr. 6395-400).[44] As set forth *infra* at 112-16, the evidence of these concededly non-legislative corrupt promises and attempts was truly "overwhelming." *United States v. Jass*, 569 F.3d 47, 65 (2d Cir. 2009). And on the counts related to Daibes's federal prosecution and Qatar, the evidence of Menendez's corrupt promises and attempts to affect Daibes's case *after* Sellinger's confirmation (a paradigmatic non-legislative attempt to influence the Executive Branch) was similarly overwhelming. (*See infra* at 131-32).

---

[43] Daibes's analogy to the presidential immunity recognized in *Trump v. United States*, 603 U.S. 593, 631-32 (2024) (Daibes Br. 31) is even farther afield. That immunity "differs in both origin and purpose" from Speech or Debate immunity, *Carroll v. Trump*, No. 24-644, 2025 WL 2585964, at *9 (2d Cir. Sep. 8, 2025), and that case did not address structural error at all.

[44] Daibes is thus wrong to claim that "[t]he Egypt scheme turned principally on" military aid, let alone a "single text message" on that subject. (Daibes Br. 32).

Even, however, if any evidence of legislative acts had been introduced and was not harmless as to the directly relevant counts, it would undeniably be harmless as to the counts related to other parts of the scheme, as well as to Menendez's obstruction of justice. Menendez's attempt to characterize the Government's proof as a "three-legged stool" (Menendez Br. 1) finds no support in the record. Quite the opposite: as described in Point III, *infra*, the three main subdivisions of the corruption scheme—Egypt, the New Jersey Attorney General conduct, and the Daibes federal prosecution and Qatar conduct—were each presented separately and supported by extensive independent proof, as Judge Stein recognized. (*See* Menendez SPA-29-37, 53-60 (Egypt counts); Menendez SPA-38-44 (New Jersey Attorney General counts); Menendez SPA-44-49 (Daibes federal prosecution and Qatar counts)).

Menendez's and Hana's attempts to manufacture an interdependence between the three sets of counts (Menendez Br. 50-51; Hana Br. 36) relies on the sort of limited "supplemental" reference in summation that this Court routinely holds to be harmless beyond a reasonable doubt. *See United States v. Bailey*, 743 F.3d 322, 345 (2d Cir. 2014) (limited nature of reference to inadmissible evidence in summation "only reinforces a conclusion of harmlessness"). In its summation, for the corrupt intent elements of each set of counts, the Government first discussed at length the indisputable documentary evidence pertaining only to that set of counts, apart from reference to a shared thing of value. (*See* Tr. 6390-401 (Egypt); Tr. 6431-41 (New Jersey Attorney General); Tr. 6489-503 (Daibes federal prosecution and Qatar)). The Government explicitly argued

that this evidence *alone* sufficed for conviction as to that part of the scheme. (*See, e.g.*, Tr. 6401 (regarding Egypt counts: "[E]ven if there were nothing more than what we've just been through, we would be done with these elements."); Tr. 6441 (similar regarding New Jersey Attorney General counts); Tr. 6503 (similar regarding Daibes federal prosecution and Qatar counts)). The Government then, for each set of counts, listed four other categories of reasons that set was proven, again not relying on any other set apart from the shared thing of value. (*See* Tr. 6401-22 (Egypt); Tr. 6447-61 (New Jersey Attorney General); Tr. 6504-21 (Daibes federal prosecution and Qatar)).[45] Only after this, as a *sixth* corroborative reason for each set of counts, did the Government briefly reference the evidence on the other sets, to further support the already overwhelming inference of guilt. (*See* Tr. 6422-23 (Egypt); Tr. 6461-62 (New Jersey Attorney General); Tr. 6521-23 (Daibes federal prosecution and Qatar)). These brief references were made during a summation that stretched to almost 200 pages. (*See* Tr. 6366-441, 6447-556).

---

[45] The shared thing of value was Daibes's October 2021 provision of transportation and gold to Menendez, which related both to the Egypt counts and to the federal prosecution and Qatar counts. (*See, e.g.*, Tr. 6414, 6493, 6502-03, 6515-21). But brief references to a shared *thing of value* have nothing to do with any *legislative-act* evidence. *See, e.g.*, *Brewster*, 408 U.S. at 526 ("Taking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act.").

The Government's reference, in discussing each set of counts, to the evidence on the other sets, is precisely the type of limited reference that this Court has held harmless beyond a reasonable doubt. In *United States v. Lombardozzi*, where evidence was admitted in violation of the Confrontation Clause, and directly referenced in summation, this Court still held the error harmless beyond a reasonable doubt because (1) "early in the summation" the Government argued that other, properly admitted, evidence was "all you need to convict the defendant"; (2) the reference to the prohibited evidence was brief in contrast to the overall summation; (3) the reference to the prohibited evidence also emphasized that it was supported by "all the evidence which you heard"; and (4) the evidence was overwhelming. 491 F.3d 61, 76-77 (2d Cir. 2007). Each of these factors applies in this case, rendering any error harmless under numerous decisions of this Court. *See, e.g.*, *Bailey*, 743 F.3d at 345; *United States v. Treacy*, 639 F.3d 32, 45-46 (2d Cir. 2011) (Confrontation Clause violation harmless even where "repeatedly emphasized" in summation, in light of strength of other evidence); *United States v. Reifler*, 446 F.3d 65, 87-88 (2d Cir. 2006); *United States v. Al-Sadawi*, 432 F.3d 419, 426 (2d Cir. 2005).[46]

---

[46] Nor, contrary to Hana's undeveloped suggestion (Hana Br. 36), would the invalidation of any counts create spillover prejudice on any other counts, given that no count involves evidence significantly more inflammatory than any other; the bulk of the evidence on each count would have been admissible to prove

Thus, even if legislative-act evidence related to Egypt was introduced and was not harmless as to the counts concerning Egypt, it would be harmless as to the counts related to Daibes's federal prosecution and Qatar. Even if legislative-act evidence related to Qatar were introduced and not harmless as to those counts, it would be harmless as to the Egypt counts. And even if *each* of *every* defendant's Speech or Debate claims were meritorious—and none is—none would affect Menendez's and Hana's convictions on Counts Nine and Ten, the substantive offenses related to Menendez's corrupt promises and attempts to influence two New Jersey criminal cases in exchange for the Convertible.[47]

Similarly, even if every Speech or Debate claim was meritorious, each would be harmless as to Menendez's convictions on Counts Seventeen and Eighteen, for obstruction of justice. Obstruction convictions are often affirmed even when underlying convictions are reversed. *See, e.g.*, *United States v. Triumph Cap. Grp.*, 544 F.3d 149, 152 (2d Cir. 2008) (affirming obstruction

---

intent on the other counts; and the evidence on each count was overwhelming. *See, e.g.*, *United States v. Sullivan*, 118 F.4th 170, 211 (2d Cir. 2024).

[47] None of the cases Menendez cites (Menendez Br. 50-51)—each involving intricate factual or legal dependencies between counts—remotely applies to the circumstances here, where three distinct *quid pro quo* agreements, each proved with independent evidence, were briefly referenced as corroborating each other.

conviction, reversing all underlying convictions); *United States v. Mangano*, 128 F.4th 442, 452 (2d Cir. 2025) (affirming obstruction convictions, reversing certain underlying convictions); *United States v. Aiello*, 118 F.4th 291, 306-07 (2d Cir. 2024) (affirming false statements conviction following vacatur of underlying conviction). So too here. Even had Menendez not been guilty of corruption or foreign influence offenses, he could still readily have been convicted for endeavoring to obstruct the grand jury's investigation.[48] Contrary to Menendez's argument (Menendez Br. 51), his obstruction did not depend on the payments being bribes. Rather, Menendez obstructed justice by submitting false evidence to the grand jury that the payments were loans, when in fact they were not loans. (*See infra* at 138-40). The evidence that these payments were not loans had nothing to do with legislative acts—it was documentary and cooperator evidence of Menendez's and his coconspirators' statements. (*See* Tr. 6544-49).

---

[48] Menendez badly misrepresents the Government's remark that the first counts discussed—which introduced *elements* that would be repeated in other corruption counts—were a "building block" for other counts (Menendez Br. 51). The Government never said that counts related to other parts of the scheme—or, as he absurdly claims, to obstruction—depended *factually* on those counts. (*See* Tr. 6373).

# POINT II

## The Jury Was Properly Instructed

The District Court properly instructed the jury on the requirement that bribery offenses involve a *quid pro quo* contemplating an official act. Menendez's objection to the official act instruction (Menendez Br. 60-62) is frivolous in light of this Court's decision in *United States v. Mangano*, 128 F.4th at 476-77, approving an instruction substantively indistinguishable from that given by Judge Stein. And Hana's challenge to the *quid pro quo* instruction (Hana Br. 40-43) rests, entirely, on a strained reading of a single sentence in a two-paragraph instruction containing the very words that Hana argues were necessary.

### A. Relevant Facts

#### 1. The Official Act Instruction

Judge Stein instructed the jury:

> To qualify as an official act, the public official must make a decision or take an action on the applicable question or matter, or agree to do so. The decision or action does not need to be specifically described in any law, rule, or job description to be considered by you to be an official act.
>
> The decision or action may include using one's official position to exert pressure on another official to perform or not perform an official act. It may also include using one's official position to provide advice to

> another, knowing or intending that such advice will form the basis for an official act by another.
>
> However, not every action taken by a public official qualifies as an official act. Some examples of actions that are not without more official acts are setting up a meeting—these are things that are not official acts—setting up a meeting isn't an official act. Talking with a lobbyist or another official isn't an official act. Organizing an event, expressing support for an action, decision, or idea, without more, those actions by themselves do not constitute a decision on a question or matter and are therefore not official acts.
>
> That is not to say that sort of activity is not relevant. For example, such activity may be evidence of an agreement to take official acts or to advise or pressure another official to take official acts.
>
> What's an official act, ladies and gentlemen? It's for you, because it is a fact issue. You will decide what an official act is in the context of these charges.

(Tr. 7088-89).

### 2. The *Quid Pro Quo* Instruction

Judge Stein instructed the jury:

> Bribery involves an exchange of a thing or things for official action by a public

official. In other words, a quid pro quo, which is Latin for this for that or these for those.

. . .

The government has to prove that the defendant you are considering demanded, sought, received, or agreed for a public official to receive a thing of value in exchange for the promise or performance or non-performance of an official act. To prove a quid pro quo, the government must show both (1) there was a particular question or matter on which the official promised to act in exchange for the thing of value and (2) that the particular question or matter was identified and agreed upon at the time the public official, here Mr. Menendez, accepted or agreed to accept the payment or benefit.

While the government is not required to prove that the particular act of influence was identified at the time the public official accepted or agreed to accept the payment or benefit, it is not sufficient if the government only shows that a public official simply promised to take some or any official action. The government must prove at a minimum that the public official promised to take official action on a particular question or matter as the opportunity to influence that same question or matter arose.

(Tr. 7089-90).

Soon after giving the above charge, at the defendants' request, Judge Stein further instructed the jury at length on the principle that "goodwill gifts" are "not bribes." (Tr. 7092-93).

## B. Applicable Law

### 1. Review of Jury Instructions

A defendant challenging a jury instruction "must demonstrate both error and ensuing prejudice." *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009). Instead of reviewing the challenged phrases in isolation, this Court reviews "the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Raniere*, 55 F.4th 354, 362 (2d Cir. 2022); *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989). An instruction is "erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Silver* ("*Silver I*"), 864 F.3d 102, 118 (2d Cir. 2017).

This Court reviews preserved instructional errors *de novo*, but instructions to which the defendant did not object are reviewed only for plain error. *See, e.g.*, *United States v. Guldi*, 141 F.4th 435, 446 (2d Cir. 2025). To preserve an objection to jury instructions, a defendant must "direct the trial court's attention to the contention that is to be raised on appeal." *United States v. Masotto*, 73 F.3d 1233, 1237 (2d Cir. 1996); *see also* Fed. R. Crim. P. 30(d). When a defendant "states distinctly, under Rule 30, the grounds for

objecting [to] the charge below, but urges a different ground on appeal, the objection is not properly preserved on appeal and [the Court] therefore review[s] for plain error." *United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001).

Even where a jury-instruction objection was preserved, reversal is not warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011).

#### 2. The Official Act and *Quid Pro Quo* Requirements

The Supreme Court has interpreted the federal bribery statute's requirement of an actual or promised official act:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official

> position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*McDonnell v. United States*, 579 U.S. 550, 574 (2016).[49]

This Court has affirmed the use of jury instructions tracking this language, *see Mangano*, 128 F.4th at 476-77, rejecting defense arguments that "if one public official has no formal or official relationship with another, he essentially acts as a private party in advising or seeking to pressure the other official." *Id.* at 476; *see also id.* at 456-57, 477 (affirming conviction based on "clear evidence" of defendant pressuring other officials despite not having official supervisory authority over them or making overt threats); *Biaggi*, 853 F.2d at 98-99 (affirming conviction of Congressman for attempts to influence city officials); *United States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are

---

[49] The parties in this case—as was done in *McDonnell*, 579 U.S. at 562—agreed to apply the definitions to the honest services fraud and extortion charges, as well as to bribery. (Menendez A-347, 362).

indisputably formal exercises of governmental power constituting official acts under *McDonnell*."); *United States v. Boyland*, 862 F.3d 279, 292 (2d Cir. 2017) (affirming conviction of state assemblyman for taking bribes in exchange for helping secure permits from city agencies).[50]

Although bribery requires a *quid pro quo* for official action, "a public official is not required to actually make a decision or take an action . . . . [I]t is enough that the official agree to do so. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *McDonnell*, 579 U.S. at 572; *see also Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his

---

[50] Other courts agree. *See United States v. Kimbrew*, 944 F.3d 810, 814, 815 (9th Cir. 2019) (affirming Section 201 conviction of Congresswoman's aide based on corrupt promises to pressure city employees); *United States v. Lee* ("*Lee II*"), 919 F.3d 340, 352 (6th Cir. 2019) (rejecting argument that "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official").

agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense.").

Following *McDonnell*, this Court reaffirmed that a *quid pro quo* may include a promise or agreement to exchange things of value for official acts as opportunities arise, so long as the question or matter is identified at the time of the bribe or extortion. *See United States v. Silver* ("*Silver II*"), 948 F.3d 538, 568 (2d Cir. 2020) ("the Government must prove that, at the time the bribe was accepted, [the defendant] promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose" (emphasis in original)).

## C. Discussion

### 1. Menendez's Challenge to the Official Act Instruction is Meritless

Menendez's argument that the District Court was required to insert lengthy limiting definitions for the terms "pressure" and "advice" (Menendez Br. 60-62) is indistinguishable from one this Court has rejected. In *Mangano*, the defendant similarly argued the district court erred by declining to limit pressure or advice to those circumstances where the defendant had a "formal or official relationship with" the official whom he sought to pressure or advise to take action. *See* 128 F.4th at 476. This Court rejected that claim, explaining that *McDonnell* contains no such requirement. *Id.* at 476-77. Moreover, this Court approved of a jury instruction materially identical to that given by Judge Stein here. (*Compare Mangano*, 128 F.4th at 476 ("The decision or action may include using one's official

position to exert pressure on or to order another to perform an official act. It may also include using one's official position to provide advice to another, knowing or intending that such advice will form the basis for an official act by another . . . ." (quoting instructions)), *with* Tr. 7088 ("The decision or action may include using one's official position to exert pressure on another official to perform or not perform an official act. It may also include using one's official position to provide advice to another, knowing or intending that such advice will form the basis for an official act by another.")).

Even had this Court not already decided to the contrary, Menendez offers no real argument that a lay juror needs to be told, much less at length, what "pressure" or "advise" means. A district court need not explain straightforward terms such as these. *Cf., e.g.*, *United States v. Ng Lap Seng*, 934 F.3d 110, 145 (2d Cir. 2019) (rejecting claim that jury needs to be told what "business" means). Rather than explain how these terms allegedly have some different "colloquial" meaning (which they do not), Menendez really just complains that the District Court supposedly did not cabin the advice or pressure to circumstances in which Menendez uses his official position. (Menendez Br. 61). But Judge Stein did just that, instructing, without objection, that the requisite pressure or advice must involve the use of "one's official position" (Tr. 7088), using language directly from *McDonnell*. *See* 579 U.S. at 574. And no rational juror could possibly have understood this instruction to permit conviction if Menendez, as he now claims, did no more than "merely express[ ]" his "preference," in an unofficial and "colloquial" manner, on a general "policy." (Menendez

Br. 60-61 (emphasis omitted)). All the more so because Judge Stein also instructed, again directly from *McDonnell*, that "expressing support for an action, decision, or idea, without more," is not sufficient. (Tr. 7088).

Even if some form of additional definition was permissible (although not required), Menendez's requested instruction was not, since it would have drastically narrowed *McDonnell*'s plain language and imposed a requirement of actual action that the Supreme Court and this Court have expressly rejected. (*Compare* Menendez A-325 ("Menendez must have used his power to threaten, coerce, or similarly apply force") *with McDonnell*, 579 U.S. at 572 ("a public official is not required to actually make a decision or take an action"), *and Silver II*, 948 F.3d at 551 ("it is not necessary that the public official in fact intend to perform the contemplated official act")). A defendant is not entitled to a jury instruction that is legally incorrect. *See United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008).

In any event, given the overwhelming evidence of Menendez using his official position to pressure and advise, as well as promising to do so, *see infra* Point III, any error would have been harmless.

### 2. Hana's Challenge to the Quid Pro Quo Instruction is Meritless

Hana claims that Judge Stein committed prejudicial error by allegedly failing to instruct the jury about the "timing requirement" for proving a *quid pro quo*. (Hana Br. 40). Hana is wrong.

As Hana acknowledges (Hana Br. 41), Judge Stein correctly instructed the jury on the timing requirement set forth in *Silver II*, 948 F.3d at 568. (*See* Tr. 7089 ("To prove a quid pro quo, the government must show both (1) there was a particular question or matter on which the official promised to act in exchange for the thing of value and (2) that the particular question or matter was identified and agreed upon *at the time* the public official, here Mr. Menendez, accepted or agreed to accept the payment or benefit." (emphasis added))).

Hana's only argument is the unpersuasive claim that a later portion of the same instruction somehow negated this clear timing requirement because, in a sentence using the words "at a minimum," it did not reiterate the timing requirement. (Hana Br. 40-41). But the sentence Hana objects to—*i.e.*, "The government must prove at a minimum that the public official promised to take official action on a particular question or matter as the opportunity to influence that same question or matter arose" (Tr. 7090)—obviously discusses the different concept of the minimum *specificity* of the agreement, and does not negate the timing requirement any more than it negates any other portion of the jury charge that is not repeated in that sentence.

Even on its own, the "at a minimum" sentence does not bear Hana's reading, but it would be of no moment even if Hana's reading of the sentence were tenable—because that is not how jury instructions are understood by a jury or reviewed by this Court. Rather, this Court reviews "the instructions as a whole to see if the

entire charge delivered a correct interpretation of the law." *Raniere*, 55 F.4th at 362; *see also United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) ("We emphatically do not review a jury charge on the basis of excerpts taken out of context, but in its entirety[.]"). And when read together with the timing requirement that appears immediately before this sentence in the instructions (Tr. 7089-90), it is even clearer that the "at a minimum" sentence does not *negate* that requirement but correctly adds additional detail by describing the minimum level of *specificity* with which the action must be identified.

In short, Hana's argument collapses on the slightest scrutiny of the actual instruction he challenges. Far from a case where an erroneous statement conflicted with a correct "instruction elsewhere in the jury charge" (Hana. Br. 41), this is one in which the only "error" evaporates upon reading the sentence in its immediate context. There is no likelihood that the jury understood the instructions in the manner that Hana asserts. *See Victor v. Nebraska*, 511 U.S. 1, 6 (1994) ("[T]he proper inquiry is not whether the instruction could have been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it."); *cf. United States v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007) (rejecting claim resting on a "careful picking apart of the instructions' wording" that "reveal[ed] minor ambiguity"). Nor is there any likelihood that the jury understood Judge Stein's instruction to permit conviction for mere

"general ingratiation or access payments" (Hana Br. 42),[51] particularly given that Judge Stein gave a lengthy freestanding instruction that "goodwill gifts" are not bribes (Tr. 7092-93).

Any conceivable error, moreover—and there was none—would have been harmless. The evidence of Hana's guilt was overwhelming, *see infra* Point III, and the entire case was presented to the jury based on an agreement as to specific questions or matters from the beginning. (*See* Tr. 6389-92).

## POINT III

### The Evidence Was Sufficient

The evidence introduced during the nine-week trial was overwhelming, and the defendants' contrary arguments rely on impermissibly construing it in the light most favorable, not to the verdict, but to themselves.

### A. Applicable Law

"A defendant challenging the sufficiency of the evidence bears a heavy burden[.]" *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). A verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (emphasis in original). Accordingly, a "court may enter a judgment of acquittal only if the

---

[51] Hana did not make this argument in the District Court, rendering this portion of his claim reviewable for plain error only. *See Vasquez*, 267 F.3d at 87.

evidence" of guilt "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004).

On a sufficiency challenge, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). A reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008). Because "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court," *United States v. Cuti*, 720 F.3d 453, 462 (2d Cir. 2013), "the government's case need not exclude every possible hypothesis of innocence," *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

"These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105. "A jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015).

With respect to a conspiracy conviction, the deference afforded to a verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a

conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

## B. Discussion

### 1. The Evidence Proved the Counts Related to Egypt

#### a. The Evidence Showed Official Acts

The evidence established that Menendez agreed, promised, and in some cases performed official acts for the benefit of Egypt and Hana. The defendants do not dispute that actions by Menendez to approve U.S. military aid would amount to official acts (*see* Menendez Br. 57-59; Hana Br. 47; Daibes Br. 41), and while the Government, as noted in Point I, did not introduce evidence of the *performance* of any such acts, the *agreement* to perform or *promise* of such acts was alone sufficient. *See, e.g.*, *Evans*, 504 U.S. at 268.

Among other evidence, Menendez texted Hana, through Nadine Menendez, a promise to swiftly approve a sale of tank ammunition, a clear promise of an official act. (GX-B201-10).[52] Similarly, even if Menendez's decision to ghostwrite a letter for the Egyptian government in support of U.S. arms sales to Egypt was not itself an official act, the context—Menendez

---

[52] Hana's observation that the text message itself is not, without more, an official act (Hana Br. 46-47) misses the point, since it is a promise of one, which is itself sufficient. *See, e.g.*, *Evans*, 504 U.S. at 268.

writing a response to the basis for another Senator's holds on FMF—allowed the strong inference that Menendez had promised that he would not perform the official act of imposing holds on that financing for those same reasons. (GX-A403 ("I write to *respond to some of the issues* that have been raised by Senator [Senator-1] and others, which have lead [sic] to *a hold on $300 million dollars* in appropriated aid to Egypt." (emphases added)). In this context, the jury could also reasonably interpret Menendez's offers of information about other arms transfers (GX-1302 row 166) or legislation affecting the region (*id.* rows 1070-72) as evidence of additional promises of official acts. (*See* Menendez SPA-30 n.4).

Menendez's promises and attempts to influence the official position of the USDA on a foreign relations matter also, contrary to the defendants' arguments (Menendez Br. 58-59; Hana Br. 49-50; Daibes Br. 41-42), encompassed an official act. The USDA's campaign to influence Egypt was part of "the United States official diplomatic relations" (Tr. 1789), involving the formulation of an official U.S. policy position through an interagency process and the articulation of that position in bilateral communications by the USDA and the acting ambassador in Cairo, who was the President's representative. (Tr. 390, 471-72).

These formal acts of diplomacy, which Menendez promised and attempted to influence, are official acts of the Executive Branch. Under Secretary McKinney's articulation and effectuation of the position of the United States in bilateral diplomacy was within the "specific duties" conferred on McKinney "by the

authority of his office." *McDonnell*, 579 U.S. at 570; (*see, e.g.*, Tr. 1769).[53] These acts have particular significance given the need for "the Nation" to speak "with one voice" on foreign policy. *Zivotofsky*, 576 U.S. at 30; *Biden v. Texas*, 597 U.S. 785, 805 (2022) ("Article II of the Constitution authorizes the Executive to engage in direct diplomacy with foreign heads of state and their ministers.").

The defendants' attempts to liken the USDA's actions to "general policy issue[s]" such as "economic development" (Hana Br. 50; Daibes Br. 42), ignore the record, which reflected that the USDA sought reversal of a specific decision by Egypt denying official recognition to seven U.S.-based halal certifiers and granting it to Hana's company. (Tr. 388; GX-8B-7; GX-8B-20). The official position of the United States on the legal status of eight identified corporate entities is nothing like a "broad policy objective" such as "Virginia business and economic development," which was found wanting in *McDonnell*, 579 U.S. at 578-79. Instead, the focus on eight identified entities resembles the specific

---

[53] Contrary to the defendants' arguments (Menendez Br. 59; Hana Br. 50; Daibes Br. 42), the evidence thus allowed the jury to find far more than a mere public statement or use of letterhead. The use of official letterhead was never argued to be "by itself, a formal exercise of government power," *Silver I*, 864 F.3d at 120, but rather one among many indicia that McKinney's actions fell within the "specific duties" conferred by the "authority of his office," *McDonnell*, 579 U.S. at 570.

proposals related to identified chemical compounds approved as official acts in *McDonnell*. *Id.* at 570-71.[54]

Indeed, although Menendez's agreement and promises alone are sufficient and no action is required, Menendez's actions are precisely the sort of pressure or advice contemplated in *McDonnell*. The fact that Menendez was not an executive branch official did not mean he could not attempt (much less promise) to advise or pressure McKinney. *See, e.g.*, *Mangano*, 128 F.4th at 456-57, 477 (affirming conviction based on "clear evidence" of defendant pressuring other officials despite not having official supervisory authority over them); *United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("[F]ederal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision."); *Lee II*, 919 F.3d at 352 ("nowhere in *McDonnell* did the Supreme Court state that it was creating" a rule under which "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official").[55]

---

[54] Because Menendez's call related to this concrete and focused matter, there is no merit to Hana's claim (Hana Br. 50) that affirming would open the floodgates to acts lacking such concreteness and focus.

[55] To the extent Menendez and Daibes (Menendez Br. 56; Daibes Br. 42) seek to read into *United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017) any

The jury was entitled to reject the defendants' recharacterization of Menendez's call to McKinney as a routine matter not involving any pressure or advice (Menendez Br. 57-58; Hana Br. 51; Daibes Br. 42-43). *See, e.g.*, *United States v. Burke*, No. 19 Cr. 322, 2024 WL 3090277, at *16 (N.D. Ill. June 21, 2024) ("[The defendant's] attempt to characterize his conduct as a 'permissible constituent referral,' is a thinly veiled challenge to the jury's findings of his corrupt intent."). The jury could infer that the nature and context of Menendez's call showed an attempt to use his official position to apply pressure (or, at a minimum, a promise of such pressure, of which the call was the start). *See, e.g.*, *id.* ("[W]hen the longest-serving alderman and Chairman of the Committee on Finance asks a city official to 'look into' a pending permit, the request is not taken lightly."); *United States v. Gilbert*, No. 17 Cr. 419 (AKK) (TMP), 2018 WL 2095853, at *5 (N.D. Ala. May 4, 2018) (rejecting argument that state legislator did not commit official act because he "did not threaten to hold an oversight hearing or withhold agency funding unless the state agencies did what he wanted").

Menendez's call to McKinney was unique in McKinney's experience. (Tr. 2009-10). Indeed, McKinney felt the need to reassure his professional staff, the only time he had ever done so after a call from a Member of Congress. (GX-1302 row 743; Tr. 1820-21). While an official act need not be unusual, *see City of Columbia*

---

broader principle than the facts of that very different case, any such principle has been rejected by this Court. *See Mangano*, 128 F.4th at 456-57, 477.

*v. Omni Outdoor Advert.*, 499 U.S. 365, 378 (1991), such evidence about the unusual nature of a politician's contact with an official can support an inference of attempted pressure. *See, e.g.*, *Lee II*, 919 F.3d at 357 (affirming where prosecutor testified that the defendant "had never contacted her in such a way regarding other cases").[56]

### b. The Evidence Showed a *Quid Pro Quo*

The evidence overwhelmingly proved a corrupt *quid pro quo* arising out of Menendez's agreement,

---

[56] Menendez's reliance on *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008), (Menendez Br. 56-58) is misplaced. In that case, the defendant only "contacted mayors and other local officials urging them to comply with Rhode Island law governing patient entitlement to be taken by ambulance to the hospital of the patient's choice," 513 F.3d at 294, a form of lobbying legal under state law (and which likely would not amount to a concrete and focused question or matter, divorced as it was from specific patients). That pre-*McDonnell* out-of-circuit case says nothing about whether a defendant seeking to pressure or advise officials regarding a specific question or matter must make any explicit statement, and certainly cannot displace this Court's binding law that no such magic words are required for an attempt (let alone a promise). *See, e.g.*, *Mangano*, 128 F.4th at 456-57, 477; *United States v. Reichberg*, 5 F.4th 233, 249 (2d Cir. 2021).

promises, and attempts to take official acts related to Egypt. Contrary to Hana's and Daibes's claims of an after-the-fact gratuity (Hana Br. 53-58; Daibes Br. 47-48), the evidence showed that the payments Hana eventually caused his halal company to make, with Daibes's assistance, fulfilled an agreement and promises made far earlier, and well in advance of Menendez's official acts. *See, e.g.*, *Snyder v. United States*, 603 U.S. 1, 19 (2024) ("the timing of the agreement is key, not the timing of the payment").[57]

As Judge Stein recognized, the evidence was sufficient for the jury to conclude that the corrupt bargain of payments for official acts was agreed to far in advance of when the payments were actually made. (Menendez SPA-32-34). Hana's promises of benefits to Nadine Menendez began around the time of the first meeting she arranged between Menendez and the Egyptian general Shawky in March 2018. (*See, e.g.*, GX-1302 row 30 (February 2018 text from Aslanian that Nadine Menendez's contacts with Menendez would "result to a good job for" her); *id.* row 184 (May 2018 email from Nadine Menendez to Menendez noting that Shawky and Hana had gotten her "clearance for a project" and asking Menendez to ghostwrite a letter for the Egyptian government); *id.* row 520 (March 26, 2019 text from Nadine Menendez to Howard Dorian complaining about "a year of broken promises by Will to me", claiming she had "kept every promise to Will", and stating, "I am willing to give 100% and make

[57] Menendez does not challenge the sufficiency of the evidence of this or any of the other *quid pro quos*.

sure this goes skyhigh on condition that I start getting my $ 2500/week"); *id.* row 545 (April 2, 2019 text from Dorian telling Nader Moussa, "[I]t's really important that we make sure Nadine stays happy because if she's not she's going to cancel the meetings that Wael has set up with Senator Menendez")).[58] The text and voice messages likewise make clear that Menendez was aware that Hana had promised Nadine Menendez a job through the halal company and was initially delinquent in making the promised payments. (*See* Menendez SPA-33-34; *see also* GX-1302 rows 527, 588).

Hana and Daibes argue that Menendez was not specifically aware that Nadine Menendez was behind on her mortgage payments until July 2019 (Hana Br. 53-54; Daibes Br. 47-48), but as Judge Stein recognized, the relevant issue was whether Menendez knew that Hana had promised payments to Nadine Menendez, not the precise form those payments ultimately took. (*See* Menendez SPA-36). On that point, the evidence demonstrated that Menendez knew the payments were promised and helped ensure that Hana made them, including through pressuring Daibes to facilitate them. Nadine Menendez told Menendez about the need for the money for her mortgage (GX-1302 row 956 (Nadine Menendez to Daibes: "So, um, I will tell

---

[58] Hana's suggestion that these "promises" may not have concerned payment (Hana Br. 57) is a jury argument refuted both by the message itself (GX-1302 row 520) and by references throughout early 2018 to remuneration in the form of a "job" (*id.* row 30), "deals" (*id.* row 81), or a "project" (*id.* row 184).

Bob on Friday"); *id.* row 964 (Nadine Menendez to Menendez: "I double checked about the payments")), leading him to follow up to ensure that she asked Daibes to induce Hana to pay (*id.* rows 956, 968-73, 981), resulting in Hana paying promptly (*id.* rows 986-88; *see also* Menendez A-1421). Indeed, Nadine Menendez ultimately deducted the payment made to her mortgage company from the supposed paychecks she demanded (GX-D102-C), showing that the mortgage payment was made in partial satisfaction of Hana's corrupt promises of a paycheck—promises dating back long before the official acts Menendez promised and took.

The defendant's arguments also improperly fail to analyze the evidence "in conjunction, not in isolation." *Persico*, 645 F.3d at 104. Viewed as a whole, the timing of the parties' communications and conduct proves that Menendez agreed to be, and was, influenced by Hana's promises of payment to Nadine Menendez—promises that Daibes helped make good on. As far back as May 2018, Menendez ghostwrote a letter for the Egyptian government *the very day* that Nadine Menendez said that she had gotten "clearance for a project" (which, in context, plainly involved a promise of payment) from Hana and Shawky, the Egyptian general. (GX-1302 row 184). And Menendez's promises to approve the tank ammunition sale took place during the "year of broken promises" by Hana of employment for Nadine Menendez. (*Id.* row 520). Similarly, Menendez's contacts with McKinney took place not only after a year of such promises, but also just weeks after Menendez had been informed that Hana would receive the halal monopoly (*id.* row 588 ("Seems like halal

went through. It might be a fantastic 2019 all the way around")), and almost immediately after Hana's requests to him, passed along through Nadine Menendez (*id.* rows 701, 704, 721-25).[59] Shortly thereafter, Hana listed Nadine Menendez as vice president of his halal company with a $120,000 salary, rendering her his second-highest paid employee. (*Id.* row 759).

Such timing evidence powerfully supported the jury's finding of corrupt intent. *See, e.g.*, *Silver II*, 948 F.3d at 571; *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) ("The government's evidence of the timing of the payments in relation to the actions taken by [the public official] could also be accepted by a rational jury in support of" a *quid pro quo*); *United States v. Rosen*, 716 F.3d 691, 702 (2d Cir. 2013) (affirming where *quid pro quo* evidence included timing of payments, importance of official action to payor, and failure to disclose payments); *see also, e.g.*, *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) ("[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. . . . [A] jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt."); *United States v.*

---

[59] Hana's observation that Menendez's call to McKinney came before a June 28 voice message related to Nadine Menendez's mortgage (Hana Br. 55) is irrelevant, given that it came after numerous other promises that Hana would pay Nadine Menendez.

*Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024) (*quid pro quo* requirement "may be met by implication from the official's and the payor's words and actions and need not entail an express statement" (collecting cases)).

Indeed, evidence of the timing of key actions can by itself suffice to support a verdict. *See, e.g.*, *Reichberg*, 5 F.4th at 249 (the defendant's "efforts on behalf of one individual in particular leave us with no doubt that this jury's verdict was reasonable and supported by the evidence," reciting timeline of communications); *United States v. Calk* ("*Calk I*"), No. 19 Cr. 366 (LGS), 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022) ("The timing and circumstances of each loan was sufficient for the jury to infer [the defendant]'s corrupt intent."); *United States v. Calk* ("*Calk II*"), 87 F.4th 164, 182 (2d Cir. 2023) (affirming sufficiency in *Calk I*); *see also, e.g.*, *Silver II*, 948 F.3d at 557 n.10 ("[B]ribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo. . . . [I]n some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient.").

Contrary to Hana's argument that Menendez could not have agreed to protect Hana's monopoly until the monopoly began (Hana Br. 57), the jury could easily conclude, based on the conspirators' communications, that the award of the monopoly and the need to protect it were foreseeable and foreseen (Menendez SPA-36), and in any event that when the monopoly was awarded, it was added to Menendez's corrupt agreement with Hana. *See, e.g.*, *United States v. Percoco* ("*Percoco I*"), 13 F.4th 180, 191 (2d Cir. 2021) ("It

would be strange indeed to hold that an original deal between an official and payor somehow froze their agreement in time, excluding the possibility that an official could later commit to take more acts in order to maintain a revenue stream."), *rev'd on other grounds by Percoco v. United States* ("*Percoco II*"), 598 U.S. 319, 322 (2023).[60]

Notwithstanding his conclusory protestations (Daibes Br. 47-48), the evidence also showed Daibes's participation in the scheme. He solicited business, as far back as mid-2018, from the same Egyptian government contacts to whom Hana transmitted Menendez's corrupt promises (*see, e.g.*, GX-1302 rows 198-204, 225-37, 243, 247, 289-92, 302-04); he was a close confidante and business backer of Hana (*see, e.g.*, Tr. 715, 787-88, 971, 5076-77); and he eventually accepted Hana's multimillion dollar investment of monopoly profits into Daibes's real estate projects (*see, e.g.*, Tr. 749; GX-1302 rows 1201, 1262). He was instrumental in causing Hana to pay the bribe checks (*see, e.g.*, GX-1302 rows 862, 994-95, 1010, 1098-117, 1123-28; *see also id.* row 1099 (Daibes: "Nadine I personally gave Bob a check for September")), and to pay Nadine Menendez's mortgage company (*see, e.g.*, *id.* rows 956, 968-74, 981, 986-88). But even before assisting with the *payment* of these bribes, he was part of the *agreement* to pay them, as evidenced by the fact that Menendez and Nadine

---

[60] This Court reaffirmed the relevant portion of *Percoco I* following the Supreme Court's reversal of a different count. *See United States v. Percoco* ("*Percoco III*"), 80 F.4th 393, 394 (2d Cir. 2023).

Menendez did not even know whether the bribe checks would come from him or Hana. (*See, e.g.*, *id.* rows 862, 992-95).

Contrary to Hana's and Daibes's purported innocent explanations (Hana Br. 57-58; Daibes Br. 47-48), there was ample evidence of the *quid pro quo* in addition to the timing, including the solicitous favorable treatment that Menendez provided and offered (*see* Hana/Daibes A-2223-24), and the nature of the things of value, particularly the fraudulent nature of Nadine Menendez's supposed employment (*see* Hana/Daibes A-2224-25). The verdict was also supported by ample evidence of consciousness of guilt. Indeed, Menendez's appellate counsel now admits that "[t]he Senator knew about" the checks for Nadine Menendez at the time (Menendez Br. 9), even though Menendez dispatched his prior counsel to meet with prosecutors and falsely deny that knowledge (*see* Menendez A-1416). *See, e.g.*, *United States v. Zheng*, 113 F.4th 280, 296 n.5 (2d Cir. 2024) ("A jury may infer a defendant's knowledge that conduct is wrongful from his efforts to conceal his conduct."); *see also, e.g.*, *Bruno*, 661 F.3d at 744 (jury may "infer guilt from . . . behavior indicating consciousness of guilt").

### 2. The Evidence Proved the Counts Related to New Jersey State Criminal Matters

#### a. The Evidence Showed Official Acts

The evidence overwhelmingly proved that Menendez agreed, promised, and attempted to take official acts to disrupt two New Jersey state criminal matters. Decisions concerning the disposition of criminal

matters are "the sort of specific, formal exercises of government power that can constitute official acts." *Reichberg*, 5 F.4th at 249.

Although Menendez's promise alone is sufficient, his attempts to pressure then-New Jersey Attorney General Grewal to influence these matters were paradigmatic examples of how a public official may "make a decision or take an action on a question, matter, cause, suit, proceeding or controversy by using his official position to exert pressure on *another* official to perform an official act," or by "advis[ing]" the other official to do so. *McDonnell*, 579 U.S. at 572 (emphasis in original). Contrary to Menendez's and Hana's claims (Menendez Br. 54-56; Hana Br. 52), an attempt to exert pressure need not use any particular words, and indeed, can be proved circumstantially. For example, this Court has affirmed sufficiency of the evidence of an official act just based on the timing of calls and text messages, without direct evidence of the content of the phone call during which the bribe recipient exerted pressure on another official. *See Reichberg*, 5 F.4th at 249 ("The first arrest-and-release was on February 16, 2014. [The defendant] texted [the bribe recipient] "Eddie Sankari" and "78pct," and one minute later [the bribe recipient] turned around and called the 78th Precinct, where Sankari was being held, setting in motion Sankari's release.").

Indeed, it is a jury question whether an official who explicitly *disclaims* any intent to pressure nonetheless actually attempts to do so. In *Lee II*, a city council member called a city's chief prosecutor to inquire about a case, stating, "I'm not trying to influence you,

you can't say I'm trying to influence you. I'm trying to make you think. That's all I'm trying to do; just trying to make you think." 919 F.3d at 344. The Sixth Circuit held that "a juror could easily have heard those words and concluded that they meant the exact opposite—that [the defendant] was, in fact, trying to influence the prosecutor." *Id.* at 357; *see also Reichberg*, 5 F.4th at 249 n.70 (citing *Lee II* as example of official act).

The evidence proved that Menendez attempted to perform an official act by pressuring or advising Grewal. Contrary to Menendez's arguments that he merely "express[ed] support" (Menendez Br. 21), Grewal testified that Menendez claimed that the particular criminal matters involved selective prosecution, which would if true have been a basis for dismissal. (*See, e.g.*, Tr. 2715-16, 2737). Although Grewal himself did not subjectively feel pressured, he understood Menendez's call as an attempt to pressure his office and so did not tell his team about the call. (Tr. 2718 (Grewal: "I view my job as insulating the team from any type of pressure or interference from the outside, and so I wasn't going to relate to anyone in the office that there was this inquiry"); *id.* (Grewal: "I don't want my teams to feel pressured or intimidated"); Tr. 2740). And as with McKinney, these were Menendez's only such contacts with Grewal, strongly supporting the inference of an improper attempt to pressure Grewal for private benefit rather than a more general policy concern. (Tr. 2740-41); *see Lee II*, 919

F.3d at 357 (defendant "had never contacted her in such a way regarding other cases").[61]

The defendants argue that Menendez had no formal authority over Grewal, but the law is clear that the lack of such authority does not mean Menendez could not attempt to pressure or advise him. *See, e.g.*, *Mangano*, 128 F.4th at 456-57, 477 (affirming conviction based on "clear evidence" of defendant pressuring other officials despite not having official supervisory authority over them or making overt threats); *Biaggi*, 853 F.2d at 98-99; *Skelos*, 707 F. App'x at 739; *Boyland*, 862 F.3d at 292; *Kimbrew*, 944 F.3d at 814-15; *Lee II*, 919 F.3d at 352.

Moreover, Menendez's promises to Uribe and Hana rendered Menendez and Hana guilty even *before* Menendez contacted Grewal. *See, e.g.*, *Evans*, 504 U.S. at 268; *United States v. Hood*, 343 U.S. 148, 151 (1952). Contrary to Menendez's cursory and undeveloped argument (Menendez Br. 57 n.3), these promises were established through Uribe's testimony and contemporaneous documentary evidence. (*See, e.g.*, Tr. 3104-05 (Uribe testifying that he asked Menendez to "see if there is anything in his power, don't let these people

---

[61] Hana's argument that Menendez did not sufficiently identify the cases (Hana Br. 52) is a jury argument that was properly rejected, given that Menendez identified the cases by the defense attorney and other case information, and Grewal intentionally prevented him from providing more details (Tr. 2716, 2729-30, 2733, 2735).

hurt my daughter," and Menendez said he would "look into it"); Tr. 3104 (Uribe testifying that Menendez stated that "he was asked by Will and Nadine to get a better resolution" for Parra); GX-1303 row 963).[62] Menendez's objection that he did not tell Uribe that he would take a specific action such as "threaten New Jersey's federal funding" (Menendez Br. 57 n.3) founders on *McDonnell*'s holding that "the public official need not specify the means that he will use to perform his end of the bargain." 579 U.S. at 572. Menendez's promises to "get a better resolution" for Parra and "see if there is anything in his power" to protect Peguero (Tr. 3104) are thus sufficient standing alone. *See, e.g.*, *Boyland*, 862 F.3d at 292 (defendant "agreed to ensure that favorable governmental decisions would be made").[63]

---

[62] Menendez's claim that Uribe was purportedly discredited and the Government allegedly "cut bait" (Menendez Br. 12) grossly misstates the trial record and the Government's summation, in which the Government described at length how Uribe's testimony was "devastating proof of the defendants' guilt." (Tr. 6463). But regardless, such credibility issues are for the jury and are irrelevant to sufficiency. *See, e.g.*, *Coplan*, 703 F.3d at 62.

[63] Menendez's claim that he promised not to act but only to "look into" acting (Menendez Br. 12) is a jury argument, which is refuted by the context of Menendez's statements and actions, Nadine Menendez's unequivocal promises, and Menendez's own boast of having purportedly "saved [Uribe's] ass twice. Not

#### *b.* The Evidence Showed a *Quid Pro Quo*

The evidence at trial amply proved a corrupt *quid pro quo*. The events surrounding Menendez's contacts with Grewal alone overwhelmingly proved Menendez's corrupt agreement with Hana, Nadine Menendez, Uribe, and others.

The evidence showed that in January 2019, Menendez promised and attempted to influence Grewal concerning Parra's prosecution in exchange for the Convertible. That month, in quick succession, Nadine Menendez complained to Hana about lacking a car (GX-1303 rows 111, 113); Menendez performed web searches for the price of a Mercedes C300 (the make and model of the Convertible) (*id.* rows 172-74); and Menendez, through Nadine Menendez, invited Hana and Uribe to a planning meeting (*id.* rows 253-55).

The timeline of communications in the next several days alone establishes Menendez and Hana's corrupt intent surrounding Menendez's call to Grewal. On January 29, 2019, Menendez contacted Nadine Menendez to request basic identifying details about Parra's case (but not any evidence of discrimination or any other ground for intervention into that case), which Nadine Menendez in turn requested from Hana. (*See, e.g.*, GX-1303 rows 354-69). After Hana provided this information and Nadine Menendez reported back

---

once, but twice." (Tr. 3152). *See, e.g.*, *Silver I*, 864 F.3d at 123 n.111 (evidence that public official "sought to take credit" could support inference of official act).

to Menendez, Menendez called Grewal. (*See, e.g.*, *id.* rows 370-71, 373, 379). Just days later, Hana asked Daibes to pay for a car for Nadine Menendez, which she made clear she expected Hana to provide. (*See id.* rows 386-87, 390; Tr. 3000-01). This sequence alone shows Menendez's and Hana's corrupt intent. *See, e.g.*, *Reichberg*, 5 F.4th at 249; *Silver II*, 948 F.3d at 557 n.10.[64]

Hana was deeply involved in Uribe's provision of the Convertible. Despite Hana's claim that his "involvement ended" before March 2019 (Hana Br. 59), Uribe was on the phone with Hana when, on March 27, 2019, Uribe first texted Nadine Menendez the Mercedes dealership's address. (GX-1303 rows 521-23). And Hana promised to accompany Nadine Menendez to the dealership (*id.* row 551), and funded part of the purchase price, using cash provided by Parra and Hernandez to partially reimburse Uribe for the bribe payments he was making on the Convertible (*see* Tr. 3078-79).

In any event, the evidence of Menendez's and Hana's corrupt exchange of *promises* was itself sufficient. Uribe testified that Menendez admitted having been asked by Hana and Nadine Menendez to get a better resolution for Parra and his company. (Tr. 3104). This alone powerfully proved Hana's

---

[64] None of this, of course, related to "retaining a new lawyer for Parra" (Hana Br. 58-59), an unpersuasive defense argument the jury was not required to credit.

corrupt agreement with Menendez, whether or not Uribe was told how Hana and Menendez would carry out their promises. *See, e.g.*, *McDonnell*, 579 U.S. at 572 ("[T]he public official need not specify the means he will use to perform his end of the bargain[.]"). The fact that Uribe testified Nadine Menendez had not initially heard of "part two" of the corrupt transaction, in which Menendez was expected to intervene on behalf of Peguero (as opposed to only Parra), hardly exonerates Hana (Hana Br. 60). To the contrary, it is powerful evidence of Hana's corrupt participation in part one, as Nadine Menendez "acknowledged" Hana "promised" she would "receive from Will [Hana]" a car once the "prosecution against Parra [was] stopped." (Tr. 3003).[65]

### 3. The Evidence Proved the Counts Related to Daibes's Federal Prosecution and Qatar

#### a. The Evidence Showed Official Acts

The evidence proved that Menendez accepted cash and gold from Daibes in exchange for promised and attempted official acts to influence Daibes's federal prosecution and knowing that Daibes expected him in exchange to advance a Senate resolution regarding Qatar. The jury could readily conclude each of these

---

[65] The sufficiency of the overwhelming evidence of the corrupt *quid pro quo* related to the investigation involving Peguero (*see, e.g.*, Hana/Daibes A-2234-36) is unchallenged in this appeal.

agreed, promised, attempted, and/or requested actions was an official act.

There appears to be no dispute that Menendez's recommendation of whom to appoint for New Jersey U.S. Attorney (*see, e.g.*, Tr. 3631, 3635) was an official act (Daibes Br. 43), which it plainly was. *See, e.g.*, *Reichberg*, 5 F.4th at 249. Similarly, Menendez's promises or attempts to influence the Daibes prosecution by contacting the New Jersey U.S. Attorney's Office are also paradigmatic official acts. *See, e.g.*, *id.*; *Lee II*, 919 F.3d at 357. Menendez attempted to do so by asking his outside political advisor Soliman to question Sellinger regarding his recusal and ask Sellinger to ensure—despite his recusal—that Daibes receive "all due process." (Tr. 3946-47).[66] In addition, Menendez promised to do so by calling Khanna, the ultimate supervisor of the case against Daibes, praising Daibes's counsel, and then immediately calling Daibes to report back after that call. (Tr. 4997; GX-1304 rows 242-43). This timing allowed the jury to infer that the promise was made notwithstanding that—as in other

---

[66] Although of course every defendant is entitled to due process (Daibes Br. 43-44), Menendez's choice to single out the case of one defendant, a case in which Menendez knew Sellinger was forbidden from being involved in any way, entitled the jury to conclude that Menendez was requesting favorable treatment. *See, e.g.*, *Lee II*, 919 F.3d at 357 ("[A] juror could easily have heard those words and concluded that they meant the exact opposite—that [the defendant] was, in fact, trying to influence the prosecutor.").

cases—direct evidence of the content of the call to Daibes was not presented. *See, e.g.*, *Reichberg*, 5 F.4th at 249.[67]

The evidence was also sufficient to prove that Menendez accepted cash and gold bars from Daibes knowing that Daibes expected him in return to act on the Senate resolution regarding Qatar. *See, e.g.*, *McDonnell*, 579 U.S. at 572 ("A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return."). Whether Menendez actually thereafter supported that resolution is irrelevant. *See, e.g.*, *McDonnell*, 579 U.S. at 572; *Evans*, 504 U.S. at 268; *Brewster*, 408 U.S. at 526-27; *Silver II*, 948 F.3d at 551-52; *see also id.* at 545 ("Extortion under color of right and honest services fraud require that the official reasonably believe, at the time the promise is made, that the payment is made in return for a commitment to perform some official action.").[68]

---

[67] Daibes's claim that Menendez's call to Khanna did not amount to performance of an official act (Daibes Br. 43-44) is beside the point; the call and its timing clearly evidence Menendez's *promise* to Daibes to perform one.

[68] Daibes's observation that his message was not itself an official act by Menendez (Daibes Br. 45) is irrelevant, as the message and the surrounding communications evidenced Daibes's corrupt request for an

### b. The Evidence Showed a *Quid Pro Quo*

Notwithstanding Daibes's unpersuasive parsing (Daibes Br. 48-50), the timing of the defendants' actions related to the New Jersey U.S. Attorney and Qatar overwhelmingly proved a *quid pro quo*. While meeting with Sellinger as the principal candidate for New Jersey U.S. Attorney, Menendez criticized Daibes's prosecution and asked Sellinger to personally involve himself in that case if he became U.S. Attorney. (Tr. 3611-12). But when Sellinger informed Menendez he might have to be recused from that prosecution, Menendez *within hours* shifted his support to Suarez, a controversial candidate who Daibes thought would treat him favorably. (*See, e.g.*, GX-1304 rows 32-40; Menendez A-1676; Tr. 3893-94). Then when Suarez's candidacy appeared unlikely to succeed, and Menendez learned that his outside political advisor Soliman believed Sellinger would *not* have to be recused from the Daibes prosecution, Menendez reversed himself again and supported Sellinger. (*See, e.g.*, Tr. 3935-39, 3942). These reversals alone show the corrupt agreement. *See, e.g.*, *Calk I*, 2022 WL 101908, at *2 (defendant's reversals proved *quid pro quo*).

The timing of Daibes's provision of gold also demonstrates a *quid pro quo*. Shortly before Sellinger's confirmation, Daibes provided at least one kilogram of gold to Menendez in person (*see, e.g.*, GX-1304 rows

---

act, and Menendez's promise to take one. (*See* Menendez SPA-45).

176-80; *see also* Menendez SPA-47). Menendez did not disclose this receipt of gold in his financial disclosure forms (GX-10E-6), and indeed did not disclose any gold at all until approximately four months later, when he falsely represented to Senate Ethics Committee counsel that this gold had been given to Nadine Menendez prior to their 2020 marriage, and that he had only recently learned of it. (*See, e.g.*, Tr. 5278-79; GX-8K-1). This, along with Nadine Menendez's lies to the jeweler Khorozian (in a sale Daibes helped arrange) about where the gold came from (*see, e.g.*, Tr. 5090; GX-1304 rows 264-67, 269-80), showed consciousness of guilt. *See, e.g.*, *Zheng*, 113 F.4th at 296 n.5; *see also, e.g.*, *Bruno*, 661 F.3d at 744.

Contradicting Daibes's claims of a gratuity (Daibes Br. 48), the corrupt promises and things of value both continued after this first gold delivery. Nadine Menendez texted Daibes in late 2021 that Menendez was "FIXATED" on Daibes's upcoming trial, and Daibes responded that Menendez "was amazing in all he did." (*See* GX-1304 rows 211-14). During the next weeks, Menendez and Daibes took a series of telling actions, and Menendez repeatedly looked up the price of a kilogram of gold. Menendez contacted Khanna (the ultimate supervisor of Daibes's prosecution after Sellinger's recusal) to praise Daibes's lawyer, and immediately thereafter called Daibes. (Tr. 4997; GX-1304 rows 242-43). On the same day that Menendez made one attempt to call Khanna, Daibes's driver contacted Nadine Menendez, prompting her to thank Daibes for "Christmas in January." (GX-1304 rows 234-38). Menendez also told Soliman to question Sellinger about why he was recused from the Daibes prosecution

—a directive that, for the first time in fifteen years working for Menendez, Soliman declined to follow yet falsely told Menendez he had. (Tr. 3945-49).

During this period, Menendez also attempted to get the Qatar-linked firm Heritage to invest with Daibes. Menendez gave Daibes advance copies of press releases praising Qatar (GX-1304 rows 118, 120-27, 133-38), and Daibes offered Menendez a luxury wristwatch just days before sending Menendez information on a Senate resolution favoring Qatar that was pending before Menendez (*id.* rows 160-64).[69] This request that Menendez support the resolution was made just weeks before Daibes's kilogram gold delivery to Menendez, which was itself followed several weeks later by Daibes notifying Menendez that another Senator had cosponsored the resolution. (*Id.* rows 176-77, 189). On multiple occasions during this period, Menendez searched for the price of a kilogram of gold (*see, e.g.*, *id.* row 191), and in May 2022, several weeks after reaching a plea deal and just days after signing a letter of intent with Heritage, Daibes provided Menendez yet another kilogram of gold (*see id.* rows 332-42).

---

[69] Daibes's claim that his offer of a luxury wristwatch could not have been corrupt because it preceded (by a day) the introduction of the Senate resolution (Daibes Br. 50) ignores, among other things, his and Menendez's extensive Qatar-related communications leading up to the resolution (*see, e.g.*, GX-1304 rows 118-40) and the gold Daibes provided several weeks later.

This evidence supported a strong inference of corrupt intent by Menendez and Daibes, *see, e.g.*, *Bruno*, 661 F.3d at 744, as did Daibes's provision of envelope after envelope of incriminatingly packaged cash, and over a quarter of a million dollars in gold bars. (*See* Hana/Daibes A-2242-43). *See, e.g.*, *United States v. Hills*, 27 F.4th 1155, 1176 (6th Cir. 2022) (*quid pro quo* proved where defendant was "given envelopes containing thousands of dollars of cash"); *see, e.g.*, *id.* at 1175-76 ("Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim.").[70]

#### 4. The Evidence Proved Obstruction of Justice

##### a. Applicable Law

Section 1503 prohibits a person from "corruptly or by threats or force, or by any threatening letter or communication, influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). The defendant's conduct must have a "nexus" to a judicial proceeding, which requires "some relationship in time, causation or logic to a judicial proceeding, such as a federal grand jury proceeding, so that it may be

---

[70] Daibes cites a Western District of New York case (Daibes Br. 49) that the District Court correctly recognized bears "little resemblance" to this case, as it involved the provision of far fewer things of value, "years removed" from the official acts, unlike here. (Menendez SPA-49).

said to have the natural and probable effect of interfering with that judicial proceeding." *Schwarz*, 283 F 3d at 108. The delivery of false documents to a grand jury constitutes obstruction of justice. *See United States v. Aguilar*, 515 U.S. 593, 601 (1995). Since the law punishes a corrupt "endeavor," no actual obstruction of the proceeding need be shown. *See, e.g.*, *id.* at 601-02 (The term "endeavor . . . makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way").

Otherwise lawful conduct can constitute obstruction if done with a corrupt motive to influence the federal proceeding, *United States v. Cioffi*¸ 493 F.2d 1111, 1119 (2d Cir. 1974) (advising witness to invoke Fifth Amendment can be a crime by "one who bribes, threatens, coerces a witness to claim it or advise with corrupt motive a witness to take it"), including attempts to influence prosecutors based on lies or bribes, *see United States v. Polakoff*, 121 F.2d 333, 333 (2d Cir. 1941) (obstruction of justice, under predecessor statute, could be based on, effort to influence a prosecutor with "otherwise legitimate arguments [to that prosecutor] for concealed or falsified ends."); *id.* at 335 ("It is as 'corrupt' to persuade a public officer by lies as by bribes; indeed, to influence him by fraud is not far afield from influencing him by 'threats or force,' also prohibited by the statute."); *United States v. Freidel*, 124 F.2d 515, 515-16 (2d Cir. 1941) (affirming sufficiency of evidence of obstruction where defendant agreed to intercede with prosecutors in exchange for bribes).

#### b. The Evidence Showed an Intent to Obstruct the Daibes Federal Prosecution

Contrary to Daibes's argument (Daibes Br. 52), the evidence of Menendez's and Daibes's agreement that Menendez, in exchange for bribes, would use his position and influence as a U.S. Senator in an effort to resolve Daibes's federal criminal case more favorably to Daibes (*see supra* at 130-36), proves a conspiracy to obstruct justice as well as corruption offenses. *See Polakoff*, 121 F.2d at 335; *Freidel*, 124 F.2d at 515-16. That part of Menendez's attempted influence involved a coded appeal for favorable treatment disguised as a call for "due process," stressed by Daibes (Daibes Br. 53), did not compel the jury to take Menendez's words at face value, particularly because Menendez singled out one case, and one he knew Sellinger was recused from. *See, e.g.*, *Lee II*, 919 F.3d at 357 ("[A] juror could easily have heard those words and concluded that they meant the exact opposite"). That Menendez carefully chose his words or that his intermediary did not relay his message to Sellinger does not undermine the jury's determination that the defendants agreed for Menendez to "endeavor" to interfere with the prosecution. *Aguilar*, 515 U.S. at 601-02.

#### c. The Evidence Showed an Endeavor to Obstruct the Grand Jury Investigation

The evidence demonstrated that Menendez agreed to and did endeavor to obstruct a Southern District of New York grand jury's investigation of his conduct.

There is no real dispute that the provision of false or misleading information in response to a grand jury subpoena constitutes obstruction of justice, *see Aguilar*, 515 U.S. at 601; *Triumph Cap. Grp.*, 544 F.3d at 168, or that that in fact happened here. Menendez's only claim, that the jury supposedly could not have inferred his participation (Menendez Br. 69), relies entirely on impermissibly construing the evidence most favorably to him.

The evidence demonstrated that after the defendants (including Menendez) learned of the grand jury investigation, Nadine Menendez and Uribe met and agreed on a cover story falsely characterizing Uribe's payments for the Convertible as a "loan" (Tr. 3161-66), and that after a November 22, 2022 grand jury subpoena was issued to Menendez's Senate Office seeking information regarding Hana's and Uribe's payments to Nadine Menendez (GX-11A-5), Menendez and Nadine Menendez sought to implement that cover story. In a coordinated series of checks, Menendez provided money to his wife to return to Uribe and Hana and he and Nadine Menendez falsely characterized the transactions on checks (and transmittal letters) as repayments of loans. (Menendez A-1402-10). These false documents were then produced pursuant to a grand jury subpoena. (GX-1409).

Contrary to Menendez's argument (Menendez Br. 70), the jury needed no evidence of privileged discussions to infer Menendez's participation in Nadine Menendez's submission of the false documents he prepared; instead, the jury could infer Menendez's knowing participation from the timing of the documents,

which were prepared shortly after a subpoena to Menendez's office—and from the extensive evidence of Menendez's involvement in Nadine Menendez's daily life. (*See* Menendez SPA-63). That inference was also buttressed by Menendez's own conduct authorizing his then-counsel to give prosecutors a presentation reinforcing the false statements on the checks. (*See* Menendez A-1416-19). *See United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) (defendant client's role is evident when attorney makes "a direct assertion of a fact which in all probability had to have been confirmed by the defendant"). Since that presentation reinforced the false documents that had been submitted to the grand jury, it was telling evidence of Menendez's intent and knowledge of the false documents, even if the presentation was not itself delivered to the grand jury. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 428 (4th Cir. 2019) (affirming conviction where defendant's attorney sent U.S. Attorney's Office a letter purporting to explain transactions relating to subpoenaed materials, and attached false loan documents).[71]

---

[71] Given the likelihood that statements made to prosecutors shortly before an indictment would influence the grand jury's decision whether or not to indict, this Court can also affirm on the independent ground that this presentation itself was an act of attempted obstruction. *See, e.g.*, *id.* at 428-29; *United States v. Fassnacht*, 332 F.3d 440, 451 (7th Cir. 2003).

### 5. The Evidence Proved Venue Was Proper

The evidence amply supported the jury's finding that venue was proper.[72]

#### a. Applicable Law

"When a federal statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011). "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *Id.* For substantive offenses, "venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Id.* at 319. "The commission of some crimes can span several districts," and in the case of such continuing offenses, "Congress has instructed that venue properly lies in 'any district' in which the charged offense 'was begun, continued, or completed.'" *United States v. Davis*, 689 F.3d 179, 185-86 (2d Cir. 2012) (quoting 18 U.S.C. § 3237(a)). Bribery, wire fraud, and extortion are all continuing offenses. *See United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (bribery);

---

[72] Menendez does not challenge venue for Counts Seventeen and Eighteen, charging him with conspiring and endeavoring to obstruct a Southern District of New York grand jury. (Menendez Br. 70-80).

*Rutigliano*, 790 F.3d at 396 (wire fraud); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999) (extortion).

For bribery-related charges, this Court has held that contacts "laying the groundwork" for the solicitation or receipt of bribes are "part and parcel" of the bribes and are essential conduct for venue purposes. *See Davis*, 689 F.3d at 190 ("[T]elephone calls placed into the Southern District of New York laying the groundwork for bribes were 'part and parcel' of a bribery offense culminating weeks later." (quoting *Stephenson*, 895 F.2d at 874-75)). For extortion, venue is proper "in any district where interstate commerce is affected or where the alleged acts took place," *Stephenson*, 895 F.2d at 875, and for wire fraud, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends," *Rutigliano*, 790 F.3d at 397. For purposes of Section 219, venue lies where the defendant commits the conduct specified by the statute, including "agreeing, consenting, assuming, or purporting to act as . . . an agent of a foreign principal." (Menendez SPA-76-77).

For a conspiracy, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed. . . . The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 319-20; *see also id.* at 320 (noting that "venue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense").

### b. Discussion

#### i. Substantive Counts Related to Egypt (Counts 5, 6, 7, 8, 16)

The substantive counts related to Egypt are supported by evidence of multiple acts of essential conduct in the Southern District of New York, which were more than sufficient for the jury to find venue proven by a preponderance of the evidence on these counts. (*See, e.g.*, Menendez SPA-68-72, 76-77). These involved evidence that: (i) Hana, through Aslanian, paid several hundred dollars for a June 2018 meal for Menendez and Nadine Menendez at the Mr. Chow restaurant in midtown Manhattan (GX-7B-1, GX-5E-101A); (ii) during that June 2018 dinner in Manhattan, Hana sent interstate WhatsApp messages to Egyptian defense attaché Shawky scheduling a July 2018 meeting and dinner that precipitated Menendez's promise to approve a sale of tank ammunition (GX-1302 rows 251-57, 314-31; GX-1463); (iii) Menendez, Daibes, and Egyptian official Helmy met at a hotel in Manhattan to discuss rewarding Daibes with business ventures with Egypt (GX-1302 rows 1082-88, 1090-97, 1130-31); (iv) Daibes provided free transportation to Menendez and Nadine Menendez through Manhattan on their way back from a trip to Egypt (*see, e.g.*, GX-A111-PH1; Menendez A-1485); and (v) Nadine Menendez, in consultation with Menendez and Daibes, sold gold bars through Khorozian (who called a Manhattan gold dealer and traveled to Manhattan) under the false claim that they were from a family member (*see, e.g.*, Tr. 5090-93; GX-B201-1A; GX-3D-6).

***1. Meetings***—The in-person meetings in the Southern District of New York are essential conduct for the counts related to Egypt and were fully sufficient to allow the jury to find venue. The provision of things of value in the district, even things of comparatively modest value such as meals or transportation, is essential conduct for the bribery and foreign influence offenses. *See, e.g.*, *Stephenson*, 895 F.2d at 874. The defendants were free to argue to the jury that these minor things of value were unconnected to the offenses charged, but the jury could—and did—disagree. *See, e.g.*, *United States v. Ganim*, 510 F.3d 134, 138-39, 152 (2d Cir. 2007) (affirming jury instructions permitting jury to find corrupt *quid pro quo* involving series of things of value including meals); *United States v. Falcón-Nieves*, 79 F.4th 116, 128 (1st Cir. 2023) (holding that meals and similar benefits can be things of value, citing cases). The Mr. Chow dinner paid for by Hana's associate and the luxury hotel meeting at which Menendez was Helmy's "honorable guest" were both thus things of value provided in the Southern District of New York and alone sufficient for venue.

Even leaving aside the provision of things of value in the district, the in-person meetings in New York were also essential conduct because they laid the groundwork for a further exchange of things of value for official acts. *See, e.g.*, *Davis*, 689 F.3d at 190; *Stephenson*, 895 F.2d at 875. In strikingly similar circumstances, then-District Judge Alison Nathan held venue was sufficient based on messages facilitating the next steps of a bank bribery scheme. *See United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *38 (S.D.N.Y. Oct. 18, 2017). Those messages were

essential conduct "in at least two respects": first, because they were "acts necessary" to carry out the next steps of the scheme; and second, because they provided reassurances to the bribe payors that the bribe recipient was willing to assist them, in order "to lay the groundwork for his ultimate receipt of the largest bribe payment." *Id.* at *39. Here, just as in *Gross*, Menendez's meeting with Hana at Mr. Chow—along with the interstate wire Hana sent to Shawky during that meeting—was an "act[ ] necessary" to carry out the scheme because Menendez's agreement to do the Shawky meetings precipitated his promise to approve a tank ammunition sale, and it "demonstrated [Menendez's] good faith efforts to demonstrate to [Hana] that he was actively working towards this goal —to lay the groundwork for his ultimate receipt of" the bribe payments Hana had been promising. *Id.* By the same token, Menendez's meeting with Daibes and Helmy in Manhattan was part of an effort for Menendez to ensure that Daibes received business from the Egyptian government, as well as a way for Menendez to "demonstrate[ ]" his "good faith efforts" to reward Daibes and "lay the groundwork for" Menendez's receipt of bribes from Daibes. *Id.*

These meetings, similarly, evinced Menendez's willingness to act as an agent of Egypt. In disputing venue on the foreign agent charge (Menendez Br. 78), Menendez omits the second section of the statute, which states that an "agent of a foreign principal" includes not just one who actually takes certain actions as an agent but also "any person *who agrees, consents, assumes or purports to act as, or who is or holds himself out to be* . . . an agent of a foreign principal." 22

U.S.C. § 611(c)(2) (emphasis added). As Judge Stein correctly found, "the jury was entitled to infer that [the Mr. Chow dinner, during which Hana set up the meeting between Menendez and Egyptian officials] was part of or constituted Menendez 'agreeing' or 'consenting' to act as an agent of a foreign principal." (Menendez SPA-77).

Menendez and Daibes's venue challenges (Menendez Br. 70-78; Daibes Br. 54-57) impermissibly recharacterize the evidence in the light least favorable to the Government. *See, e.g.*, *Tzolov*, 642 F.3d at 318. For example, Menendez claims that there was "no evidence about what was discussed" or "that Senator Menendez sought or agreed to accept a bribe" when he met with Hana and Nadine Menendez at Mr. Chow in Manhattan. (Menendez Br. 72-73). But there was ample circumstantial evidence that he did both. First, he accepted the Mr. Chow dinner worth several hundred dollars, which the jury could conclude was itself a bribe. Second, Hana's contemporaneous messages, sent while face to face with Menendez at Mr. Chow, reflect that what was "discussed" included scheduling a meeting and private dinner with Shawky, which led directly to Menendez's promises of military aid in exchange for a bribe. In fact, Hana sent not just one but two text messages, approximately 30 minutes apart, setting up both a meeting and a private dinner with Shawky, providing even stronger evidence that the Shawky meetings—which immediately preceded Menendez's corrupt promise to approve a tank ammunition sale—were discussed at length during the dinner. (GX-1302 rows 252-53). Menendez strainingly suggests there was insufficient evidence that

Menendez "caused" the transmission of the interstate text message from Mr. Chow (Menendez Br. 75), but the jury was entitled to infer that Hana acted with Menendez's consent when sending messages indicating Menendez's availability to meet and dine with Shawky (rather than, absurdly, somehow providing times Menendez was available against Menendez's will).

Menendez and Daibes again impermissibly construe the evidence in their favor when they deny that their meeting with Helmy at a Manhattan hotel was part of the scheme. (Menendez Br. 74, 76-77; Daibes Br. 56-57). Judge Stein properly found this argument "unpersuasive" given the circumstantial evidence showing the meeting was "part and parcel" of the bribery offenses. (Menendez SPA-70-71). The hotel meeting was preceded by a series of texts and planning meetings among Menendez, Nadine Menendez, Hana, Daibes, and Helmy. (GX-1302 rows 1012-20, 1058-59, 1063-68, 1082-88). After arranging a pre-meeting rendezvous at a Starbucks in midtown Manhattan (via text messages sent 24 minutes before they met there, indicating that they were sent while in the district (*id.* rows 1092-94)), Daibes and Menendez met with Helmy at the Madison Avenue hotel, and Daibes made a note shortly after with the name of Kamel, the head of Egyptian intelligence. (GX-D112). Afterwards, Helmy told Nadine Menendez that he "ha[d] been instructed from [his] boss in Cairo to start talks with [Daibes] regarding what was discussed in NY about Egyptian investments in USA," and stated that he wanted to inform her because he "met [Daibes] through you and Bob." (GX-1302 row 1130). Nadine Menendez thanked

Helmy and said—in an echo of her remarks at other key moments in the scheme—"I hope 2020 Will be a fabulous year for all of us." (*Id.* row 1131).[73] This evidence shows not only that Menendez, as Helmy's "honorable guest" at a luxury hotel, received a thing of value from the hospitality, *see Calk II*, 87 F.4th at 182-83, but also that the meeting, as part of the scheme, initiated a business relationship between Daibes and Menendez's Egyptian contacts, one which Daibes had long sought (GX-1302 rows 243, 247, 289-304), and one which Menendez and Nadine Menendez believed would benefit them as well (*id.* row 1131).

***2. Transportation***—As with the meals, Daibes's provision of transportation to Menendez through the Southern District of New York was a thing of value. *See Calk II*, 87 F.4th at 182-83. Menendez's and Daibes' complaint that there was no evidence that Menendez discussed bribery with the driver (Menendez Br. 73; Daibes Br. 55), is a strawman. The hour-long interstate car ride with a private driver supplied by their bribe-payor was *itself* a thing of value. (*See* Menendez SPA-72 ("nowhere in the statute does it

---

[73] This message was strikingly similar to her reactions the year before to other successes in the bribery scheme, such as to Hana's impending receipt of the halal monopoly grant (GX-1302 row 588 ("Seems like halal went through. It might be a fantastic 2019 all the way around.")) and to her own impending purchase of the Convertible with $15,000 cash from Uribe (GX-1303 row 644 ("Thank you. For all of us, 2019 will be a fantastic year")).

require that a high value item be paid")).[74] The jury was also entitled to find by a preponderance that it was part and parcel of the offenses—the driver was no bystander but a participant in the scheme, who provided Menendez and Nadine Menendez with envelopes of cash and gold bars on behalf of Daibes. (Hana/Daibes A-1837; GX-1304 rows 234-37). And Menendez and Nadine Menendez were returning from a trip to Qatar and Egypt set up by an Egyptian official who feared she would "probably loose [her] job" when the State Department learned about the trip. (GX-1302 rows 1233-35). The timing also supported a finding that the transportation was part and parcel of the offenses, as it took place the day before Daibes provided Menendez and Nadine Menendez with a kilogram of gold. (*Id.* rows 1253-57).

***3. Sale of Gold***—The jury could readily have found that Khorozian's sale in Manhattan, at the direction of Nadine Menendez and Menendez, of gold from Daibes was a "crucial component[ ] of" the scheme for Daibes to provide things of value to Menendez including gold and assistance in obtaining real estate with the proceeds of the gold sale. *Stephenson*, 895 F.2d at 874. The sale—which Nadine Menendez was told would be carried out in Manhattan, and which was brokered by a

---

[74] Daibes suggests that there was no evidence the transportation had "subjective" value to Menendez (Daibes Br. 55), but transportation by a private driver from Queens to New Jersey has an objective monetary value. *See, e.g.*, *Calk II*, 87 F.4th at 170 ("the 'thing of value' may be measured by . . . its market value").

phone call in her presence to the Manhattan-based dealer (Tr. 5092-93)—was intended to pay down the mortgage on the home shared by Menendez and Nadine Menendez at a time when Daibes was assisting them in looking for a new home to purchase. (GX-1304 rows 256-59, 264-67, 269-72, 280-81, 294-96, 302; DX-1304 rows 260-1, 297-3, 300-1, 301-1, 326-2, 328-1, 342-2, 342-3, 342-6, 342-7; GX-8K-1). The conversion of a gold bar to a liquid form that could be used to pay the mortgage was essential to that scheme because they enabled the further real estate transactions contemplated as part of the scheme.

The claim that the sale was unconnected to the scheme (Menendez Br. 74, 76) is an unpersuasive jury argument. As an initial matter, the liquidation of an illicitly received valuable object into fungible and untraceable money is itself offense conduct. *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017) (finding single conspiracy continuing through liquidation of fraudulently inflated stock positions and laundering of the defendant's gains). But the sale also furthered the ongoing offense of seeking to obtain not just gold bars from Daibes but also real estate with his assistance, as shown by, for example, Daibes's involvement in their real estate search (GX-1304 rows 256-59, 294-96, 302); Daibes's involvement in the gold sale in Manhattan (GX-1304 rows 264-67, 269-72, 280-81; DX-1304 row 297-3); Menendez and Nadine Menendez's coordinated false statements covering up that sale (Tr. 5092-93, 5278-79; GX-10E-4, 10E-6); and Daibes's continued

gold bar deliveries after the sale (*see* GX-1304 rows 332-42).[75]

In denying foreseeability of this New York sale (Menendez Br. 74; Daibes Br. 57), Menendez and Daibes ignore reality. Basic and generally known facts about the New York metropolitan area make it highly foreseeable that gold sales are likely to be transacted in the Diamond District in Manhattan. *See, e.g.*, *United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("The proximity of Manhattan to Brooklyn and Queens and the conspirators' transfer of hundreds of thousands of dollars in cash admitted *a preponderance finding that Boruch could reasonably have foreseen that his coconspirators transported at least some of the money* at issue to Brooklyn and Queens from Manhattan." (emphasis added)). But beyond that, the jury had ample evidence to infer by a preponderance that Menendez was personally involved and aware of (or at least able to foresee) the Diamond District sales,

---

[75] For the honest services fraud counts, the concealment of the source of the gold also established the misrepresentation element of the offense. (Tr. 7105). And for the Hobbs Act counts, the sale satisfied the interstate commerce element even without any consideration of concealment. *See, e.g.*, *Ramirez v. United States*, 898 F. Supp. 2d 659, 667 (S.D.N.Y. 2012) ("[T]he robbery affected interstate commerce in this district because Petitioners divided and sold the stolen cocaine in the Bronx after transporting it over state lines . . . . even though the robbery itself did not take place in this district.").

*Davis*, 689 F.3d at 186—given, among other things, his coordinated lies with Nadine Menendez about the source of the gold, their communications close in time to the sale, and his involvement in the minutiae of her life (Menendez SPA-71). The Manhattan sale was similarly foreseeable to Daibes: Daibes was aware of not just the gold sale (GX-1304 rows 264-67, 269-72, 280-81; DX-1304 row 297-3), but also the real estate search that motivated the sale (GX-1304 rows 256-59, 294-96, 302), and was a trusted co-conspirator the jury could readily infer would be kept apprised. Moreover, Daibes was aware of the practices of the jeweler Khorozian, who testified that when he sold gold to Nadine Menendez, he made sure to apprise her of when exactly he would be going to Manhattan to sell it so she would not think he was "cheating." (Tr. 5097). Given that Khorozian had sold approximately ten to twelve one-kilogram bars of gold to Daibes (Tr. 5079)—bars Khorozian obtained from contacts such as the dealer in the Diamond District—Daibes was no doubt kept similarly apprised of (or at least could foresee) Khorozian's use of a Manhattan dealer. The fact that the sale would be in Manhattan was thus known, or at a very minimum foreseeable, to both Menendez and Daibes.

#### ii. Substantive Counts Related to the New Jersey Attorney General's Office (Counts 9 and 10)

The trial evidence straightforwardly established venue for the New Jersey Attorney General's Office counts. The jury heard that bribe payments were made

from the Southern District of New York, as Uribe, from New Jersey, called an associate in the Bronx and caused that associate to make payments on the Convertible while that associate was in the district (Tr. 3041-42; Menendez A-1477-81), alone defeating Menendez's claim that "the benefits allegedly provided to the Senator and Nadine were all given in New Jersey." (Menendez Br. 72). Nadine Menendez caused bribe cash to be surreptitiously deposited in bank accounts in New Jersey and on Long Island on the same day, necessarily entailing moving the cash across the waters of the Southern District of New York (Menendez A-1429-30, 1672). (*See* Menendez SPA-75 ("travel through this District with a bribery payment ostensibly to avoid detection is sufficient for venue" (citing cases)). Moreover, Nadine Menendez, both in her texts with Uribe and her calls with Menendez, connected to cell towers in the district, thus utilizing physical structures in this district to transmit "communications [that] were 'crucial components' of the charged bribery scheme" (Menendez SPA-74), including instructions to Uribe so Menendez could meet and be briefed by him before seeking to pressure Grewal (Menendez A-1482), and then to meet Uribe again to "take credit" after meeting Grewal, *Silver I*, 864 F.3d at 123 n.111, so as to keep Uribe paying for the Convertible (Menendez A-1483).[76]

---

[76] Contrary to Menendez's claims (Menendez Br. 77), venue may be based on telecommunications (not just wire transfers of funds) that "*transited through*" a district. *United States v. Hwa*, No. 18-CR-

The jury could readily have found that all of these acts in the district, were part and parcel of the offenses, *see, e.g.*, *Stephenson*, 895 F.2d at 874, and were foreseeable to Menendez, particularly given the proximity of districts covering the New York metropolitan area and the fact that the long-running scheme involved a number of separate financial transactions. *See, e.g.*, *Boruch*, 550 F. App'x at 33 (affirming foreseeability based on proximity of districts and number of transactions during scheme); *see also, e.g., United States v. Shepard*, 500 F. App'x 20, 23 (2d Cir. 2012); *Davis*, 689 F.3d at 188-89. Indeed, bribery venue is proper based on the foreseeability not of any one electronic communication, but that at least some communications in the scheme would be made in this district. *See Gross*, 2017 WL 4685111, at *40 ("Even if it was not reasonably foreseeable that any *one* of these emails would be sent from Manhattan, . . . a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to [the defendant] that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails from [a co-conspirator] while [the co-conspirator] was in this

---

538 (MKB), 2021 WL 11723583, at *21 (E.D.N.Y. Sept. 3, 2021) (emphasis in original). Here, Nadine Menendez "caused communications to be transmitted into and out of the Southern District," *United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001), as part and parcel of the crimes.

district." (emphasis in original)).[77] In any event, the jury was plainly entitled to infer that Menendez, who was involved in the most quotidian details of Nadine Menendez's life and tracked her movements remotely using the Find My Friends application, was aware of or able to foresee that Nadine Menendez would cause some of the bribe money to be transported through the district for surreptitious deposit into her account. (Menendez SPA-74-75).

#### iii. Substantive Counts Related to Daibes's Federal Prosecution and Qatar (Counts 11, 12, 13, 14)

The evidence established venue for the counts related to Daibes's federal prosecution and Qatar. That evidence included (i) Daibes's provision of transportation through the district, in connection both with the Egypt and the Qatar conduct (*see supra* at 148-49); (ii) the sale in Manhattan of kilogram gold bars that

---

[77] For similar reasons, the jury could infer that a technologically adept individual such as Menendez (who was entrusted with the review and approval of multimillion-dollar sales of military equipment (GX-B201-10) and who used applications such as Signal and WhatsApp to communicate (Tr. 3876-77, 4184)) was sufficiently aware of basics like the fact that buildings interfere with radio waves, and thus able to foresee that sometimes cellphones used near the Hudson River, where Menendez and Nadine Menendez lived, would connect to cell towers across the river.

Daibes provided in connection with both the Egypt and the Qatar conduct (*see supra* at 149-52); (iii) an in-person meeting between Menendez, Daibes, and the Emir of Qatar in Manhattan and Daibes's attempts to make WhatsApp calls to the principals of Heritage while in Manhattan for that meeting (Menendez SPA-73); and (iv) numerous electronic communications by various professionals involved in evaluating and effectuating Heritage's real estate transaction with Daibes (GX-4F-8; 4F-28; GX-4F-31).

The provision of transportation and the sale of kilogram gold bars in the district, both provided immediately upon Menendez's return from a trip to Egypt and Qatar (Menendez SPA-73)—provide ample basis for the jury to find venue for the New Jersey U.S. Attorney's Office and Qatar-related counts just as for the Egypt-related counts. But there are additional bases as well, such as the in-person meeting between Menendez, Daibes, and the Emir of Qatar at a hotel in Manhattan.[78] Contrary to Menendez's and Daibes's

---

[78] Although not highlighted specifically for venue in summation, evidence of the meeting being held in Manhattan was presented, and argued, to the jury. (GX-1304 rows 141, 144-147, & 155; Tr. 4189-91, 6525). This is therefore nothing like the cases cited by Menendez in which the Government had "failed to make this argument or proffer evidence" of the defendant's knowledge of a particular fact, *United States v. Bouchard*, 828 F.3d 116, 127 (2d Cir. 2016), or in which the Government tried to rely on appeal on a venue

contentions (Menendez Br. 73-74; Daibes Br. 57-58), the evidence showed that Daibes was invited to this event by individuals connected to Heritage, Daibes sent his "bio" to a principal of Heritage in advance of it, and around the time of the event Daibes attempted to call two individuals connected to Heritage multiple times (GX-1304 rows 141-58), entitling the jury to conclude that the event was part of the scheme to obtain business for Daibes, not listen to "speakers' 'insights . . . about Afghanistan.'" (Menendez Br. 73). The jury could readily infer that this Manhattan meeting with Qatar's leader let Menendez "demonstrate[ ]" his "good faith efforts" to reward Daibes by benefiting his business and "lay the groundwork for" Menendez's receipt of more bribes from Daibes, just as the meeting with Helmy did in connection with the Egypt counts. *Gross*, 2017 WL 4685111, at *39. Indeed, just days after the meeting Daibes offered Menendez a luxury wristwatch (Menendez SPA-73), supporting just this inference.[79]

Similarly, the acts of the real estate professionals in Manhattan evaluating and carrying out the investment also served to further the scheme, by facilitating Daibes's receipt of the multimillion-dollar investment

---

provision on which the jury was not instructed, *United States v. Abbas*, 100 F.4th 267, 288 (1st Cir. 2024).

[79] Although the photograph of a luxury watch was sent to Menendez a few days *after* the September 19, 2021 dinner, the corrupt agreement came *before* (GX-1304 rows 118-140), showing bribery, not a mere gratuity as asserted by Daibes. (Daibes Br. 58).

from Heritage that he was bribing Menendez to attempt to obtain. (GX-4F-8; 4F-28; 4F-31). *See United States v. Georgiton*, No. 23-6807, 2025 WL 1091253, at *3 (2d Cir. Apr. 8, 2025) (affirming bank bribery venue based on location of, and communications by, title agency in real estate purchase).

#### iv. Corruption Conspiracy Counts (Counts 1, 2, 3)

Venue for the conspiracy counts is supported by the conduct supporting the substantive counts and more. Even if all the acts in the Southern District of New York had been merely preparatory, they would still support venue for the conspiracy counts. *See Tzolov*, 642 F.3d at 320 (holding defendant's use of airports in district not sufficient for venue on *substantive* securities fraud count but sufficient for conspiracies to commit securities fraud and wire fraud).

Contrary to Menendez's suggestion, this Court's cases do not hold that a conspiracy terminates when the conspirators receive some proceeds (Menendez Br. 79), only that it continues at least through the conspirators receiving *all* of the proceeds. *See, e.g.*, *United States v. Salmonese*, 352 F.3d 608, 615-17 (2d Cir. 2003). Since, among other things, Menendez continued to receive bribes through at least May 2022 (GX-1304 rows 332-42), the March 2022 sale of gold bars in Manhattan was obviously during the course of the conspiracy, even leaving aside that Menendez sought to use that sale to purchase real estate with Daibes's assistance.

Daibes alleges that none of the Manhattan activity was reasonably foreseeable to him, even claiming that "the government did not connect Daibes to anything even remotely related to the Egypt scheme until June 2019." (Daibes Br. 59). He is wrong. Beginning in June *2018*, *before* the Mr. Chow dinner, Daibes, through Nadine Menendez, Hana, Aslanian, and directly, sought business with the same Egyptian government officials that Hana and Menendez employed during the scheme. (GX-1302 rows 198-204 (Nadine Menendez to Menendez: "Will needs to fly down on Daibes plane to Washington Fred wants to meet somebody at the ministry for building projects here for Egypt"); *id.* rows 225-37 (reservations for July 2018 dinner, including Menendez, Nadine Menendez, "Will, Fred, the General" and others); *id.* rows 243, 247 (June 2018 emails identifying Shawky as point of contact for Daibes real estate proposal); *id.* rows 289-92 (July 9, 2018, Nadine Menendez to Menendez, "We just came to meet current General for Fred's project"); *id.* rows 302-04 (Hana July 11, 2018 emails to Helmy and Essam pitching Daibes real estate joint venture with Egyptian company)).[80] And it was not just foreseeable but known to Daibes that his own driver would be transporting Menendez from the airport through the Southern

---

[80] These attempts to leverage Menendez's and Hana's Egyptian government contacts for business in the course of the scheme continued, as noted above, into 2019 and 2020, with the Lotte New York Palace Hotel meeting in Manhattan and follow up. (GX-1302 rows 1082-88, 1092-94, 1130-31).

District of New York the day before Daibes brought Menendez gold bars (GX-A111-PH1), and surely also that his own jeweler (Khorozian) would use his Diamond District contacts to sell the gold bars he had given Nadine Menendez (GX-1304 rows 264-67, 269-72, 280-81).

#### v. Conspiracy Count Related to Daibes's Federal Prosecution (Count 4)

Venue for the obstruction conspiracy count is supported by all of the above evidence of Daibes's provision of transportation through the district, and the sale of kilogram gold bars that Daibes provided as bribes to Menendez and Nadine Menendez, even if those acts were considered preparatory. *See Tzolov*, 642 F.3d at 320. Menendez argues that these acts were not done to influence Daibes's prosecution (Menendez Br. 79), but to reach that conclusion he improperly views the evidence in the light most favorable to himself. Viewing the evidence in the proper light, these acts—transportation through the district upon Menendez's return from Egypt, and kilograms of gold from Daibes liquidated in this district as part of Menendez's search for a new home that Daibes was assisting with—were part of the lucrative things of value Daibes gave Menendez in exchange for Menendez's promise to influence his federal prosecution. In other words, the jury was entitled to find that these acts in the district *were* intended to influence Daibes's

pending prosecution, or at least preparatory to that endeavor.[81]

## POINT IV

### Section 219 Is Constitutional

According to Menendez, 18 U.S.C. § 219 violates the separation of powers because the Constitution purportedly neither permits "judges and juries to assess the propriety" of a Member's actions, nor permits the Executive Branch to "micromanage" the Legislative Branch's "work" through a criminal prosecution. (Menendez Br. 64-65). That is wrong. As this Court explained more than forty years ago in rejecting a separation of powers challenge to the bribery prosecution of a Member of Congress, arguments about potential abuse or interference in the work of Congress caused by the enforcement of a criminal statute that Congress expressly applied to itself are not for resolution by the courts. They are about "choices of public policy," not "constitutional imperatives." *Myers I*, 635 F.2d at 939.

Menendez's challenge to Section 219 is no different. Rather, Menendez's sweeping claims echo those that have been made and rejected for decades by Members

---

[81] Daibes's suggestion, citing *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985), that venue for obstruction is only proper where the proceeding being obstructed is pending (Daibes Br. 58 n.3), confuses sufficient with necessary. *See Reed*, 773 F.2d at 480-81 ("the place where the acts constituting the crime occurred is a proper venue").

of Congress accused of violating corruption or disclosure statutes. Members of Congress are not "immune from criminal responsibility" under statutes that Congress itself passes and expressly applies to itself. *Brewster*, 408 U.S. 516; *see also Gravel*, 408 U.S. at 627 (rejecting "a judicially fashioned privilege [extending] so far as to immunize criminal conduct proscribed by an Act of Congress"). As the Supreme Court has explained, Congress "is free to exempt its Members from the ambit of" a criminal statute if it determines that the risk of abuse or interference warrants amending the law, but "[d]epriving the Executive of the power to investigate and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence." *Brewster*, 408 U.S. at 524; *see also Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 224 (D.C. Cir. 2013) ("[W]hatever encroachment upon congressional authority we might engender by applying [the Freedom of Information Act] to congressional communications, it was Congress that passed the Act and Congress that can amend it."); *United States v. Rose*, 28 F.3d 181, 190 (D.C. Cir. 1994) (rejecting separation of powers challenge to suit under the Ethics in Government Act; explaining that "by codifying these requirements in a statute, Congress has empowered the executive and judicial branches to enforce them; in bringing this action, then, the DOJ was fulfilling its constitutional responsibilities, not encroaching on Congress's"); *Menendez*, 831 F.3d at 174 (similar).

So too here. As Judge Stein explained: "Menendez has not identified any specific, constitutionally designated authority of Congress that is being yielded to or

encroached upon by the Executive Branch. He makes only the general—and wholly unsubstantiated—claim that enforcement of Section 219 by the Executive Branch would 'arrogate power over the day-to-day functions' of Congress." (Menendez SPA-16). To be sure, as Menendez states, "a statute may violate the separation of powers 'whether or not the encroached-upon branch approves the encroachment.'" (Menendez Br. 67 (quoting *New York v. United States*, 505 U.S. 144, 182 (1992))). But what Menendez terms "encroachment" is not an unconstitutional flaw in the particular statute at issue, but part of our constitutional structure, which permits Congress to enact criminal statutes that apply not only to those whom it governs, but to its Members. *See Brewster*, 408 U.S. at 522 (the risk that a prosecution "might endanger the independence of the legislature" is "inherent in a system of government that delegates to each of the three branches separate and independent powers."); *Myers I*, 635 F.2d at 939; *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("Proper respect for a coordinate branch of the government requires that we strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated.").[82]

---

[82] Underscoring the lack of any showing of unconstitutional "encroachment," the only cases Menendez cites that actually invalidate federal statutes involved direct displacement or misappropriation of the core Constitutional functions of other branches, whether by prescribing a rule of decision to the judiciary,

Menendez barely acknowledges the foregoing precedents or Judge Stein's opinion, much less engages with them. As to cases upholding the Ethics in Government Act, he states that it "neither purports to regulate, nor risks chilling, how legislators do their jobs." (Menendez Br. 68). But the obvious concern animating disclosure of outside income and gifts is precisely that a Member's conduct would be influenced by such things, and an action against a Member of Congress plainly can affect a Member's work. That is not a constitutional injury. *See Rose*, 28 F.3d at 190 (while "the Committee's deliberations might be affected by an awareness that the DOJ might make use of its proceedings to bring an action against a Member, . . . no one suggests that the separation of powers is threatened by this interaction between the two branches as

---

constraining the President's removal authority for executive officials, or granting Members of Congress executive power or legislative power free from Article I's procedures. (*See* Menendez Br. 65, 67). Nothing like this is implicated by enforcing a generally applicable law preventing Members of Congress, like other public officials, from serving as foreign agents. And Menendez's citation of Speech or Debate Clause cases (Menendez Br. 64-65) does nothing to support his request here that this Court reach far *beyond* the Clause and invalidate a federal statute that can be violated by non-legislative acts. *See, e.g.*, *Forrester*, 484 U.S. at 224 ("the Court has been careful not to extend the scope of [the Clause] further than its purposes require").

each pursues its constitutional responsibilities”). As to cases upholding bribery prosecutions, including this Court’s decision in *Myers I*, the entirety of Menendez’s argument is simply to note that the Supreme Court has said that “[t]aking a bribe . . .is not . . . an act performed as a part of . . . the role of a legislator.” (Menendez Br. 68 (quoting *Brewster*, 408 U.S. at 526) (ellipses by Menendez)). Even if that argument were deemed sufficiently developed to warrant consideration, *see, e.g.*, *United States v. Collymore*, 61 F.4th 295, 297 n.1 (2d Cir. 2023), acting as secret foreign agent also is not the proper “role of a [U.S.] legislator.” On the contrary, one who so acts “gravely undermine[s] legislative integrity and defeat[s] the right of the public to honest representation.” *Brewster*, 408 U.S. at 524-25.

Menendez appears to suggest that even if Section 219 for this reason might be otherwise constitutional, it must be struck down because it supposedly criminalizes acting at the mere “ ‘request’ of a foreign official.” (Menendez Br. 68). But consistent with this Court’s precedent, *see Att’y Gen. of U.S. v. Irish N. Aid Committee*, 668 F.2d 159, 161-62 (2d Cir. 1982), the District Court instructed (without objection) that a “request” in Section 219 is *not* a mere ask but requires a showing of “authority over the agent.” (*See* Tr. 7127 (“ ‘request has a particular meaning here and it’s narrower than its meaning in everyday use”; the foreign principal “making the ask must have some degree of authority

over the agent")). Menendez's parade of horribles (*see* Menendez Br. 66-67) is thus wholly illusory.[83]

However, even if they posed a real concern, such hypotheticals could still not disturb *Menendez*'s conviction, because the evidence that Menendez acted upon bribes, not mere words, was overwhelming. (*See supra* at 111-23). Since bribery prosecutions are constitutional, *see Brewster*, 408 U.S. at 522, 524-25; *Myers I*, 635 F.2d at 939, Menendez thus cannot successfully challenge the statute as applied to himself, even if a different legislator in a different case could. *See,*

---

[83] Menendez also misrepresents a Congressional hearing statement (Menendez Br. 67), which simply articulated the same statutory interpretation of "request" that was used in this case. *See Inquiry into the Matter of Billy Carter and Libya: Hearing Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Gov'ts, of the S. Comm. on the Judiciary*, 96th Cong., 2d Sess., 700, 701 (1980) ("If we broadly *construed the word 'request'* to include all forms of argument or persuasion, it would be *totally out of line with* the other terms 'agent,' 'order,' and 'direction and control.'" (emphasis added)). That interpretation is fully in accord with this Court's precedent, *see Irish N. Aid Committee*, 668 F.2d at 161-62, and the District Court's instructions (*see* Tr. 7127-28).

*e.g.*, *Parker v. Levy*, 417 U.S. 733, 759 (1974); *Antonyuk v. James*, 120 F.4th 941, 978-79 (2d Cir. 2024).[84]

## POINT V

## The District Court Properly Admitted Summary Charts and Testimony

### A. Applicable Law

This Court regularly approves admission of summary charts, including chronological summaries of communications. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020) (hundreds of pages of text messages, emails, and other documents "merited the use of summary charts in a complex fraud trial," citing cases); *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020); *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010); *see also United States v. Yousef*, 327 F.3d 56, 157-58 (2d Cir. 2003); *United States v. Lasko*, 146 F. App'x 530, 532 (2d Cir. 2005).

While summaries must be based on the evidence they purport to represent, they need not include all

---

[84] For the same reason, Menendez's one-sentence reference to Section 219's alleged "vagueness" (Menendez Br. 66), even if deemed sufficiently developed to warrant consideration, fails. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions[.]").

evidence the opposing party wishes. *See, e.g.*, *Ho*, 984 F.3d at 209 (affirming admission of timeline "created for the purpose of generating a narrative supporting the prosecution's theory of the case"); *Miller*, 954 F.3d at 565 (affirming admission of summary chart listing "highly selective" set of calls and texts); *Yousef*, 327 F.3d at 158 (approving charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records"). Courts routinely reject challenges that summary charts "cherry pick," *e.g.*, *United States v. Gentile*, No. 21 Cr. 54 (RPK) (PK), 2024 WL 3046193, at *3 (E.D.N.Y. June 18, 2024), or take evidence "out of context to support the government's narrative," *United States v. Parnas*, No. 19 Cr. 725 (JPO), 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022). In short, "[a] summary, to be admissible . . . need not give effect to the contentions of the accused," but only "be what it purports to be." *United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983).

A Rule 1006 summary must be " 'based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent [and admissible] evidence.' " *SEC v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 419 (S.D.N.Y. 2018) (quoting *Fagiola v. Nat'l Gypsum Co.*, 906 F.2d 53, 57 (2d Cir. 1990)). This does not require "detailed testimony stating the basis" of each entry, but simply enough explanation to show how the chart was "derived from the underlying evidence." *United States v. Citron*, 783 F.2d 307, 317 (2d Cir. 1986). "Objections that a summary d[oes] not fairly represent the [underlying] documents and [is] excessively confusing and misleading go more to [the summary's] weight

than to its admissibility." *Alpine Secs.*, 354 F. Supp. 3d at 419.

The grant of a new trial based on any arguably misleading aspects of a summary chart is an "exceptional" step that is inappropriate when even an "arguably somewhat confusing" chart is accurate. *United States v. Archer*, 977 F.3d 181, 198 n.4 (2d Cir. 2020).

## B. Discussion

Hana identifies no respect in which the Government's summary charts were inadmissible. The Government offered several chronologies of communications and other documents, each consisting of hundreds of line entries and summarizing far more voluminous records. (*See* GX-1302, 1303, 1304; *see also* Hana/Daibes A-1859-60, 1862; Dkt. 433 at 1-2; Dkt. 455 at 1-2). Each is substantively indistinguishable from the timelines this Court approved in *United States v. Ho*, 984 F.3d at 209-10. Each summary witness provided foundational testimony showing how the chart was "derived from the underlying evidence," *Citron*, 783 F.2d at 317, and the charts each "already list[ed] the source of the summary material," *Gentile*, 2024 WL 3046193, at *4. (*See* Tr. 1172-78, 2316-19, 4112-15).

Hana's suggestion that these straightforward Rule 1006 charts were akin to a "summation" is meritless. The charts were not "embellished by or annotated with the conclusions or inferences drawn by the proponent," *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir.

1998).[85] And the testimony reading portions of the charts did not involve the witnesses drawing "controversial inferences"—or any inferences at all—but simply performing "routine computations and culling through of documents to eliminate confusing and extraneous evidence." *Lemire*, 720 F.2d at 1350; *see also United States v. Baker*, 923 F.3d 390, 398 (5th Cir. 2019) (summary witness who "highlighted some key pieces of evidence" was not a "substitute for closing argument"); *United States v. Abou-Khatwa*, 40 F.4th 666, 686 (D.C. Cir. 2022).

The only example of supposed unfairness Hana points to (Hana Br. 62) actually shows the summaries' appropriateness. The timestamps showing that Uribe's phone was on a call with Hana at the same time that it sent Nadine Menendez's phone information about a Mercedes-Benz dealership (GX-1303 rows 521-23) are not arguments at all, let alone unfair ones. Instead, they are probative and undisputed *evidence*, and could have been presented through the raw documents—which were all properly admitted—but were more efficiently "culled from a voluminous set of records" into a summary. *Yousef*, 327 F.3d at 158.

---

[85] These charts are unlike that in *United States v. Conlin*, cited by Hana (Hana Br. 61-62), which contained an agent's written opinions, which the court had prevented the agent from offering orally. *See United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977).

Hana's complaint that the summary witnesses did not conduct the investigation or draft the charts (Hana Br. 63-64) is baseless. It is common for witnesses to testify about reviewing and verifying charts they did not draft. *See Lemire*, 720 F.2d at 1349. Nothing in Rule 1006 so much as suggests the approach for which Hana advocates is required. Indeed, the selection of entries on a summary chart is not "testimonial," rendering Hana's citation of the Confrontation Clause inapposite. *See, e.g.*, *United States v. Melgen*, 967 F.3d 1250, 1260-61 (11th Cir. 2020).

Hana's complaint that the District Court limited cross-examination to the scope of direct examination (Hana Br. 64) fares no better. *See United States v. Koskerides¸* 877 F.2d 1129, 1134, 1136-37 (2d Cir. 1989); *Lemire*, 720 F.2d at 1349. Hana, like his co-defendants, had a full opportunity to cross-examine each summary witness about the evidentiary foundation of the summary charts they reviewed. *See Archer*, 977 F.3d at 198 n.4 ("the threat of prejudice was mitigated by the cross-examination"). Each chart was thus accompanied by ample foundational testimony. (*See, e.g.*, Tr. 1174-76, 1572, 1583-85, 2318-20, 2561, 2563, 2579-82, 2650-52, 2667, 2669-71, 4113-16, 4218-23, 4226). And Hana and Menendez called their own summary witness to introduce charts based on the Government's charts, but with additional line entries containing the evidence they had sought to offer on cross-examination. (*See* DX-1302, 1303, 1304, HANA-1300).

Finally, even had there been any error, it would have been harmless in light of the overwhelming "properly admitted" evidence underlying the charts.

*See United States v. Rom*, 528 F. App'x 24, 29 (2d Cir. 2013); *Archer*, 977 F.3d at 198 n.4.

## POINT VI

## Hana's Forfeiture Order Was Proper

### A. Applicable Law

When entering judgment, the district court "shall order the forfeiture of the property as part of the sentence." 28 U.S.C. § 2461(c). "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A).

"[T]he amount of a forfeiture order" is a factual finding that this Court reviews "for clear error." *United States v. Stevenson*, 834 F.3d 80, 85 n.3 (2d Cir. 2016). The district court's determination of forfeiture "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). "[T]he government need prove facts supporting forfeiture only by a preponderance of the evidence." *United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004). "The calculation of forfeiture amounts is not an exact science," and the court need not establish them "with precision but rather need only make a reasonable estimate . . . given the available information." *Treacy*, 639 F.3d at 48.

## B. Discussion

The District Court did not err—let alone clearly err—in finding, by a preponderance of the evidence, that Hana had received $125,000 in criminal proceeds subject to forfeiture. (Dkt. 750 at 38). This finding was supported by the trial testimony, which established that Parra and Hernandez agreed to pay Hana $200,000 to $250,000 in exchange for Menendez seeking to favorably resolve Parra's criminal case and a related investigation (Tr. 2962-69, 3075), and that Hernandez then told Uribe that he and Parra subsequently paid Hana $125,000 (Tr. 3076).

Hana is wrong to claim that Hernandez's statement supporting the forfeiture was "totally uncorroborated." (Hana Br. 64-65). Although there is no corroboration requirement for sentencing factfinding, *see United States v. Lee* ("*Lee III*"), 818 F.2d 1052, 1057-58 (2d Cir. 1987), the statement was in any event corroborated. Hernandez's statement to Uribe about having paid Hana some of the agreed cash for the Convertible—a detailed statement including the amount and location of the payment (Tr. 3076)—was corroborated by Uribe's observations of Hana requesting a cash payment from Hernandez, of Hernandez agreeing to the payment, of Hernandez paying Hana the rest of the agreed cash, and of Hana letting Uribe keep that remaining cash because Uribe was paying for the Convertible (Tr. 2962-69, 3001, 3075, 3078-80), as well as by multiple incriminating text messages (*see* GX-1303 row 22; 1315 rows 6-7).

The cases Hana cites (Hana Br. 65) are inapposite, concerning either lack of personal involvement, *see*

*United States v. Corrado*, 227 F.3d 543, 555 (6th Cir. 2000), or speculative calculations, *see United States v. Basciano*, No. 03 Cr. 929 (NGG), 2007 WL 29439, at *4 (E.D.N.Y. Jan. 4, 2007), neither of which applies here.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated: New York, New York
September 9, 2025

Respectfully submitted,

JAY CLAYTON,
*United States Attorney for the Southern District of New York, Attorney for the United States of America.*

PAUL M. MONTELEONI,
CATHERINE GHOSH,
ELI J. MARK,
LARA POMERANTZ,
DANIEL C. RICHENTHAL,
NATHAN REHN,
*Assistant United States Attorneys,*
CHRISTINA A. CLARK,
*Special Assistant United States Attorney,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On August 22, 2025, this Court granted the Government leave to file an oversized brief of no more than 42,000 words. Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its August 22, 2025 order. As measured by the word processing system used to prepare this brief, there are 41,909 words in this brief.

JAY CLAYTON,
*United States Attorney for the Southern District of New York*

By: NATHAN REHN,
*Assistant United States Attorney*